# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN COUNCIL OF THE BLIND, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>PAUL H. O'NEILL, Secretary of the Treasury, et al., )<br><br>Defendants. ) | CIVIL ACTION NO.<br>1:02CV00864 JR |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The defendants, by their undersigned counsel, hereby move that summary judgment in their favor be granted under Rule 56 of the Federal Rules of Civil Procedure, on the grounds that there is no genuine issue as to any material fact and that defendants are entitled to judgment as a matter of law.

The grounds for this motion are more fully set forth in the accompanying Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment and Defendants' Statement of Material Facts as to Which There Is No Genuine Issue.

Dated: August 29, 2002

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

ROSCOE C. HOWARD, JR.
United States Attorney

RICHARD G. LEPLEY, D.C. Bar 332346
Assistant Director

_____
W. SCOTT SIMPSON, Va. Bar 27487
Senior Counsel

Attorneys, Department of Justice
Civil Division, Room 986
Post Office Box 883
Washington, D.C. 20044
Telephone:  (202) 514-3495
Facsimile:  (202) 616-8202
E-mail: scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS

2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN COUNCIL OF THE BLIND, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | CIVIL ACTION NO. |
| v. ) | 1:02CV00864 JR |
| ) | |
| PAUL H. O'NEILL, Secretary of the Treasury, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROBERT D. McCALLUM, JR.
Assistant Attorney General

ROSCOE C. HOWARD, JR.
United States Attorney

RICHARD G. LEPLEY, D.C. Bar 332346
Assistant Director

W. SCOTT SIMPSON, Va. Bar 27487
Senior Counsel

Attorneys, Department of Justice
Civil Division, Room 986
Post Office Box 883
Washington, D.C. 20044
Telephone: (202) 514-3495
Facsimile: (202) 616-8202
E-mail: scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS

August 29, 2002

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATUTORY AND ADMINISTRATIVE BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

    I.    The Rehabilitation Act Does Not Require Changing
        the Currency for Visually-Impaired Persons . . . . . . . . . . . . . . . . . . . . . . . . . 5

    II.   Two of Plaintiffs' Prayers for Relief Must Be Dismissed . . . . . . . . . . . . . . . . . 16

        A.    The Specific Nature of Any Redesign Would Be Within
              the Sole Discretion of the Secretary of the Treasury . . . . . . . . . . . . . . . 17

        B.    Congress Specifically and Expressly Prohibits Any
              Redesign of the One-Dollar Bill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    III.  The Treasurer of the United States Should
         Be Dismissed as a Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

<u>INTRODUCTION</u>

By statute, the "form and tenor" of United States Federal Reserve Notes "shall be . . . as directed by the Secretary of the Treasury."  12 U.S.C. § 418.  Therefore, as the plaintiffs concede, "the form and design of United States currency is solely within the discretion of the Secretary," subject only to statutory requirements regarding the denominations to be produced, the use of a specific printing process, the printing of a distinctive letter and serial number on each bill, and the inclusion of the motto "In God We Trust" and of the portrait and name of a deceased person. <u>See</u> Complaint ¶ 22; <u>see also</u> 12 U.S.C. §§ 413, 418; 31 U.S.C. § 5114.  Notwithstanding the Secretary's broad discretion regarding the "form and design" of the currency in every other respect, plaintiffs assert that the Rehabilitation Act of 1973 requires the Secretary to make several changes to enable blind and visually-impaired persons to distinguish more easily among the various denominations.  29 U.S.C. §§ 791 <u>et seq</u>.  Specifically, plaintiffs seek an order requiring (1) that each denomination have a different length, height, and color from all others, (2) that a "raised" (i.e., embossed) denomination numeral and a Braille symbol be included on each note, and (3) that a denomination numeral at least one-half the height of the note, printed in black ink, be included on each note.  <u>See</u> Complaint at 16-17.

Plaintiffs' aim is an appropriate subject for public policy discussion.  <u>Cf</u>. <u>Modderno v. King</u>, 82 F.3d 1059, 1060 (D.C. Cir. 1996) ("Whatever the merit of these broader arguments, we must leave them for resolution in other spheres, such as the political branches of government . . . ."), <u>cert. denied</u>, 519 U.S. 1094 (1997).  As a legal matter, however, the Rehabilitation Act does not require the Secretary to make the changes requested by the plaintiffs, because plaintiffs' redesign of the currency would impose "undue financial and administrative burdens" on the Bureau of Engraving and Printing, to which the Secretary has delegated the

development of currency design and the production of currency.  See Southeastern Community

College v. Davis, 442 U.S. 397, 412 (1979).  The fact that this task is statutorily committed to the

sole discretion of the Secretary counsels even further against any court order requiring a redesign

of the currency.

       The plaintiffs' redesign would, moreover, impose burdens at least as great on the entire

banking and commercial sector, which would have to replace or modify automated teller

machines, vending machines, and other currency-handling equipment to accommodate the

change, and on the Federal Reserve System, which circulates the currency and removes worn and

counterfeit notes from circulation.  The financial impact of designing and producing the new

currency would also fall upon the Federal Reserve System, which is statutorily responsible for

reimbursing the BEP's costs.  See 31 U.S.C. § 5143.  Furthermore, this redesign would affect the

currency transactions of every American individual and business, and give rise to a host of

public-policy issues not appropriate for resolution in a judicial setting.  For all of these reasons,

summary judgment should be granted to the defendants, and this action should be dismissed with

prejudice.

       Assuming summary judgment of this entire action were, for some reason, deemed

inappropriate, two of plaintiffs' individual prayers for relief should be dismissed — that is, their

request for an order that certain specific features be included in any redesigned currency, and

their request for an order requiring a redesign of the one-dollar bill.  See Complaint at 16-17.

Assuming the existing currency were found to violate the Rehabilitation Act, the details of a

redesign of the currency would be within the sole discretion of the Secretary of the Treasury; and

a specific legislative provision expressly prohibiting any redesign of the one-dollar bill would

foreclose including that denomination in an injunction.  Lastly, one of the two defendants named

in this action — the Treasurer of the United States — should be dismissed because the Treasurer

has no role in the design or production of currency.

<u>STATUTORY AND ADMINISTRATIVE BACKGROUND</u>

The country's current monetary system was established by the Federal Reserve Act of

1913.  <u>See</u> Act of Dec. 13, 1913, ch. 6, 38 Stat. 251.  A portion of section 16 of that enactment,

now codified as section 418 of Title 12, governs the production of United States currency:

**§ 418. Printing of notes; denomination and form**

In order to furnish suitable notes for circulation as Federal reserve notes,
the Secretary of the Treasury shall cause plates and dies to be engraved in the best
manner to guard against counterfeits and fraudulent alterations, and shall have
printed therefrom and numbered such quantities of such notes of the denomina-
tions of $1, $2, $5, $10, $20, $50, $100, $500, $1,000, $5,000, $10,000 as may be
required to supply the Federal Reserve banks.  Such notes <u>shall be in form and
tenor as directed by the Secretary of the Treasury</u> under the provisions of this
chapter and shall bear the distinctive numbers of the several Federal reserve banks
through which they are issued.

12 U.S.C. § 418 (emphasis added); <u>see</u> Act of Dec. 13, 1913, ch. 6, § 16, 38 Stat. at 267.  This

section has been amended several times since its initial enactment in 1913.  Most recently,

Congress amended section 418 to change "the Comptroller of the Currency shall, under the

direction of the Secretary of the Treasury, cause plates and dies to be engraved," in the first

sentence, to "the Secretary of the Treasury shall cause plates and dies to be engraved."  <u>See</u>

Pub. L. No. 103-325, § 602(g)(3), 108 Stat. 2160, 2293 (1994).[1]

---

[1] This recent amendment affirms that Congress is aware of the content of section 418, and
thus reinforces the conclusion that Congress intends the Secretary to exercise sole discretion over
the form of currency.  <u>See</u> <u>Consolidated Rail Corp. v. United States</u>, 896 F.2d 574, 579 (D.C. Cir.
1990) (amendment bolsters conclusion that Congress is aware of statute and intends adherence to
(continued...)

The underlined language in section 418 indicates that the "form and tenor" of the currency are committed to the Secretary of the Treasury.[2]  Thus, the design and production of our national currency are committed to the sole discretion of the Secretary.  12 U.S.C. § 418; see Complaint ¶ 22.  That discretion is limited only by statutes which control the denominations of currency that may be produced; mandate the use of a specific printing process; and require that each bill bear a distinctive letter and serial number, the portrait and name of a deceased person, and the motto "In God We Trust."  12 U.S.C. §§ 413, 418; 31 U.S.C. § 5114.  The Secretary has delegated the development of currency design and the production of currency to the Bureau of Engraving and Printing ("Bureau" or "BEP"), a component of the Department of the Treasury. See Declaration of Thomas A. Ferguson ¶ 3 [hereinafter Ferguson Decl.].

The BEP does not circulate the currency that it produces.  Rather, it sells currency to the Federal Reserve System ("Fed"), a federal government entity composed of a Board of Governors and twelve regional Federal Reserve Banks.  Id. ¶¶ 10, 11.  Banks and other private depository institutions are members of a Federal Reserve Bank.  Id. ¶ 10.  The Federal Reserve Board orders new currency from the Bureau based on the needs of the Federal Reserve Banks, which correspond to the circulation needs of depository institutions.  Id. ¶ 11.  The Federal Reserve Banks place currency in circulation by selling currency to depository institutions.  Id. ¶¶ 11, 13.

---

[1](...continued)
its plain language); accord Oviawe v. INS, 853 F.2d 1428, 1433 (7th Cir. 1988).

[2] The use of the word "tenor" in this provision is apparently an instance of the now-obsolete definition "quality, character, or condition."  See The Random House College Dictionary 1354 (rev. ed. 1980).

4

The Federal Reserve Banks are also responsible for detecting overly-worn and counterfeit bills and removing them from circulation.  Id. ¶ 14; see 31 U.S.C. § 5141 et seq.

The BEP's activities are financed by a revolving fund which is replenished by the sale of the Bureau's products.  See Ferguson Decl. ¶ 7.  Thus, the Bureau recovers its costs of designing and producing currency by selling currency to the Federal Reserve System.  Id.  The Fed, in turn, recovers its costs of purchasing and handling currency by selling currency to private depository institutions.  Banks and other depository institutions then recover their costs through banking fees, lending rates, and charges for other banking services.  Id. ¶ 56.

ARGUMENT

I.    The Rehabilitation Act Does Not Require Changing
      the Currency for Visually-Impaired Persons

Section 504(a) of the Rehabilitation Act provides in part:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. . . .

29 U.S.C. § 794(a).  Under this provision, a government agency may be required to make accommodations for a disability, but need only make such accommodations as are "reasonable."  See Alexander v. Choate, 469 U.S. 287, 301 (1985).  Moreover, requested accommodations are not "reasonable" if they would entail either "undue financial and administrative burdens" or a "fundamental alteration in the nature of a program."  Southeastern Community College v. Davis, 442 U.S. 397, 410, 412 (1979); see School Bd. of Nassau County v. Arline, 480 U.S. 273, 287

5

n.17 (1987); <u>Barth v. Gelb</u>, 2 F.3d 1180, 1187 (D.C. Cir. 1993), <u>cert. denied</u>, 511 U.S. 1030

(1994).

In this case, the accommodations sought by the plaintiffs — extensive changes in United

States currency — would impose "undue financial and administrative burdens," and would not,

therefore, be reasonable.  Specifically, the changes sought would require the expenditure of

millions of dollars and thousands of man-hours of labor to redesign the currency, replace existing

equipment, and produce the changed currency (above the amounts now expended to produce the

existing currency).  Additional costs would be incurred by the Federal Reserve System to adapt

to the new currency.  Moreover, expenditures by the private sector to accommodate these

changes would rival — and may even exceed — the expenditures incurred by the government in

making the changes.

Based on all of these factors, the Bureau of Engraving and Printing has determined not to

recommend, to the Secretary of the Treasury, the currency redesign requested by the plaintiffs,

and that decision is well within the statutory discretion governing the design and production of

U.S. currency.  <u>See</u> Ferguson Decl. ¶ 58; 12 U.S.C. § 418.  Indeed, the plaintiffs themselves

recognize and concede that the Federal Reserve Act places the "form and design" of the currency

"solely within the discretion of the Secretary."  <u>See</u> Complaint ¶ 22.  Summary judgment should,

therefore, be entered for the defendants.

The existing precedent on "reasonable accommodation" applies here only in miniature,

for the Rehabilitation Act has never been used in attempting to compel such a vast and expensive

undertaking.  The Supreme Court long ago established the extent of a defendant's obligation to

undertake accommodation in <u>Southeastern Community College v. Davis</u>.  In <u>Davis</u>, a licensed

practical nurse was denied admission to the school's nursing program because of a severe hearing

disability, and the nurse alleged that that denial violated the Rehabilitation Act.  The Supreme

Court disagreed, rejecting plaintiff's contention that the school should have accommodated her

disability by giving her "individual supervision by faculty members whenever she attend[ed]

patients directly" and by dispensing with certain course requirements.  442 U.S. at 407-08.

Section 504 of the Rehabilitation Act requires "evenhanded treatment" of handicapped persons,

but does not require "affirmative efforts to overcome the disabilities caused by handicaps."  Id. at

410.  Thus, the Court held, a refusal to make "major adjustments" or to undertake "undue

financial and administrative burdens" does not constitute "discrimination" under the Act.  Id. at

412-13.  The Court rejected the accommodations sought by the plaintiff, holding that "[s]uch a

fundamental alteration in the nature of a program" is not required.  Id. at 410.

     The Supreme Court also addressed the reasonableness of requested accommodations in

Alexander v. Choate.  Alexander involved a state's decision to reduce, from twenty to fourteen,

the number of inpatient hospital days that the state's Medicaid program would provide for each

recipient in one year.  Plaintiffs asserted, among other things, that the imposition of any

durational limitation on inpatient coverage violated the Rehabilitation Act.  469 U.S. at 306.

"The thrust of this challenge," the Court noted, was that "(1) the effect of such limitations falls

most heavily on the handicapped and . . . (2) this harm could be avoided by the choice of other

Medicaid plans that would meet the State's budgetary constraints without disproportionately

disadvantaging the handicapped."  Id.

     The Court rejected this challenge, primarily because of the expense of implementing the

decisionmaking implicit in plaintiffs' argument.  Specifically, the Court noted that to avoid

imposing any durational limitation having an unduly disproportionate impact on the handicapped, a state would need to analyze the effect of every "across-the-board action affecting Medicaid recipients." Id. at 308.  Such an analysis "would have to be further broken down by class of handicap," and "the State would then have to balance the harms and benefits to various groups to determine, on balance, the extent to which the action disparately impacts the handicapped." Id.  "It should be obvious," said the Court, that the "administrative costs" of carrying out such an accommodation would be "well beyond" what the Rehabilitation Act requires.  Id.

The accommodations requested — and held to be unreasonable — in Davis and Alexander are minuscule compared to the sweeping, costly changes in the United States currency sought by the plaintiffs here.  The plaintiffs seek (1) the production of Federal Reserve Notes of varying length, height, and color, by denomination, (2) the printing of an embossed denomination numeral, and the inclusion of a Braille symbol, on each note, and (3) the inclusion, on each note, of a denomination numeral at least one-half the height of the note, printed in black ink on a white background.  See Complaint at 16-17.  Implementing these changes — particularly the produc- tion of notes in various sizes — would impose substantial financial and administrative burdens on the Bureau of Engraving and Printing in at least the following areas:  research and consultation; planning the redesign of the currency; plate engraving and manufacture; purchasing and installing additional equipment; producing the new currency; public education; and replacing worn currency.  See Ferguson Decl. ¶ 21.

Any redesign of the currency requires thorough research, consultation, and planning. Consultation must occur with other federal entities, such as the Secret Service and the Federal

Reserve Board, and with interested members of the public.  Id. ¶ 23.  In relation to the redesign sought by the plaintiffs, considerable research and planning would be required to determine the appropriate sizes of the bills and to create a new, different design for each denomination.  Id. ¶¶ 24-25.  Implementing the Braille symbols and raised numerals requested by the plaintiffs would substantially complicate and lengthen this process.  Id. ¶ 25.  These initial tasks would take approximately three to six years and cost between 1 and 2 million dollars.  Id. ¶ 26.

After designing the new currency, the Bureau would have to engrave new templates and manufacture new printing plates.  A template would have to be engraved, by hand, for each denomination.  Id. ¶ 27.  Approximately half of the BEP's 455 plates would have to be replaced (given that the one-dollar bill, which, by statute, cannot be changed, accounts for about half of the Bureau's production).  Id. ¶¶ 5, 28.  This task would take approximately five to seven years — after completion of the research and design phase — and cost between 3 and 4 million dollars.  Id. ¶ 29.

The most costly impacts of implementing plaintiffs' redesign of the currency would occur in purchasing, installing, and operating additional equipment.  The Bureau uses separate machinery to perform intaglio printing on the currency, to perform offset printing of new security features, to inspect the printed bills, and to add identifying marks (serial numbers, etc.) and package the completed bills.  Id. ¶¶ 30-39.  The Bureau's existing intaglio and offset equipment is designed to accommodate the size of the existing printing plates, on which thirty-two bills are printed.  Producing larger bills would entail printing fewer bills on each plate, thus requiring

9

additional printing runs to maintain current production levels.[3]  Id. ¶¶ 31, 33.  To perform those additional printing runs, the Bureau would have to acquire at least four additional intaglio presses and two additional offset presses.  Id. ¶¶ 32, 34.  The cost of these machines would be between 46 and 61 million dollars.  Id.

As part of the production process, the Bureau uses automated equipment that inspects the bills in order to ensure accurate and uniform output.  Changing the size of the currency, and producing different denominations in different sizes, would require not only changing the physical dimensions of the currency-handling portions of those machines, but also changing the software that governs the inspection process.  Id. ¶ 35.  Additionally, varying the sizes of the denominations would eliminate the ability to use the same inspection machines for all denominations; this loss of flexibility would require adding inspection capacity in order to maintain current production levels.  Id. ¶ 36.  Based on all of these considerations, implementing plaintiffs' currency redesign would require the Bureau to design, purchase, and install at least two new pieces of inspection equipment, at a total cost of between 16 and 21 million dollars.  Id. ¶ 37.

After inspection, the printed sheets of currency run through another machine to print the serial numbers and other identifying marks, cut the sheets into individual bills, and package the completed currency.  Id. ¶ 38.  Producing bills of different sizes would require designing and purchasing new equipment (and new software) to perform these tasks.  Id. ¶ 39.  As with the

---

[3] Printing fewer bills on each plate would be much cheaper than varying the size of the printing plates by denomination, because the latter alternative would entail replacing half of the Bureau's existing intaglio and offset presses to accommodate different-size plates, rather than only acquiring a few additional presses to perform additional printing runs.  See Ferguson Decl. ¶ 31.

10

inspection step, too, eliminating the flexibility of using every machine for every denomination would require increased capacity to maintain current production levels.  Id.  Thus, the Bureau would have to design, purchase, and install twenty new pieces of equipment for these tasks, at a total cost of between 100 and 130 million dollars.  Id.

Acquiring all of this new equipment would, of course, involve preparing equipment specifications and requests for proposals, evaluating contract offers, and otherwise working with contractors.  Id. ¶¶ 40-44.  These procurement tasks would consume approximately 7,000 man-hours, over a period of several years, to acquire all of the above-described equipment.  Id. ¶ 44. The Bureau would have to expend between 9 and 12 million dollars, in addition to the above-stated direct acquisition costs, to award and administer the contracts and prepare its work space for replacement and additional equipment.  Id.

In addition to the costs of acquiring new equipment, implementing the redesign sought by the plaintiffs would increase the yearly cost of producing United States currency.  More distinc-tive currency-grade paper and more ink would be needed.  Id. ¶ 45.  Other production expenses would also increase, such as maintenance costs for the new equipment described above and additional man-hours for BEP's existing employees involved in production.  Id.  These increased production costs — the paper, the ink, and the other expenses — would total between 36 and 45 million dollars per year.[4]  Id.  Additionally, new employees would be needed to operate the new

---

[4] These figures do not include certain additional costs that the Bureau has not estimated at this time, due to technical uncertainties and challenges — that is, the costs of equipment for embossing a numeral and adding a Braille symbol, and the likely increased costs of packaging, handling, and storage due to variations in the thickness of each bill because of the addition of those features.  See Ferguson Decl. ¶ 47.

equipment — up to a total of 246 full-time equivalents, or another 15 to 20 million dollars per year.  Id. ¶ 46.

Another very significant increase in yearly expenses would be the increased cost of replacing worn currency.  Approximately 95% of the BEP's yearly production is attributable to the need to replace worn currency removed from circulation by the Federal Reserve System.  Id. ¶ 15.  Including the embossed numeral and the Braille symbol requested by the plaintiffs would cause the currency to wear out much faster, because the ink of the embossed numeral would rub off during circulation and the raised dots of the Braille symbol would wear away faster than the surrounding paper, rendering those features useless for blind persons.  Id. ¶ 49.  Until the means of implementing those features is determined and tested, it is difficult to know precisely how much their inclusion would decrease the useful life of each bill.  The Bureau believes, however, that including such features would reduce the life of each bill by at least fifty percent.  Id. ¶ 50.  Assuming an even more conservative estimate of a forty percent reduction in the life of each bill, the increased production volume caused by including an embossed numeral and a Braille symbol on each bill (other than the $1 bill) would increase the overall costs of producing the country's currency by between 92 and 109 million dollars per year .  Id. ¶ 51.

Lastly, to introduce a drastic change in the currency such as that sought by the plaintiffs, the Bureau would have to undertake an extensive public-education campaign.  Given that United States currency is widely used throughout the world, a worldwide public education campaign would be needed to familiarize users with the new currency and to advance public acceptance of the currency.  Id. ¶ 48.  An additional effort would be needed to prepare blind and visually-impaired persons to recognize and use the redesigned currency.  For the 1996 redesign, which

involved enlargement of the portrait and the addition of a watermark and a security thread, the

Bureau expended approximately 50 million dollars on public education.  Id.  For the much more

extensive changes requested by the plaintiffs here, the Bureau would have to spend between 70

and 90 million dollars on public education.  Id.

In summary, implementing the currency redesign sought by the plaintiffs would require

an extensive effort of several years' duration, affecting every BEP employee to one degree or

another.  Id. ¶¶ 26, 29, 43, 44, 53.  Initial expenses attributable to the redesign (research,

consultation, and redesign; engraving and manufacturing new printing plates; purchasing and

installing new equipment; and public education) would amount to between 245 and 320 million

dollars.  Id. ¶ 53.  Increased annual production costs due to the redesign would total between 143

and 174 million dollars — not counting the increased cost of producing each denomination in a

different color and including an embossed numeral and Braille symbol on each bill, nor the cost

of increasing the Bureau's production capacity to meet the increased demand due to the shorter

life of the redesigned notes.  Id. ¶¶ 52, 55.

Given this monumental impact on its operations, the currency redesign sought by the

plaintiffs would clearly impose "undue financial and administrative burdens" on the Bureau of

Engraving and Printing, and a refusal to undertake this task is well within the Secretary of the

Treasury's statutory discretion.  Davis, 442 U.S. at 412; 12 U.S.C. § 418.  The burdens described

above far exceed the course adjustments held unreasonable in Davis and the analysis of Medicaid

program changes held unduly burdensome in Alexander.  442 U.S. at 407-08, 412; 469 U.S. at

308.

13

A redesign of the currency would also have very substantial impacts on other persons and entities — specifically, the Federal Reserve System and the entire American public.  The Fed, which issues and circulates the currency, is responsible for identifying worn and counterfeit bills and removing them from circulation.  <u>See</u> Ferguson Decl. ¶ 54.  Because these tasks are performed automatically by machinery, the issuance of redesigned bills in different sizes would require the Fed, at the very least, to adjust its equipment; at worst, the Fed would have to replace its equipment, if the largest redesigned bill exceeded the size parameters of its existing equipment.  <u>Id</u>.  The Bureau's costs of implementing plaintiffs' redesign would also fall upon the Fed, which would be responsible for reimbursing those costs.  <u>See</u> 31 U.S.C. § 5143.  Further, the Fed's ongoing costs of acquiring new currency from the Bureau would increase because of the reduction in the useful life of the redesigned bills, given the inclusion of the raised numeral and Braille symbol requested by the plaintiffs.  <u>See</u> Ferguson Decl. ¶¶ 13, 49-51, 55.

The impact on the American public may well dwarf the impact on the BEP and the Federal Reserve System.   Plaintiffs' redesign would affect American individuals and businesses in countless ways, many of them probably not yet imagined.  For example, automated teller machines and vending machines would have to be replaced or modified to accommodate bills of different sizes.  <u>Id</u>. ¶ 57.  The life of every member of the public would be affected, such as in the need to adjust to the new currency and even to purchase new wallets.  And, as noted already, all of the costs of the redesign, from the Bureau's initial and increased production costs to the Fed's increased costs and the costs of replacing or modifying business equipment, would ultimately be borne by the public, in higher banking fees, higher lending rates, and higher retail prices.  <u>Id</u>. ¶¶ 22, 56.

14

Finally, the plaintiffs should not be heard to argue that the supposed "benefits" of redesigning the currency outweigh these administrative and financial burdens.  See Borkowski v. Valley Cent. School Dist., 63 F.3d 131, 139 (2d Cir. 1995); Vande Zande v. Wisconsin Dept. of Admin., 44 F.3d 538, 543 (7th Cir. 1995).  First, the Supreme Court did not engage in any such comparison in Davis or Alexander, and has never addressed whether the Rehabilitation Act requires comparing costs and benefits.  Second, any comparison of the costs and "benefits" of plaintiffs' redesign would turn on a host of issues regarding unquantifiable "costs" and subtle impacts that a court would be ill-equipped to evaluate.  Cf. Borkowski, 63 F.3d at 138 (reasonableness depends on "the desirability of a particular accommodation according to the consequences that [it] will produce"); US Airways, Inc. v. Barnett, 122 S. Ct. 1516, 1522 (2002) (noting that a requested "accommodation could prove unreasonable because of its impact, not on business operations, but on fellow employees").  For example, other advocates of the blind and visually-impaired may disagree that a court order requiring the changes sought by the plaintiffs would best serve the overall interests of those persons.  Third and finally, a comparison of costs and benefits is entirely inappropriate where the defendant is a federal agency, the task in question is statutorily committed to the discretion of the agency, and the plaintiffs seek a change with drastic nationwide consequences.[5]

_____

    [5] Any attempt to compare the costs of plaintiffs' redesign and the Bureau's resources would be similarly unavailing.  Although Supreme Court precedent indicates that a court must consider a costs-versus-resources defense proffered by the defendant (and must give the defendant "wide discretion in adopting its own systems of cost analysis"), the Court has not addressed whether such a comparison is required if not offered by the defendant.  See Olmstead v. L.C., 527 U.S. 581, 603-04 (1999) (plurality); id. at 608, 615 (Kennedy, J., concurring).  Furthermore, none of the regulations often cited as the basis for a cost-resources comparison apply here, and a comparison of costs and resources makes little, if any, sense in relation to the

(continued...)

15

Under these circumstances, the issues raised in this action should be left to the legislative and administrative processes responsible for determining national policy.  The Rehabilitation Act simply was not intended as a vehicle for major social reform affecting the daily life of every American.  Defendants should be granted summary judgment on plaintiffs' claims to the contrary.

II.    Two of Plaintiffs' Prayers for Relief Must Be Dismissed

If this entire case were not disposed of on summary judgment, two of plaintiffs' prayers for relief would have to be dismissed.  See generally Crawford v. Bell, 599 F.2d 890, 893 (9th Cir. 1979) (upholding dismissal of certain prayers for relief but not others).  First, their request for an order requiring the inclusion of certain specific features in a redesign of the currency must be dismissed because the specifics of any redesign required by the Rehabilitation Act would be within the sole discretion of the Secretary of the Treasury.  Second, plaintiffs' request for an order requiring a redesign of the one-dollar bill must be dismissed because Congress has expressly and specifically prohibited redesign of the one-dollar bill.[6]

---

[5](...continued)

activities of the federal government itself, whose resources are theoretically limitless.  See, e.g., 45 C.F.R. § 84.12(c) (HHS regulations); see also Borkowski, 63 F.3d at 139 ("[W]here the employer is a government entity, Congress could not have intended the only limit on the employer's duty to make reasonable accommodation to be the full extent of the tax base on which the government entity could draw."); Vande Zande, 44 F.3d at 542-43.  In any event, a cost-resources comparison in this case would favor the defendants, given that the initial cost of preparing to implement plaintiffs' redesign would exceed, by 26 to 101 million dollars, the Bureau's entire expenditure in producing currency during the most recently-concluded fiscal year, and the redesign would increase by 65% to 79% the Bureau's annual cost of producing currency.  See Ferguson Decl. ¶¶ 6, 52.  These figures do not take into account the increased costs due to including the Braille symbol and raised denomination numeral that plaintiffs seek, nor the impacts on the Federal Reserve System and the private sector.

[6] In the alternative to dismissal, defendants request that these prayers be stricken from the complaint.  See Fed. R. Civ. P. 12(f).

16

A.    The Specific Nature of Any Redesign Would Be Within the Sole
      Discretion of the Secretary of the Treasury

In their prayers for relief, plaintiffs seek not only "a permanent injunction prohibiting

Defendants from continuing to manufacture banknotes in the present manner," but also —

> a permanent injunction requiring that banknotes be designed to incorporate
> features which would make them accessible to people with visual disabilities,
> including but not limited to:
> (1)    a low vision feature involving a single denomination numeral which is at
>        least one half the size of banknote height, and is printed with black ink on
>        a white surface so as to increase contrast levels;
> (2)    denomination numerals indicated by Braille symbols and raised printing
>        on the banknote itself.
> (3)    varying the length, height, and color of banknotes by denomination.

See Complaint at 16-17.  In other words, plaintiffs ask the Court not only to enjoin continuing

issuance of the currency as presently designed, but also to order the inclusion of certain specific

features in the new currency.  To some extent, therefore, plaintiffs are asking the Court to

participate in the redesign of the currency.

As plaintiffs acknowledge, however, the design of United States currency is, pursuant to

the Federal Reserve Act, "solely within the discretion of the Secretary of the Treasury."  Id. ¶ 22;

12 U.S.C. § 418 (Federal reserve notes "shall be in form and tenor as directed by the Secretary").

Thus, assuming the existing United States currency were somehow found to violate the Rehab-

ilitation Act, this Court could only enter declaratory judgment to that effect and enjoin the

violation.  The Court should not order the inclusion of any specific features in a redesign of the

currency, and plaintiffs' prayer for relief to that effect must be dismissed.

17

B.    Congress Specifically and Expressly Prohibits Any
      Redesign of the One-Dollar Bill

Another of plaintiffs' prayers for relief seeks "a permanent injunction mandating that the $1 banknote be redesigned to incorporate new low vision features as mandated by Congress." See Complaint at 17.  However, the current-year appropriations act for the Department of the Treasury provides that "[n]one of the funds appropriated [therein] or otherwise available to the Department of the Treasury or the Bureau of Engraving and Printing may be used to redesign the $1 Federal Reserve note."  See Pub. L. No. 107-67, § 117, 115 Stat. 514, 525 (2001).  Identical language has appeared in the two immediately preceding appropriations acts.  See Pub. L. No. 106-554, § 117, 114 Stat. 2763 (2000); Pub. L. No. 106-58, § 117, 113 Stat. 430, 441 (1999). Therefore, even if the existing currency were found to violate the Rehabilitation Act as a general matter, this specific, recently-reenacted prohibition would easily override, in relation to the one-dollar bill, the more general anti-discrimination provisions of the Rehabilitation Act.  See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general."); Busic v. United States, 446 U.S. 398, 406 (1980) ("[A] more specific statute will be given precedence over a more general one, regardless of their temporal sequence.").

The plaintiffs not only fail to recognize that the prohibition in the current appropriations act forecloses redesigning the one-dollar bill; they also contend that a statement in a 1999 congressional committee report actually requires redesigning the one-dollar note.  In that report, the conferees on an appropriations bill wrote that they were "concerned about the cost associated with producing special anti-counterfeiting properties for the estimated 6 billion circulating $1

18

Federal Reserve Notes," but that they "believe[d] it [was] important to update the currency, such as making minor modifications to assist the visually impaired." H.R. Conf. Rep. No. 105-789, at 76 (1998), reprinted in 144 Cong. Rec. H9870, H9890 (daily ed. Oct. 7, 1998). Thus, the conferees purported to "direct the Department of the Treasury and the Bureau of Engraving and Printing . . . to only make minor design enhancements to the $1 note for the visually impaired and elderly population, provided it has no effect on the use of $1 Federal Reserve Notes with existing bill accepting machinery." Id.

 This statement cannot, however, be read as requiring the redesign that plaintiffs seek. First, a statement in a committee report is not legislation; such a statement cannot, itself, establish a legal mandate. See Lincoln v. Vigil, 508 U.S. 182, 192 (1993) ("indicia in committee reports and other legislative history as to how . . . funds should or are expected to be spent do not establish any legal requirements on the agency") (internal quotation marks omitted); American Hospital Ass'n v. NLRB, 499 U.S. 606, 616 (1991) (statements in committee reports do not have "the force of law"). Second, the bill to which this conference report relates (which did not, in any event, become law) contains no language regarding a redesign of the currency. See H.R. Conf. Rep. 105-789, at 1-62 (setting forth text of H.R. 4104), reprinted in 144 Cong. Rec. at H9871-H9886. Moreover, no legislative enactment during that fiscal year, or since, has required any redesign of currency for the visually-impaired. See Pub. L. No. 105-277, 112 Stat. 2681 (1998) (FY 1999 appropriations act). Third, even if the bill to which the above-quoted conference report relates had required the Secretary of the Treasury to redesign the one-dollar bill for the visually-impaired, it would have been overridden by the current appropriations act, which forbids any redesign regardless of its purpose. See Clarke v. United States, 915 F.2d 699, 701

19

(D.C. Cir. 1990) (one appropriations act "superseded" by next act).  Fourth and finally, even if a prior appropriations act were not overridden by the current act, the 1999 act could not require a redesign of the one-dollar bill now, because an appropriations act expires at the end of the fiscal year to which it relates.  See Massachusetts v. Nuclear Regulatory Comm'n, 924 F.2d 311, 324 (D.C. Cir.), cert. denied, 502 U.S. 899 (1991).

III.    The Treasurer of the United States Should Be Dismissed
        as a Defendant

        In addition to the Secretary of the Treasury, who is responsible for the design and production of United States currency, the plaintiffs have named as a defendant the Treasurer of the United States.  The Treasurer is basically the government's cashier, serving as the custodian of funds received and held in the United States Treasury.  See, e.g., 2 U.S.C. § 158; 12 U.S.C. §§ 1439a, 1712, 1755(d); 16 U.S.C. § 3172(b); 28 U.S.C. § 2041; 33 U.S.C. § 944(a); 40 U.S.C. § 174j-4.  The Treasurer is not, however, involved in the design or production of currency.  See 12 U.S.C. § 418; 31 U.S.C. § 5114.[7]  In any event, an order solely against the Secretary would provide the relief sought by the plaintiffs — assuming such relief can be afforded under the Rehabilitation Act at all.  Therefore, the Treasurer of the United States should be dismissed as a defendant.

CONCLUSION

        Accordingly, defendants' motion for summary judgment should be granted, and this action dismissed with prejudice.

_____

        [7] The administrative reporting scheme alleged in paragraph 15 of the Complaint is no longer in effect.  See 67 Fed. Reg. 44,261 (July 1, 2002).

If this entire action were not disposed of on summary judgment, the Court should (1) dismiss the prayer for relief in which plaintiffs seek the inclusion of specific features in a redesign of the currency; (2) dismiss the prayer for relief in which plaintiffs seek a redesign of the one-dollar bill; and (3) dismiss the Treasurer of the United States as a defendant herein.

Dated: August 29, 2002

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

ROSCOE C. HOWARD, JR.
United States Attorney

RICHARD G. LEPLEY, D.C. Bar 332346
Assistant Director

_____
W. SCOTT SIMPSON, Va. Bar 27487
Senior Counsel

Attorneys, Department of Justice
Civil Division, Room 986
Post Office Box 883
Washington, D.C. 20044
Telephone:  (202) 514-3495
Facsimile:  (202) 616-8202
E-mail: scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS

21

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN COUNCIL OF THE BLIND, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 1:02CV00864 JR |
| | ) | |
| PAUL H. O'NEILL, Secretary of the Treasury, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.1(h), the defendants, by their undersigned counsel, submit the following statement of material facts as to which there is no genuine issue, in relation to their motion for summary judgment:

**The Bureau of Engraving and Printing**

1. The Secretary of the Treasury has delegated the design development and the production of Federal Reserve Notes, our national currency, to the Bureau of Engraving and Printing ("Bureau" or "BEP"), which is solely responsible for these tasks.  See Declaration of Thomas A. Ferguson ¶ 3.

2. The Bureau produces approximately 36 million Federal Reserve Notes each day, five days per week.  Billions of notes are produced each year.  Id. ¶ 5.

3. The BEP produced just over 7 billion Federal Reserve Notes in Fiscal Year 2001, 9 billion in 2000, and 11.4 billion in 1999.  Of the 7,004,800,000 notes produced in 2001, the Bureau produced 4,748,800,000 one-dollar bills, 915,200,000 five-dollar bills, 652,800,000

ten-dollar bills, 486,400,000 twenty-dollar bills, and 201,600,000 one-hundred-dollar bills.  <u>Id</u>. ¶ 5.

4. Over the years, about one-half of the Bureau's production consists of one-dollar bills. <u>Id</u>. ¶ 5.

5. During Fiscal Year 2001, the BEP expended approximately $219,240,000 in producing currency.  Additionally, $29,000,000 was spent on capital investments, and $9 million on research and development.  <u>Id</u>. ¶ 6.

6. Bureau operations are financed by a revolving fund established in 1950 pursuant to Public Law 81-656.  The revolving fund is reimbursed for all direct and indirect costs of operations, through the sales of Bureau products.  <u>Id</u>. ¶ 7.

7. In 1977, Congress expanded the Bureau's revolving fund to allow the Bureau to include, in the prices charged for its products, amounts sufficient to fund capital investments, thus eliminating the need to seek appropriations from Congress.  <u>Id</u>. ¶ 7.

8. All of the Bureau's costs of designing and producing Federal Reserve Notes are covered by the revolving fund.  <u>Id</u>. ¶ 7.

9. The Bureau introduced a major redesign of the currency in 1996.  The planning of this redesign began in 1991, with production of the highest denomination beginning in 1995.  <u>Id</u>. ¶ 9.

10. The cost of the design phase for the 1996 redesign was approximately $750,000.  At various times during the pre-production phase, from 80 to over 400 employees were involved in the research, design, and planning of the new design.  <u>Id</u>. ¶ 9.

11. The design of U.S. currency occurs at a BEP facility in Washington, D.C., and production occurs at BEP facilities in Washington, D.C., and Fort Worth, Texas.  <u>Id</u>. ¶ 4.

**The Federal Reserve System**

12. The Federal Reserve System ("FRS" or "System") consists of the Board of Governors, an agency of the federal government composed of members appointed by the President, which oversees the activities of the Federal Reserve Banks; twelve regional Federal Reserve Banks, which act collectively as our nation's central bank; and membership in the System for private commercial banks.  Id. ¶ 10.

13. The Federal Reserve Board, rather than the BEP, issues Federal Reserve Notes to the Federal Reserve Banks.  The Federal Reserve Banks, in turn, distribute Federal Reserve Notes to the public through the nation's depository institutions.  Id. ¶ 11.

14. The Federal Reserve System purchases Federal Reserve Notes from the BEP at cost of production.  The Federal Reserve Banks sell the notes to depository institutions at face value. Id. ¶ 13.

15.  The Federal Reserve System detects worn and counterfeit Federal Reserve Notes and withdraws them from circulation.  The FRS destroys worn notes, and forwards counterfeit notes to the United States Secret Service within the Department of the Treasury.  Id. ¶ 14.

16. Approximately 95% of the Federal Reserve Notes produced by the BEP are used to replace notes withdrawn from circulation.   The Federal Reserve Banks withdraw almost 34 million Federal Reserve Notes each day.  Id. ¶ 15.

17. In Fiscal Year 2001, the Federal Reserve Banks withdrew and destroyed 7,727,626,921 Federal Reserve Notes (8,510 tons), with a face value in excess of $86 billion.  Id. ¶ 15.

3

18. When a new currency design is placed in circulation, the FRS begins the withdrawal and destruction of the old design currency.  Id. ¶ 15

**Changes Sought by the Plaintiffs: Ramifications for BEP**

19. Implementing the currency redesign sought by the plaintiffs in this action would entail financial and administrative burdens in the following areas:  research and consultation; planning the redesign; plate engraving and manufacture; purchasing and installing additional equipment; producing the currency; public education; and replacing worn currency.  Id. ¶ 21.

20. All of the costs described below would be passed to the Federal Reserve System, which, in turn, would pass the costs to its member banks and other private financial institutions. Banks and other financial institutions would then recover those costs from their commercial and individual customers.  Id. ¶ 22.

**A.  Research, consultation, and redesign**

21. The introduction of redesigned banknotes requires time for consultation with interested entities, including the U.S. Secret Service, the Federal Reserve Board, and the Department of the Treasury.  Id. ¶ 23.

22. Implementing the currency redesign sought by the plaintiffs would involve consultation with external focus groups.  Id. ¶ 23.

23. The size of each denomination would be a key issue to be determined in implementing plaintiffs' redesign of the currency.  After determining the size of each denomination, the process of designing each denomination would begin.  Id. ¶ 24.

24. Designing different sizes of currency would significantly complicate and lengthen the redesign process, given that the use of different sizes would prevent applying the same design decisions to all denominations.  Id. ¶ 25.

25. The redesign process would also be complicated and lengthened by the need to determine how to implement the Braille symbols and the raised printing sought by the plaintiffs. Id. ¶ 25.

26. These initial tasks in implementing plaintiffs' redesign — that is, from size determination to finalizing the design —  would take approximately three to six years.  Research, consultation, and design would cost between 1 and 2 million dollars.  Id. ¶ 26.

**B. Plate engraving and manufacture**

27. Producing redesigned Federal Reserve Notes requires engraving and manufacturing new printing plates.  A template of the plates for each denomination is engraved by hand, and metallic printing plates are manufactured based on the hand-engraved templates.  BEP employees engrave the templates by hand, and the plates are manufactured in-house by BEP's craftsmen.  Id. ¶ 27.

28. The Bureau has approximately 455 printing plates that are presently used in the production of currency.  Implementing the redesign sought by the plaintiffs would require replacing approximately one-half of the Bureau's existing currency plates (given that the one-dollar bill, which would not be changed, accounts for approximately half of the Bureau's production).  Id. ¶ 28.

29. The engraving and manufacture of new printing plates for plaintiffs' redesign — from the start of engraving experimental designs to the delivery of all new plates necessary to produce

5

the current numbers of each denomination — would take approximately five to seven years. Engraving and manufacturing the new plates would cost between 3 and 4 million dollars.  Id. ¶ 29.

## C.  Purchasing and installing additional equipment

30. The Bureau uses equipment to produce, inspect, and package currency at its production facilities.  To implement the currency redesign sought by the plaintiffs, the Bureau would have to acquire additional production equipment, and would have to replace half of its inspection equipment and half of its packaging equipment.  Id. ¶ 30.

31. The Bureau's existing production equipment is designed to accommodate the size of the existing printing plates, which currently print 32 notes per sheet of currency paper.  Id. ¶ 31.

32. In order to avoid the need to replace at least half of the Bureau's existing production equipment (which would entail designing, purchasing, and installing all new equipment), the printing plates for the redesigned currency would have to be the same size as the plates now in use.  Id. ¶ 31.

33. Because the newly-designed bills would be larger than the existing bills, fewer bills would fit on each printing plate, requiring additional printing runs to maintain current production levels.  Id. ¶ 31.

34.  In order to perform additional printing runs, the Bureau would have to acquire additional production equipment to implement plaintiffs' redesign of the currency.  Id. ¶ 31.

35. To implement plaintiffs' currency redesign, the Bureau's facility at Washington, D.C., would have to procure at least two additional intaglio presses, and the Fort Worth facility would

have to procure at least two additional intaglio presses.  The cost of acquiring those four additional intaglio presses would be between 30 and 40 million dollars.  Id. ¶ 32.

36. The Bureau is currently in the process of adding new anti-counterfeiting features to the currency, now scheduled for issuance in 2003.  Adding these features will require running each sheet of currency through an additional (offset) printing process, using new, sheet-fed equipment which the Bureau has already acquired.  Id. ¶ 33.

37. Plaintiffs' redesign would entail printing fewer bills on each sheet, thus increasing the need for the new offset printing equipment in order to maintain current production levels.  Id. ¶ 33.

38. To implement plaintiffs' currency redesign, both the Washington, D.C., facility and the Forth Worth facility would each have to procure one additional offset printing press to add the new anti-counterfeiting features to the redesigned bills.  The cost of acquiring those two additional offset presses would be between 16 and 21 million dollars.  Id. ¶ 34.

39. As part of the production process, the Bureau uses equipment to inspect the bills in order to ensure accurate and uniform output.  This equipment examines each bill automatically, using software written for the Bureau by a federal contractor.  Id. ¶ 35.

40. Changing the size of the currency, and producing different denominations in different sizes, would require not only changing the physical dimensions of the currency-handling portions of the inspection equipment, but also changing the software that governs the inspection process. Id. ¶ 35.

41. Varying the sizes of the denominations would eliminate the ability to use the same inspection machines for all denominations.  This loss of flexibility would require adding inspection capacity in order to maintain current production levels.  Id. ¶ 36.

42. To implement the plaintiffs' currency redesign, the Bureau would have to design, purchase, and install at least one new piece of inspection equipment for its Washington, D.C., facility and at least one new piece of inspection equipment for its Fort Worth facility.  The cost of acquiring those two additional inspection machines would be between 16 and 21 million dollars.  Id. ¶ 37.

43. After inspection, the bills run through another printing process to add the serial numbers and other identifying marks.  The same machines that print serial numbers and identifying marks then cut and package the currency, because security and accountability considerations dictate that the bills be packaged in numerical sequence.  Id. ¶ 38.

44. Producing bills of different sizes would require designing and purchasing new equipment (and new software) to add serial numbers and identifying marks and to cut and package the currency.  Id. ¶ 39.

45. Eliminating the flexibility of using every machine for every denomination, to perform the tasks described in paragraph 43 above, would require increased capability to maintain current production levels, and replacing existing equipment with more flexible equipment.  Id. ¶ 39.

46. To implement the plaintiffs' currency redesign, the Bureau would have to design, purchase, and install ten new pieces of equipment, at each of its production facilities, to print serial numbers and identifying marks and to cut and package the currency.  The cost of acquiring those twenty new pieces of equipment would be between 100 and 130 million dollars.  Id. ¶ 39.

8

47. In addition to the above-stated figures for purchasing additional equipment, acquiring the necessary equipment would entail significant contracting costs.  The Bureau would have to undertake a lengthy procurement process for each type of redesigned equipment needed to implement the currency redesign sought by the plaintiffs.  Approximately 22 BEP employees, devoting approximately 7,000 man-hours, would be required for this entire process.  Id. ¶¶ 40-44.

48. Designing new equipment to produce the redesigned currency would cost between 162 and 212 million dollars in contractor payments.  Additionally, the Bureau would expend between $1.4 and 2 million in-house to award and administer contracts for the new equipment.  A further expenditure of between $7.6 and 10 million could be expected for site preparation for the new and additional equipment.  Id. ¶ 44.

**D.  Production of the currency**

49. Producing notes of different (and larger) sizes, in different colors, with an embossed numeral and a Braille symbol, would entail costs that are not incurred in producing the existing currency.  Id. ¶ 45.

50. Producing larger bills would require more of the specialized inks used in producing currency.  Id. ¶ 45.

51. Producing the redesigned currency would mean purchasing more of the distinctive paper used for United States currency, both because larger bills would require more paper and because more of each sheet would be discarded in the production process (given that the size of each sheet of paper would remain the same, to avoid the need to replace approximately half of the Bureau's existing production machinery).  Id. ¶ 45.

52. Other production expenses would also increase due to plaintiffs' redesign, such as maintenance costs for the new equipment described above, additional man-hours for BEP's existing employees involved in production, and depreciation on the new equipment.  Id. ¶ 45.

53. The above-described increases in production costs would total between 36 and 45 million dollars per year, at least.  Id. ¶ 45.

54. The need to acquire additional equipment would also give rise to a need for additional personnel to operate the new equipment.  For the new intaglio printing equipment, approximately 30 additional plate printers and 15 non-craft personnel would have to be recruited and hired.  For the new offset presses, approximately 22 additional offset pressmen and 11 non-craft personnel would have to be recruited and hired.  For the new currency inspection equipment, approximately 23 bookbinders and 8 non-craft personnel would have to be recruited and hired.  For the new numbering and packaging equipment, approximately 14 offset pressmen, 73 bookbinders, and 50 non-craft personnel would have to be recruited and hired.  Id. ¶ 46.

55. In summary, to operate the new equipment needed for plaintiffs' redesign of the currency, the Bureau would have to recruit and hire approximately 30 plate printers, 36 offset pressmen, 96 bookbinders and 84 non-craft personnel — for a total of 246 full-time equivalents at a total cost of approximately 15 to 20 million dollars per year.  Id. ¶ 46.

56. The above figures do not include certain other increases in the cost of production due to plaintiffs' redesign of the currency.  Embossing a numeral would require an additional step in the production process and additional, as yet unidentified equipment.  Including a Braille symbol would require newly-designed equipment to imprint a Braille symbol on currency paper.  Both the embossing and the Braille symbol could result in additional, as-yet unknown packaging,

10

handling, and storage expenses given that the embossed area, the Braille symbol, or both would increase the thickness of the note in that location.  <u>Id</u>. ¶ 47.

**E. Public education**

57. An extensive public education campaign would be required to advance public acceptance of the redesigned currency.  <u>Id</u>. ¶ 48.

58. The Bureau has expended approximately 50 million dollars on public education in relation to the 1996 redesign.  <u>Id</u>. ¶ 48.

59. The extensive, worldwide public education necessitated by the change in sizes and other new features sought by the plaintiffs would cost between 70 and 90 million dollars.  <u>Id</u>. ¶ 48.

**F.  Replacing worn currency**

60. Two of the changes sought by the plaintiffs — the printing of a "raised" (i.e., embossed) denomination numeral and the inclusion of a Braille symbol on each note — would cause the new currency to wear out faster than the existing currency.  The additional ink on the embossed numeral would rub off, and the raised dots comprising the Braille symbol would wear away faster than the surrounding paper.  Additional wear would result from daily handling as well as machine processing at banks and in vending machines.  <u>Id</u>. ¶ 49.

61. A Federal Reserve Note of plaintiffs' redesign would no longer be fit for circulation — and would have to be withdrawn and replaced — when the embossed numeral or the Braille symbol had become sufficiently worn that a blind person could no longer recognize either of those features.  <u>Id</u>. ¶ 49.

62. Currently, on average, a five-dollar bill is withdrawn after approximately two years in circulation, a ten-dollar bill is withdrawn after approximately three years in circulation, a twenty-dollar bill is withdrawn after approximately four years in circulation, and both a fifty-dollar bill and a one-hundred dollar bill is withdrawn after approximately nine years on circulation.  Id. ¶ 50.

63. The inclusion of an embossed numeral and a Braille symbol would reduce the useful (that is, blind-readable) life of each bill by at least forty percent.  Id. ¶¶ 50, 51.

64. Based on the currency needs of the Federal Reserve System during Fiscal Year 2001, the increased production volume caused by including an embossed numeral and a Braille symbol on each bill (other than the $1 bill) would increase by between 92 and 109 million dollars per year the overall costs of producing the country's currency.  Id. ¶ 51.

**G.  Summary**

65. The following table summarizes some of the costs described above:

| | |
|---|---|
| Research, consultation, and redesign | $1-2 million |
| Plate engraving and manufacture | $3-4 million |
| Purchasing and installing additional equipment | |
| Intaglio presses | $30-40 million |
| Offset presses | $16-21 million |
| Inspection equipment | $16-21 million |
| Numbering, cutting, and packaging equipment | $100-130 million |
| In-house contract expenses | $1.4-2 million |

12

| | |
|---|---|
| Site preparation | $7.6-10 million |
| Public education | $70-90 million |
| **Total initial costs** | **$245 - 320 million** |
| Production costs | $36-45 million (per year) |
| New personnel costs | $15-20 million (per year) |
| Replacing prematurely worn currency | $92-109 million (per year) |
| **Total increase in annual costs** | **$143 - 174 million** |

Id. ¶ 52.

66. The above table does not include potential costs that are not estimated above, such as the increased cost of printing each denomination in a different color, the additional production and material costs of embossing a numeral or including a Braille symbol, nor the costs of additional equipment needed for these two tactile features.  Id. ¶ 52.

**<u>Ramifications of Plaintiffs' Changes for the Federal Reserve System</u>**

67. In addition to the above-described burdens on the Bureau of Engraving and Printing, the currency changes that plaintiffs seek would impose very significant burdens on the Federal Reserve System.  Id. ¶ 54.

68. The Federal Reserve System's tasks of circulating new and fit Federal Reserve Notes, withdrawing worn notes, and identifying counterfeit notes are performed automatically, using sophisticated processing and authentication systems.  Id. ¶ 54.

69. Plaintiffs' redesign of the currency would, at the very least, require the FRS to adjust its equipment and sensors to recognize the new features of the redesigned Federal Reserve Notes. Id. ¶ 54.

13

70. The FRS would be required to purchase new equipment to perform these tasks on notes of different sizes (rather than only to adjust its equipment and sensors), if the largest redesigned bill exceeded the size parameters of existing equipment.  Id. ¶ 54.

71. Because the one-dollar note would be the smallest in size, it is likely that plaintiffs' redesign of the currency would require the FRS to purchase completely new equipment.  Id. ¶ 54.

72. The FRS's cost of purchasing new Federal Reserve Notes from the BEP would increase as a result of any decrease in the useful life of Federal Reserve Notes due to the addition of the Braille symbol and raised numeral requested by the plaintiffs.  Id. ¶ 55.

73. The FRS's currency-related costs are passed to its member depository institutions. Those institutions, in turn, pass those costs to their customers.  Thus, the increased costs to the FRS that would result from implementing plaintiffs' redesign of Federal Reserve Notes, including the cost of replacing or modifying equipment and increased orders for new notes due to decreased usable life of the notes, would be borne by the public through increased bank fees, lending rates, and cost of services.  Id. ¶ 56.

### Ramifications of Plaintiffs' Changes for the Private Sector

74. The currency redesign sought by the plaintiffs would impose significant burdens on the private sector.  Id. ¶ 57.

75. A change in the size of the currency would require replacing or altering automated teller machines and automatic vending machines.  Id. ¶ 57.

76. The changes required by plaintiffs' redesign of the currency would require thousands of hours of design, planning, and labor, and millions of dollars in labor and equipment.  Id. ¶ 57.

14

Dated: August 29, 2002

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

ROSCOE C. HOWARD, JR.
United States Attorney

RICHARD G. LEPLEY, D.C. Bar 332346
Assistant Director

_____

W. SCOTT SIMPSON, Va. Bar 27487
Senior Counsel

Attorneys, Department of Justice
Civil Division, Room 986
Post Office Box 883
Washington, D.C. 20044
Telephone:  (202) 514-3495
Facsimile:   (202) 616-8202
E-mail: scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS

15