IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN COUNCIL OF THE BLIND
1155 15th Street, N.W. , Suite 720
Washington, D.C. 20005

PATRICK SHEEHAN
14311 Astrodome Dr.
Silver Spring, MD. 20906

OTIS STEPHENS
1141 Southgate Rd.
Knoxville, TN 37919

Plaintiffs,

v.

JOHN W. SNOW
Secretary of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

Defendant

Civil Action No.1:02CV00864 JR

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## I. INTRODUCTION & SUMMARY

This litigation seeks to remedy a long-standing form of discrimination against persons with visual disabilities. United States banknotes are the medium of exchange in almost every facet of daily life. The ability to use these banknotes in a fast and easy manner is an essential ingredient of independent living. Most Americans are fortunate enough to take for granted the ability to recognize banknote denominations. However,

for millions of Americans with blindness or low vision, it is impossible to recognize the denomination of banknotes. This is due to the fact that U.S. banknotes are identical in size and texture, and virtually identical in color. As a result, individuals with visual disabilities suffer needless impediments in purchasing groceries, transportation, and a multitude of other goods and services. Further, the current banknote design puts individuals with visual disabilities at a heightened risk of fraud and deceit in connection with transactions requiring the use of banknotes.

**1**. This action seeks declaratory and injunctive relief to enjoin the Secretary's ongoing violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Pursuant to Section 504, individuals with disabilities may not be excluded from or denied the benefits of participation in any program or activity conducted by United States government. The issuance of banknotes is clearly an activity conducted by the United States government on behalf of all of its citizens. However, persons with visual disabilities are excluded from meaningful access to U.S. currency due solely to their physical limitations. This action seeks relief from the discriminatory exclusion of millions of Americans from this critical function of everyday life.

**2**. Defendant's future plans to make banknotes accessible to persons with visual disabilities are limited to the commissioning of another study. The record is abundantly clear that Defendant will take no action to alleviate the needless impediments incurred by the disabled in handling currency unless ordered by this Court.

## II. JURISDICTION AND VENUE

**3**. Jurisdiction is properly vested in this Court pursuant to 28 U.S.C. § 1331 over causes of action arising under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

**4**. Alternatively, and only if this Court finds that sovereign immunity bars the jurisdiction of this Court under 29 U.S.C § 794, then Plaintiffs assert that the design and production of currency constitutes a final agency action over which this Court has jurisdiction under the provisions of the Administrative Procedures Act, 5 U.S.C. § 702, and the general federal jurisdiction provisions at 28 U.S.C. § 1331.

**5**. Venue lies in this district under 28 U.S.C. 1391(e).

## III. PLAINTIFFS

**6**. The American Council of the Blind is the nation's leading membership organization of blind and visually impaired people. It was founded in 1961 and incorporated in the District of Columbia. The Council's membership numbers in the tens of thousands. ACB has 51 state and regional affiliates and 20 national special interest and professional affiliates. The Council strives to improve the well-being of all blind and visually impaired people by: serving as a representative national organization of blind people; elevating the social, economic and cultural levels of blind people; improving educational and rehabilitation facilities and opportunities; cooperating with the public and private institutions and organizations concerned with blind services; encouraging and assisting all blind persons to develop their abilities and conducting a public education program to promote greater understanding of blindness and the capabilities of blind people. ACB monthly publishes The Braille Forum, a national magazine with a readership of approximately 26,000. The Council also produces a monthly half-hour radio information program, ACB Reports, for radio reading information services. It also distributes TV and radio public service announcements highlighting the capabilities of blind people. The ACB has many members who would benefit from making United

States banknotes accessible to persons with visual disabilities. The American Council of the Blind has adopted numerous resolutions over the last 25 years with the purpose of encouraging the Defendant to redesign currency so as to make denomination possible for persons with visual disabilities.

**7**. Otis Stephens is a blind person residing at 1141 Southgate Rd., Knoxville, TN 37919. Dr. Stephens is a Professor of Law at the University of Tennessee School of Law at Knoxville, Tennessee. Dr. Stephens generally relies upon a trusted sighted individual to inform him as to the denomination of a particular banknote. Dr. Stephens then typically distinguishes between banknotes of varying denominations by folding the banknote into a shape peculiar to that denomination. For example, $5 banknotes are folded lengthwise; $10 banknotes are folded in halves, etc. When receiving change after purchasing an item, Dr. Stephens generally relies upon the store cashier to identify the denomination of each banknote handed to him. Dr. Stephens then folds the money received as change according to the system described above.

**8**. Patrick Sheehan is an individual with low vision residing at 14311 Astrodome Dr., Silver Spring, MD. 20906. Mr. Sheehan is a computer specialist employed by the United States Department of Veterans Affairs in Washington, D.C. Mr. Sheehan has no vision in his right eye, and left eye vision is at 20/350. Only in the most optimal lighting conditions is Mr. Sheehan able to distinguish between banknotes of varying denominations. Typically, Mr. Sheehan uses a closed circuit television to magnify the banknote so that he can distinguish between banknotes of different denominations. Mr. Sheehan then folds the banknote into a unique shape peculiar to that denomination. Banknotes received from a cashier after purchasing an item often remain unsorted until

Mr. Sheehan is in a position to examine the banknote through one of the means described above. Mr. Sheehan is legally blind under the criteria specified in 20 C.F.R. § 404.1581.

**9**. Dr. Stephens and Mr. Sheehan are otherwise qualified individuals with a disability, under the terms of the Rehabilitation Act and its implementing regulations. See 29 U.S.C. § 705(20); 31 C.F.R. § 17.103(g).

## IV. DEFENDANTS

**10**. John Snow is the Secretary of the Treasury ("Secretary"). The United States Department of Treasury is an executive agency of the United States government. The Department of the Treasury is organized into two major components: Departmental offices and the operating bureaus. The Bureau of Engraving and Printing ("BEP") is one of the operating bureaus of the Department of the Treasury. Among the BEP's functions include designing and manufacturing United States currency; designing and manufacturing many postage stamps, customs stamps and revenue stamps; designing, engraving and printing Treasury bills, notes and bonds, and other U.S. securities; and designing, engraving, and printing commissions, permits, and certificates of awards.

## V. STATUTORY FRAMEWORK

**11**. Section 504 of the Rehabilitation Act of 1973 ("Section 504") prohibits discrimination against persons with disabilities in connection with any program or activity conducted by any executive agency of the United States government. Specifically, this section provides in pertinent part as follows:

> *No otherwise qualified individual with a disability in the United States, as defined in section 706 (20) of this title, shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to*

> *discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service*.

See 29 U.S.C. § 794.

**12**. The design and production of currency is a program or activity within the meaning of Section 504.

**13**. The term "individual with a disability" means any person who—

> *(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities;*
> *(ii) has a record of such an impairment; or*
> *(iii) is regarded as having such an impairment.*

See 29 U.S.C. § 705 (2001)

**14**. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, requires reasonable accommodations for individuals with disabilities, with respect to the programs and services of the federal government.

**15**. The burden is upon the agency to prove that compliance with the requirements of Section 504 would result in an undue burden upon the agency. See 31 C.F.R. § 17.150(a)(2).

## VII. RECOMMENDATIONS MADE BY THE 1983 AND 1995 CURRENCY STUDIES

**16**. In 1983, the BEP conducted a study entitled "A Study of Mechanisms for the Denomination of Currency by the Blind or Visually Impaired", dated August 24, 1983, (hereinafter referred to as the "1983 Study", and attached hereto as Exhibit P-1).

**17**. The 1983 Study recommended that BEP seek funding for the development of a sophisticated portable electronic device which could be used by the visually disabled to denominate banknotes. See Exhibit P-1, 1983 Study at pp. 5-6.

**18**. At the request of Defendant, a separate study was conducted in 1995 by the National Academy of Sciences in connection with the use of currency by the visually impaired (hereinafter referred to as the "NAS Panel" or "NAS Study").

**19**. Panel participants included leading experts in the fields of advanced reprographic technology, materials science, substrate materials, banknote production and currency design, psychophysics, optical engineering, chemical engineering, optics and physics, as well as leading experts in low vision and blindness research. See Exhibit P-2, Preface to NAS Study.

**20.**. The NAS Panel recommended that Defendant include the following features in near term (1-3 years) currency redesigns: (a) variation in both height and length of banknotes; (b) use of large, high contrast denomination numerals on a uniform background; (c) use of different predominant colors for each denomination; and (d) use of denominational UPC coding which could be used by external devices in denominating currency.

**21.** Additionally, the NAS Panel recommended that the specifications for these new features should strive for sufficient differentiation between denominations to permit rapid, effortless performance. See Exhibit P-2, NAS Study, at pp. 4-5, 75-76. The NAS Panel found that each of the above features could be incorporated based on technologies which are already known and widely used. Id. at pp. 68-70.

**22**. The NAS Panel noted that banknote size varies with denomination in over 120 countries, and that the technology for accomplishing this change is currently in existence. Id., at p. 40. The Panel also found that this feature is generally considered very useful by the visually impaired. Id. at pp. 40-44. The Panel cited to studies which indicate that

variation of at least 5-7mm in both length and height of the banknote results in users achieving a 90% success rate with only 30 minutes of learning. Id. at p. 42.

**23**. The NAS Panel found that use of a large high contrast numeral would require little or no additional capital investment. Exhibit P-2, NAS Study, at p. 69. The Panel recommended near term (1-3 years) implementation of this feature. Id at pp. 4, 68-70. The Panel stated that people with acuity as low as 20/240 could be assisted if the numeral were 60 percent of the current note height. Id. at p. 46. People with acuity at the range of 20/160 would be assisted if the numeral were at least 40 percent of banknote height. Id.

**24**. The NAS Panel found that use of different predominant colors for each denomination would be inexpensive to implement with little or no additional capital investment. See Exhibit P-2, NAS Study, at p. 70. The Panel determined that enough research currently exists to allow experts to identify the primary colors which would be most useful to the visually impaired in facilitating denomination. Id. at p. 47. The Panel recommended near term (1-3) years implementation of this feature. Id. at pp. 68-70.

**25**. The NAS Panel also recommended that Defendant pursue a broad research agenda, with a view towards identifying potential combinations of features which could be employed to enhance denomination. Specifically, the NAS Panel recommended that “high priority” research be conducted to determine “optimum dimensions, optical contrast, location, colors, physical size” for making recognition and denomination of U.S. banknotes easy and convenient for visually disabled individuals. See Exhibit P-2, NAS Study, at pp. 65, 76.

**26**. The NAS Panel recommended "near or mid-term research" to determine the gradations which will permit reliable human discrimination of low-relief tactile features. Id., at p. 65. See also pp. 5, 76. The NAS Panel urged the Defendant to conduct research into the development of durable tactile features. See Exhibit P-2, NAS Study, at pp. 5, 59, 62, 63, 86. The NAS Panel also recommended that Defendant work with device developers to develop improved external devices which could be useful to the visually impaired. Id at pp. 76. The Panel recommended that Defendant involve appropriate user groups as early as possible to ensure selection of those features which would be most useful to the disabled population. Id at pp. 6, 77.

## VII. DEFENDANT'S FAILURE TO IMPLEMENT THE RECOMMENDATIONS CONTAINED IN THE 1983 AND 1995 STUDIES

**27**. The conclusions of the 1983 and 1995 studies were well known to Defendant when it conducted its 1996 and 2004 currency redesigns. Nonetheless, Defendant has failed to implement any of the recommendations contained in these studies.

### A. The Current Use of Color Is Inconsistent With the Recommendations of the NAS Panel

**28**. The manner in which Defendant has added color to banknotes is completely inconsistent with the recommendations of the NAS Panel. The NAS Panel recommended the use of a different predominant color for each banknote. See Exhibit P-2, NAS Study at p. 47. The NAS Panel stated that a mix of colors is not desirable from a denomination standpoint. Id. The Committee also warned that blues and greens should not be used together, as it is particularly difficult to discriminate between these colors. Id.

**29**. The color scheme adopted by the Defendant relies upon a mix of subtle colors, instead of a single predominant color for each denomination. Background colors of blue

and red have been added to the $50 note. See Exhibit P-3, Reproduction of $50 and $20 notes. The $20 note features background colors of blue, peach, and green. Id. However, the main colors of $50 and $20 denominations remain green and black; the other colors are present only in subtle shades in secondary design elements. The BEP website properly describes the background colors on the $20 and $50 notes as "subtle." See Exhibits P-4 and P-5, BEP Description of Color on $20 and $50 Notes. The present use of color does not provide adequate contrast between denominations. See Exhibit P-8, Declaration of Patrick Sheehan, at ¶ 10.

**B. Design of the Large Denomination Numeral Is Inconsistent With the Recommendations of the NAS Panel**

**30**. Defendant's introduction of the larger denomination numeral on the reverse of the $5 and higher banknotes is inconsistent with the recommendations of the NAS Panel. The NAS Panel recommended that the large denomination numeral be at least 40% - 60% of the current banknote height of 66.3 mm, preferably on each side of the banknote. See Exhibit P-2, NAS Study, at p. 46. See also Exhibit P-6, Def. Response to Interrogatory No. 15. Therefore, at a minimum, the large denomination numeral should be 26.52 mm. The NAS Panel also recommended that the large denomination numeral be printed in black ink against a white background, or in white against a black background. See Exhibit P-2, NAS Study at p. 46.

**31**. The larger denomination numeral on the $5, $10, $20, and $50 banknotes is 13 mm, or slightly less than 20% of the current banknote height. See Exhibit P-7, Def. Response to Interrogatory No. 12. This is less than half of the size recommended by the NAS Panel. The larger denomination numeral is placed on only one side of the banknote, contrary to the recommendations of the NAS Panel. See Exhibit P-2, NAS Study at p.

46. The larger denomination numeral has not been included on the $1, $2, and $100 banknotes.

**32**. The larger denomination numeral introduced by Defendant is printed in green, as opposed to black ink, thereby reducing contrast levels.

**33**. Defendant's sole reason for using green ink is that it is the color traditionally associated with U.S. banknotes. See Exhibit P-10, BEP Explanation for Use of Green Ink.

**C. Defendant Has Not Undertaken Reasonable Efforts to Develop a Portable Electronic Device Capable Of Rapid and Accurate Denomination**

**34**. The BEP's 1983 Study evaluated various features which could be used by the visually disabled to denominate currency. The 1983 Study concluded that the most practical solution was to pursue the development of a portable electronic device capable of denominating banknotes. See Exhibit P-1, 1983 Study, at p. 6.

**35**. The NAS Panel noted that portable electronic devices capable of denominating currency tend to be unreliable, slow, and expensive. See Exhibit P-2, NAS Study at p. 25.

**36**. Ms. Julia Wilson, a Supervisory Paralegal at the U.S. Department of Justice tested the Brytech Note Teller 2 electronic currency reader. See Exhibit P-11, Declaration of Ms. Julia Wilson. The test results at Table A relates to the newer series of bills (Series 2002 through 2004), and the test results at Table B relate to older series (Series 1981 through 2001). The test results at Table A reveal a 25% error rate, while the test results at Table B reveal a 6% error rate. Id. at ¶5. Ms. Wilson's Declaration further notes that the retail price of this item is $270 per unit. See Exhibit P-11, Declaration of Julia Wilson, at ¶ 8.

**37**. In August 2004, the BEP issued Request for Quotations ("RFQ") 04-0687 seeking the development of a pocket sized device with a target retail price of $35 or less, which could be used to determine the denomination of US currency. See Exhibit P-13, RFQ Specifications. This action on the part of the Treasury was taken more than 20 years after the initial recommendation of the 1983 BEP Study.

**38**. Under the terms of the RFQ, the selected vendor would be provided with up to $50,000 to develop a prototype of a device which would have an inconclusive read rate of no greater than ten per thousand notes read, and an incorrect read rate of no greater than one per fifty thousand notes read. The successful vendor would have three years after delivery of a working prototype to bring the device to the retail market. If the vendor failed to bring the device to the retail market within the three year time frame, the design would be made public, and other companies would be invited to bring the device to the retail market. Id., at pp. 1, 3. An award incorporating the terms of the RFQ was made to Mnemonics Technologies, Inc., on September 30, 2004. See Exhibit P-7, Def. Response to Interrogatory No. 13.

**39**. The specifications do not specify the response times which the prototype must be capable of achieving. See Exhibit P-13, RFQ Specifications. The specifications require that the prototype be capable of reading banknotes in only two out of four orientations. Id.

**40**. If a successful prototype is developed, the vendor has three years to bring the design to the retail market. Id. If the vendor fails to achieve this goal, then the design reverts to the public domain, in which case the design may still not be brought to the retail market. Id.

**41**. The RFQ states that the design "should facilitate the ability to mass-produce the units with a retail target price of less than thirty-five U.S. dollars." Id.

**42**. The retail price of such a unit depends largely on the size of the market and the number of people willing to purchase the item.

**43**. Defendant states that "the agreement does not establish a ceiling on the sale price of the device to the public" and further that the government "…does not exercise control over the ultimate sale price." See Exhibit P-14, Def. Admissions No's 3 & 4.

**44**. The Treasury will not assume any role in marketing the unit, or in developing sales channels for the unit. See Exhibit P-13, RFQ Specifications. at pp. 2-3 (Questions and Answers No's. 3, 10, 11).

**45**. Defendant will not provide any subsidy to qualified individuals in purchasing the unit. See Exhibit P-13, RFQ Specifications, at pp. 3-4 (Questions & Answers No's 7, 12). Defendant is unwilling to underwrite any portion of the cost of the unit for individuals who may be unable to afford it. Id.

**D. Defendant Has Not Undertaken Any of the Research and Testing Recommended By the NAS Panel**

**46**. Defendant claims to have conducted research and testing with respect to the following features: (a) inclusion of a large denomination numeral on the reverse side of the banknote; (b) inclusion of an embossed feature currently used on Canadian banknotes; (c) inclusion of a micro-perforation design currently used in Swiss currency, and (d) determination as to optimal color patterns for the visually disabled. See Exhibit P-6, Def. Response to Interrogatories No's. 14-16.

**47**. Defendant states that it obtained an assessment by the University of Minnesota Laboratory for Low-Vision Research in connection with its design of the larger

denomination numeral placed on the reverse side of the $5 and higher banknotes. See Exhibit P-6, Def Response to Interrogatory No. 15. However, Defendant is unable to locate a copy of this assessment. See Exhibit P-14, Def. Response to Document Production Request No. 19. Defendant is not certain whether the results of this assessment were conveyed orally or in writing. See Exhibit P-15, Letter from Defendant's Counsel dated August 1, 2005.

**48**. Defendant states that it tested an embossed feature which is currently used on Canadian banknotes. See Exhibit P-6, Def. Response to Interrogatory No. 14. Canadian currency incorporates a series of embossed dots which are used by the visually disabled to distinguish between denominations. This embossed feature was applied to ten (10) U.S. banknotes. See Exhibit P-36, Declaration of H.H. Holton, at ¶ 8. Defendant stated that the Canadian feature "was found to have insufficient durability to approximate the average length of time required for Federal Reserve notes to remain in circulation." See Exhibit P-6, Def. Response to Interrogatory No. 14.

**49**. Defendant was asked to produce the results of any testing which it conducted to determine the durability of the Canadian feature. See Exhibit P-14, Def. Response to Document Production Request No. 17. In response, Defendant furnished the document entitled "Tactile Feature for the Blind." Id. However, this document reflects only durability testing of the Canadian feature on Canadian banknotes. See Exhibit P-16, Tactile Feature for the Blind, at pp. 6-7. Defendant has not produced any test results reflecting upon the durability of the Canadian feature on U.S. banknotes.

**50**. The Canadian Bank Note Company developed and patented the Canadian tactile feature, and is one of two companies under contract to print paper currency for the Bank of Canada. See Exhibit P-36, Declaration of H.H. Holton, at ¶ 3, 4.

**51**. At the request of Defendant, the Canadian Bank Note Company conducted preliminary wear testing on ten (10) U.S. banknotes using the Canadian formula. After wear testing, the relief provided by the Canadian feature on U.S. banknotes was reduced on average from 110 microns to 20 to 35 microns. Id. at ¶ 8. Based on research conducted by the Canadian Bank Note Company, the 20 to 30 micron range on worn banknotes was found to be "satisfactory" with a 55 micron height or greater being "very good" as rated by the visually impaired. Id.

**52.** The Canadian Bank Note Company states that it is probable that the embossed feature could be applied to U.S. banknotes in a manner which would be useful to the blind. Id. at ¶ 9.

**53**. Defendant's claim to have conducted durability testing on the Canadian feature contradicts Defendant's sworn statement in which it admits that it is unable to determine the extent to which an embossed feature would reduce the useful life of U.S. banknotes, or even whether such reduction would be significant. See Exhibit P-7, Def. Answer to Interrogatory No. 5.

**54**. Defendant could not have reached any meaningful conclusions as to the durability of the Canadian feature on the basis of a test sample of ten (10) U.S. banknotes. Sample sizes of 1000 banknotes notes are normally required to produce statistically valid conclusions. See Exhibit P-36, Declaration of H.H. Holton, at ¶ 10.

**55**. Defendant also states that it tested a micro-perforation design developed for use as a security feature in Swiss currency to determine whether it could be useful to the visually disabled. See Exhibit P-33, Copy of Swiss Bank Note. Defendant stated that the presence of the perforation design was detectable by visually impaired persons. However, "the specific patterns could not be identified sufficiently for accurate denomination of currency. An analysis to determine the effectiveness and durability of the feature indicated that the perforation pattern could be altered or simulated easily and that the holes left by perforating accumulated dirt and debris." See Exhibit P-6, Def. Response to Interrogatory No. 14.

**56**. Defendant was asked to produce the results of any testing which it conducted to determine the effectiveness and the durability of the micro-perforation feature. See Exhibit P-14, Def. Response to Document Production Request No. 18. In response, Defendant furnished a single page memorandum from Robert Stone to Thomas A. Ferguson, dated September 4, 2002. Id. However, this memorandum merely requests approval to provide twenty blank pieces of U.S. banknote paper to Switzerland for testing. See Exhibit P-17, Memorandum from Robert Stone to Thomas A. Ferguson, dated September 4, 2002. Defendant has not produced any test results reflecting upon the durability or the effectiveness of the Swiss micro-perforation feature on U.S. banknotes.

**57**. Defendant admitted that the presence of the micro-perforation design was detectable by persons with visual disabilities. See Exhibit P-6, Def. Response to Interrogatory No. 14. See also Exhibit P-18, Report Prepared by Deloitte & Touche/Shugoll, at p. 22. The micro-perforation method could provide a meaningful

denomination cue merely by virtue of its location on the banknote, even if the specific micro-perforation pattern is not itself sufficient to provide denomination information.

**58**. Defendant was also asked to describe any testing which it conducted to determine the optimal color schemes which would be useful to the visually disabled. Defendant stated that it contracted with Deloitte & Touche/Shugoll to conduct a research study as to how color may be useful to the visually disabled in denominating currency. See Exhibit P-6, Def. Response to Interrogatory No. 16.

**59**. The purpose of the Deloitte study was to determine public awareness of design and counterfeit features in the new currency, and to determine the receptivity of the target audiences to various anti-counterfeiting features. See Exhibit P-18, Report Prepared by Deloitte & Touche/Shugoll, June 2002, Executive Summary at p.2. The target audiences were derived from individuals in the following groups: consumers, bank tellers, cashiers, gaming industry employees, law enforcement officials, and teachers. Id. The study protocols expressly excluded from participation individuals with visual impairments. Id. at Appendix A, pp. 4R, 6C.

## VIII. THE DESIGN OF CURRENCY IMPOSES A SIGNIFICANT BURDEN UPON THE VISUALLY DISABLED

**60**. Plaintiff Otis Stephens, who is blind and has no pattern vision whatsoever, must rely upon a sighted individual to inform him as to the denomination of a particular banknote. See Complaint, ¶12. See Exhibit P-30, Declaration of Otis Stephens, at ¶¶ 3, 5, 7, 11. Mr. Stephens then uses a system of folding bills in different ways to distinguish between denominations. Id., at ¶ 6.

**61**. Plaintiff Patrick Sheehan is able to distinguish between banknotes of varying denominations only in the very best of lighting conditions. See Complaint, ¶13. See

Exhibit P-8, Declaration of Patrick Sheehan, at ¶ 4. Mr. Sheehan also uses a system of folding bills in different ways to distinguish between denominations. Id., at ¶ 5.

**62.** The system of folding bills provides no assistance in ascertaining whether a vendor provides the correct denominations in return.

**63**. Dr. Stephens is aware of being successfully defrauded on at least one occasion. See Exhibit P-30, Declaration of Otis Stephens, ¶10, Docket #35, Attachment #37. Mr. Sheehan is aware of being successfully defrauded on at least six or seven occasions. See Exhibit P-8, Declaration of Patrick Sheehan, ¶6, Docket #35, Attachment 11.

**64.** A visually disabled person who has been successfully defrauded may never know what occurred. Dr. Stephens states that he can "*never be certain whether I provided or received the correct denominations*." See Exhibit P-30, Declaration of Otis Stephens, ¶13, Docket #35, Attachment #37. Mr. Sheehan is also not certain as to how many times he has been successfully defrauded, although he knows that it occurred on at least six or seven occasions. See Exhibit P-8, Declaration of Patrick Sheehan, ¶6, Docket #35, Attachment 11; See Sheehan at 140, Docket #33, Attachment #3.

**65.** Plaintiffs Sheehan and Stephens have handed out larger denominations than they intended. See Exhibit P-8, Declaration of Patrick Sheehan, at ¶ 7. See Exhibit P-30, Declaration of Otis Stephens, at ¶ 7. Mr. Sheehan estimated that in conducting approximately 65 currency transactions within a two month sample period from April 14, 2004, - June 14, 2004, there were approximately 5-10 instances during which a vendor alerted him to the fact that he was paying with the wrong denominations. See Sheehan Answer to Interrogatory #8, Docket #33, Attachment #3 (page 50 of 52). Therefore,

errors occurred in approximately 7% - 15% of all currency transactions conducted by Mr. Sheehan.

**66.** Whether due to fraud or inadvertence, errors in currency transactions often go unreported. On approximately 15-20 occasions since 1981, Mr. Sheehan handed over the wrong denomination without being informed of the error. See Sheehan at 97, Docket #33, Attachment #3.

**67.** Both Dr. Stephens and Mr. Sheehan experience fear and anxiety when conducting routine currency transactions, due to their inability to independently denominate banknotes. See Exhibit P-30, Declaration of Otis Stephens, ¶13, Docket #35, Attachment #37. See also Exhibit P-8, Declaration of Patrick Sheehan, ¶8, Docket #35, Attachment 11.

**68**. The visually disabled are frequently recognizable as having substantial life impairments, as are Mr. Sheehan and Dr. Stephens. See Exhibit P-30, Declaration of Otis Stephens, ¶ 8. Mr. Sheehan and Dr. Stephens are easy prey for unscrupulous individuals when conducting currency transactions, as they have no independent means to discern whether the change they are being handed back is correct. The visually disabled individual is at a distinct disadvantage even if a good faith dispute occurs as to what denomination was actually handed to a vendor. See Exhibit P-12, Declaration of OurMoneyToo.org, at p. 1.

**69**. Full participation in society depends upon the ability to engage in routine currency transactions in an independent and confidential manner. Currency transactions are integral to the routine process of buying and selling merchandise, using vending machines, and participating in daily life activities.

**70**. Errors in currency transactions, whether due to fraud or mistake, may have a significant financial impact. The majority of the visually disabled are elderly individuals. The elderly as a group comprise a disproportionately high percentage of people living at poverty levels. A $20 dollar currency error involving an elderly individual could produce a significant financial hardship.

**71**. There are a vast number of employment positions which demand the ability to engage in spontaneous currency transactions. These positions often exist in the retail sector, such as cashiers at drug and grocery stores. The visually disabled are precluded from obtaining employment opportunities in these areas due to the design of U.S. currency. See Exhibit P-12, Declaration of OurMoneyToo.org., at p. 3.

## IX. CURRENCY FEATURES IN USE WORLDWIDE DEMONSTRATE THE FEASIBILITY OF ACCOMMODATING THE VISUALLY DISABLED

**72**. The NAS Panel found that different sized currency is an established practice in over 120 countries. See Exhibit P-2, NAS Study at p. 40. The Panel found that 24 countries have adopted a specific scheme involving the use of large denomination numerals. Id. at p. 102. The Committee found that 167 out of 171 issuing authorities use a clearly differentiated color scheme for all denominations. Id., at p. 102. At the time of the 1995 NAS Study, there were 16 countries that used intaglio printing to produce tactile marks on each denomination. Id., NAS Study at p. 103. Another 7 currencies place tactile features on certain denominations. Id.

**73**. The Euro was introduced on January 1, 2002. During the development of the Euro, designers and printing experts consulted the European Blind Union.

**74**. On the front of each Euro note is a large denomination numeral over 2 centimeters tall, which is set against a pale background. This large denomination numeral is

manufactured with intaglio printing, and is designed to be perceptible to touch. See Exhibit P-19, Euro Vision, Understanding Euro Notes and Coins, A Guide for People with Poor Vision, jointly published by the European Blind Union, European Commission, and the European Central Bank, at p. 4. Specific patterns using intaglio print which are perceptible to touch are also printed along the edges of the EUR 200 and EUR 500 banknotes to help with recognition. These edge patterns are printed using the intaglio method. Id. at p. 5. Additionally, the notes have a foil feature which is also perceptible to touch. The foil feature on the 5, 10, and 20 Euro notes differs in shape and position from the foil feature on the 50, 100, 200, and 500 notes. Id at p. 6.

**75.** The length of the Euro increases by 6-7 mm with each denomination. The smallest note, which is the 5 Euro, is 12 cm long, while the largest note is 16 cm long. The 5, 10, 20, 50, and 100 notes also increase in height. The 5 Euro note is 6.2 cm in height, while the 100 Euro note is 8.2 cm in height. Id at p. 5.

**76.** Each Euro denomination has a striking dominant color, used on the front and the reverse sides. The dominant colors for each Euro denomination are: 5 Euro – Grey; 10 Euro – Red; 20 Euro – Blue; 50 Euro – Orange; 100 Euro – Olive Green; 200 Euro – Yellow-Brown; 500 Euro – Purple. Id. at p. 6.

**77.** The Canadian currency was redesigned in 2001 after extensive consultation with blind and visually impaired Canadians. The newly redesigned currency incorporates a series of symbols formed by groupings of six raised dots separated by a smooth surface. Each symbol is composed of two columns of three raised dots. These dots are embossed and back-coated to enhance their durability. See Exhibit P-20, Bank of Canada, Description of Accessibility Features.

**78**. The number and position of these symbols vary according to the denomination. The $5 note has one symbol, the $10 note has two symbols separated by a smooth surface, the $20 note has three symbols separated by two smooth surfaces, and the $50 note has four symbols separated by three smooth surfaces. Like the $10 note, the $100 bank note has two symbols, but the smooth surface between them is wider. Id.

**79**. The Canadian feature was subject to extensive durability testing prior to its incorporation. See Exhibit P-16, Tactile Feature for the Blind, at pp. 6-7. The results demonstrate that the embossed feature would not reduce the durability of Canadian banknotes. Id. The embossed symbols provide a relief of 140 microns, which relaxes back to 125 microns after issuance. Id., at p. 5. After a few minutes of training, users are able to denominate using the embossed symbol within an average of 13 seconds. Id. The redesigned notes did not present any stacking concerns to the Bank of Canada. Id. at p. 7.

## X. THE COSTS OF PROVIDING ACCOMMODATIONS TO THE VISUALLY DISABLED ARE NOT UNDULY BURDENSOME

### A. The 1983 BEP and 1995 NAS Panel Analysis of Cost Impacts

**80**. The issue of cost of making accommodations for the disabled was addressed by the BEP in its 1983 study. See Exhibit P-1, 1983 Study. The issue of cost was also addressed by the NAS Panel. The NAS Panel concluded that at least three of the features which could be useful to the visually disabled, i.e., color, large denomination numeral, and holes, could be achieved with little additional capital expenditures. Exhibit P-2, NAS Study, at pp. 69-70. The NAS Panel also found that use of different predominant colors for each denomination, and inclusion of a large denomination numeral, could be implemented within a 1-3 year period. Id., at pp. 68-70.

### B. Defendant's Current Analysis of Cost Impacts

**81**. Cost impacts were addressed by Defendant in responding to Plaintiff's Interrogatories during the course of this litigation. Defendant was asked to estimate the total costs involved in adding specific accessibility features to U.S. currency, including research, design, and manufacturing expenses. The following estimates provided by Defendant reflect the cost of modifying all denominations, including the $1 note. Defendant states that adding a large denomination numeral, which is at least 60% of current banknote height, would require a one time outlay of $4,500,000, plus additional annual costs in the amount of $400,000. See Exhibit P-7, Def. Response to Interrogatory No. 8. The use of large geometric shapes on banknotes would require a one time outlay of $4,500,000, with no additional annual costs. See Exhibit P-7, Def. Responses to Interrogatory No. 10. The use of different predominant colors on each banknote would require a one time outlay of $48,000,000, with additional annual cost in the amount of $20,000,000. See Exhibit P-7, Def. Response to Interrogatory No. 9. None of these features would have any impact on banknote durability. See Exhibit P-6, Def. Admissions No's 1 and 2.

**82**. Defendant estimates that the cost impact of varying the length and height of currency would be $245 - $320 million in initial costs. See Exhibit P-21, Declaration of Thomas Ferguson, Director of the Bureau of Engraving and Printing, dated August 28, 2002 (hereinafter the "Ferguson Declaration"), ¶ 52. However, $70-$90 million of the initial start up costs is related to public education expenses, as opposed to any cost involved in the production of currency. Id.

**83**. The Ferguson Declaration further refers to increased annual expenses in the amount of $143 - $174 million related to varying the height and length of banknotes. Id.

However, $92 - $109 million of the estimated increased annual costs are related to replacing prematurely worn currency. Id. The additional cost of replacing prematurely worn currency would only be incurred if an embossed numeral or tactile feature is included, in addition to the dimensional changes. See Ferguson Declaration, ¶¶ 49-51. Therefore, the additional annual costs of varying the height and length of banknotes, without also including an embossed numeral or other tactile feature, would be $51 - $65 million.

**84**. Defendant states that the cost to emboss a numeral on banknotes would require a one-time outlay of approximately $45.5 million, plus additional annual costs of $16,000,000. See Exhibit P-7, Def. Response to Interrogatory No. 5. Defendant states that the total costs to include a micro-perforation feature perceptible to touch would require a one time outlay of $75 million, plus additional annual costs of $9 million. See Exhibit P-7, Def. Response to Interrogatory No. 6. Defendant states that the cost of adding a foil feature to banknotes which is perceptible to touch would result in a one-time outlay of $51.5 million, plus additional annual costs of $15.3 million, excluding the cost of the foil, which the Defendant declines to estimate. See Exhibit P-6, Def. Response to Interrogatory No. 22.

**85**. U.S. currency is currently producing using the intaglio method. See Exhibit P-22, BEP Description of Intaglio Process. Defendant declines to estimate the costs of using intaglio printing to create a tactile feature on banknotes because it considers it unlikely that such a feature could be produced. See Exhibit P-6, Def. Response to Interrogatory No. 21. Defendant's failure to estimate the cost of using intaglio printing to create a tactile feature is unjustifiable. The Euro uses the intaglio method to create a large

denomination numeral which is perceptible to the touch. See Exhibit P-19, Euro Vision, Understanding Euro Notes and Coins, at p. 4. Specific patterns using intaglio print which are perceptible to touch are also printed along the edges of the EUR 200 and EUR 500 banknotes to help with recognition. Id. at p. 5. The Japanese yen also uses intaglio print to incorporate a tactile feature specifically designed to assist the blind in denominating currency. See Exhibit P-32, Bank of Japan Description of Yen Note. At the time of the 1995 NAS Study, there were 16 countries that used intaglio printing to produce tactile marks on currency. See Exhibit P-2, NAS Study at p. 103.

**C. Defendant's Current Cost Estimates are Either Inflated or Unsubstantiated**

**86**. Defendant's cost estimates are based on the cost of modifying all denominations, including the $1.00 note. The $1 note consists of approximately 50% of all currency production. See Exhibit P-21, Ferguson Declaration at ¶5. Defendant asserts that it is precluded from modifying the $1 note due to legislative restrictions. See Def. Motion for Summary Judgment, at 18. Therefore, the cost estimates provided by Defendant are likely to be significantly reduced if the cost of modifying the $1 note is subtracted.

**87**. Defendant asserts that to emboss currency it will be required to purchase 12 embossing machines at $3 million each (See Exhibit P-26, Cost Impact of Embossing Feature, Def. Response to Third Document Production Request); to perforate currency it will be required to purchase 12 perforation machines at $5.5 million each (Exhibit P-27, Cost Impact of Perforation Feature, Def. Response to Third Document Production Request); and to add foil it will be required to purchase 12 foil stamp machines at $3.5 million each (Exhibit P-28, Cost Impact of Foil Stamp, Def. Response to Third Document Production Request). Defendant provides no documentation as to how it arrived at its

estimated cost per machine, or as to the number of machines required to perform the manufacturing operation, notwithstanding Plaintiff's request for all documents supporting Defendant's cost estimates. See Exhibit P-24, Def. Response to Document Production Requests No's 10-16.

**88**. Defendant states that each new embossing machine will require hiring 2 pressman and 1 KG-4 helper per machine shift (Exhibit P-26, Cost Impact of Embossing Feature); each new perforating machine will require hiring one additional plate printer per machine shift (Exhibit P-27, Cost Impact of Perforation Feature), and each new foil stamp machine will require hiring 2 pressman and 1 KG-4 helper per machine shift (Exhibit P-28, Cost Impact of Foil Stamp). Defendant provides no supporting documentation as to how it arrived at its estimated staffing cost per machine.

**89**. Defendant asserts that the addition of different colors for each denomination would require a one time additional equipment cost of $48 million, plus increased annual costs of $20 million, primarily for labor. See Exhibit P-7, Def. Response to Interrogatory #9. Documents supporting this estimate reflect that the additional capital costs consist of the purchase of 4 new printing presses at $12 million each. See Exhibit P-29, Cost Impact of Offset Printing Feature, Def. Response to Third Document Production Request. The increased labor cost consists primarily of the additional labor required to operate each new machine. Id.

**90**. Defendant's cost estimates are inconsistent with the findings of the 1995 NAS Panel, which found that little additional capital investment would be required to add color to banknotes. See Exhibit P-2, NAS Study, at p. 70. In any event, Defendant has already added different colors to the $20 and $50 notes. See Exhibit P-7, Def. Response to

Interrogatory #9. Accordingly, the increased costs reflected above can only consist of the amounts required to add color to the remaining five denominations.

**91**. Defendant states that it currently plans to add different background colors to all seven denominations. See Exhibit P-6, Def. Response to Interrogatory #20. Defendant will incur the additional costs of adding different background colors for each denomination regardless of the outcome of this litigation.

**D. Defendant's Asserted Cost Impacts Do Not Impose an Undue Burden, Even Assuming Their Accuracy**

**92**. Defendant states that it has spent $4.2 billion over the past 10 years to produce currency. See Exhibit P-7, Def. Response to Interrogatory No. 1. This equates to an average of approximately $420,000,000 per year. Defendant further states that every aspect of currency production involves the incorporation of anti-counterfeiting features. See Exhibit P-7, Def. Response to Interrogatory No. 2. Therefore, Defendant states that it has spent $4.2 billion for this purpose as well. Id.

**93**. The use of different predominant colors for each denomination would result in increased annual costs $20 million (Exhibit P-7, Def. Response to Interrogatory No. 9), which is less than 4.7% of the average annual $420 million production cost.

**94**. The inclusion of an embossed numeral would result in increased annual costs of $16 million (Exhibit P-7, Def. Response to Interrogatory No. 5), or approximately 3.8% of average annual production costs.

**95**. Addition of a foil feature would result in increased annual costs of $15.3 million (Exhibit P-6, Def. Response to Interrogatory No. 22), excluding the cost of the foil itself which Defendant declines to estimate. This annual increase is approximately 3.6% of the average yearly $420 million production cost.

**96**. The use of a micro-perforation feature would result in additional annual costs of $9 million (Exhibit P-7, Def. Response to Interrogatory No. 6), or approximately 2% of average annual production costs.

**97**. The inclusion of a large denomination numeral would result in increased annual costs of $400,000 (Exhibit P-7, Def. Response to Interrogatory No. 8), which is approximately .095 percent, or less than one-tenth of one percent, of the average annual production costs.

**98**. The use of large geometric shapes on banknotes to indicate denomination would result in no increased annual costs. See Exhibit P-7, Def. Responses to Interrogatory No. 10.

**99**. Defendant calculated the cost increases associated with making the design modifications sought by Plaintiffs on the basis of its costs per 1000 notes. See Exhibit P-23, Cost Impact of Enlarged Numeral; Exhibit P-26, Cost Impact of Embossing Feature; Exhibit P-27, Cost Impact of Perforation Feature, Exhibit P-28, Cost Impact of Foil Stamp; Exhibit P-29, Cost Impact of Offset Printing Feature. Approximately 50% of the Bureau's production volume consists of the $1 note. See Exhibit P-21, Ferguson Declaration at ¶5. Therefore, the annual cost increases provided by Defendant in connection with making these design modifications must also be decreased by 50%, assuming that no modifications are made to the $1 note. The initial equipment costs estimated by Defendant must also be proportionately reduced by one-half, as only 50% of the estimated equipment would be required to meet the correspondingly reduced production volumes.

**100**. Defendant states that it has already spent approximately $49 million to make currency accessible to persons with visual disabilities. See Exhibit P-7, Def. Response to Interrogatory No. 4. Defendant states that these costs were incurred for the purpose of adding color and a large denomination numeral. Id. The additional costs to provide accommodations for the visually disabled are not disproportionate to the costs which Defendant states it has already expended for this purpose.

**101**. Defendant states that its current cost estimates do not include any reduction in the useful life of the currency due to degradation of the embossed numeral or the micro-perforation feature. Defendant states that the reduction in the useful life of banknotes associated with degradation of these features "cannot be determined." See Exhibit P-7, Def. Response to Interrogatories No's. 5, 6. The Ferguson Declaration states that no testing has been conducted to determine the extent to which the useful life of a note would be reduced by inclusion of such features. See Exhibit P-21, Ferguson Declaration, ¶ 50.

**102**. Defendant's estimates as to the useful life of currency as presently designed are inconsistent with estimates provided by the Federal Reserve Board. The Director of the BEP stated that a "on average, a five dollar bill is withdrawn after approximately two years in circulation, a ten dollar bill is withdrawn after approximately 3 years in circulation, a twenty dollar bill is withdrawn after approximately four years in circulation, and both a fifty and a one hundred dollar bill is withdrawn after approximately nine years in circulation." See Exhibit P-21, Ferguson Declaration at ¶ 50.

**103**. The Federal Reserve Board states that the average life of a $5 note is 16 months, a $10 note is 18 months, a $20 note is 24 months, a $50 note is 55 months, and a $100 note is 89 months. See Exhibit P-35, Federal Reserve Board FAQ.

**104**. The BEP receives no appropriations from Congress. See Exhibit P-21, Ferguson Declaration, ¶ 7. Rather, its operations are financed by means of a revolving fund. This fund is reimbursed through product sales for the direct and indirect costs of operations. Id. The Bureau is authorized to add an amount sufficient to cover any new capital investments and additional working capital requirements in the prices it charges for its products. Id.

**105**. In the case of currency production, the Bureau's costs are reimbursed by the Federal Reserve Board. Id. Any increased costs to modify U.S. currency to accommodate the visually disabled would be passed on to the Federal Reserve System. See Exhibit P-21, Ferguson Declaration, ¶ 22. The Federal Reserve System will in turn pass through these costs to its member banks and other private financial institutions. Id.

**COUNT I**

**106.** Plaintiffs incorporate each allegation of paragraphs 1 through 105 as fully set forth herein.

**107.** The Rehabilitation Act requires that U.S. banknotes be designed in such a manner so that their denominations are readily identifiable by persons with blindness or other vision impairments.

**108.** Defendants have acted contrary to the legal requirements of the Rehabilitation Act by designing and manufacturing banknotes which are identical in size and texture,

thereby precluding individuals with blindness or other vision impairments from being able to denominate such banknotes.

**COUNT II**

**109.** Plaintiffs incorporate each allegation of paragraphs 1 through 105 as fully set forth herein.

**110.** Defendants have acted contrary to the legal requirements of the Rehabilitation Act by failing to include in banknotes a single large denomination numeral at least 40% - 60% of the current banknote height;

**COUNT III**

**111.** Plaintiffs incorporate each allegation of paragraphs 1 through 105 as fully set forth herein.

**112.** Defendants have acted contrary to the legal requirements of the Rehabilitation Act by printing the larger denomination on the reverse side of the $5, $10, $20, and $50 notes with green ink, instead of black ink, thereby significantly reducing contrast levels;

**COUNT IV**

**113.** Plaintiffs incorporate each allegation of paragraphs 1 through 105 as fully set forth herein.

**114.** Defendants have acted contrary to the legal requirements of the Rehabilitation Act by printing the larger denomination numeral on the $5, $10, $20, and $50 bills on only one side of the banknote, and by not printing any larger denomination numeral on the $100 note.

**COUNT V**

**115.** Plaintiffs incorporate each allegation of paragraphs 1 through 105 as fully set forth herein.

**116.** Defendants have acted contrary to the legal requirements of the Rehabilitation Act by failing to design banknotes with strongly contrasting different predominant colors for each denomination;

**COUNT VI**

**117.** Plaintiffs incorporate each allegation of paragraphs 1 through 105 as fully set forth herein.

**118.** Defendants have acted contrary to the legal requirements of the Rehabilitation Act by failing to perform any testing as to the contrast, location, and physical size of the larger denomination numeral and colors which would be most useful to the visually disabled in denominating U.S. banknotes.

**COUNT VII**

**119.** Plaintiffs incorporate each allegation of paragraphs 1 through 105 as fully set forth herein.

**120.** Defendants have acted contrary to the legal requirements of the Rehabilitation Act by failing to perform any testing to determine the gradations which will permit reliable human discrimination of low-relief tactile features on banknotes.

**COUNT VIII**

**121.** Plaintiffs incorporate each allegation of paragraphs 1 through 105 as fully set forth herein.

**122.** Defendants have acted contrary to the legal requirements of the Rehabilitation Act by failing to perform any research into the development of durable tactile features on banknotes.

**COUNT IX**

**123.** Plaintiffs incorporate each allegation of paragraphs 1 through 105 as fully set forth herein.

**124.** Defendants have acted contrary to the legal requirements of the Rehabilitation Act by failing to evaluate the competing advantages of the various tactile features which are currently used in other currencies for purposes of their inclusion on U.S. currency, such as embossed dots, foil, micro-perf, and raised intaglio printing, and by failing to incorporate a tactile feature into the design of U.S. banknotes.

**COUNT X**

**125.** Plaintiffs incorporate each allegation of paragraphs 1 through 105 as fully set forth herein.

**126.** Defendants have acted contrary to the legal requirements of the Rehabilitation Act by failing to diligently pursue the development of an inexpensive and portable external device which is capable of denominating banknotes in an accurate and rapid manner.

**COUNT XI**

**127.** Plaintiffs incorporate each allegation of paragraphs 1 through 105 as fully set forth herein.

**128.** Defendants have acted contrary to the legal requirements of the Rehabilitation Act by failing to provide any meaningful future plans to make currency accessible to persons with visual disabilities.

## COUNT XII

**129.** Plaintiffs incorporate each allegation of paragraphs 1 through 105 as fully set forth herein.

**130.** Defendants have acted contrary to the legal requirements of the Rehabilitation Act by ignoring the recommendations of the 1995 NAS Panel when implementing its 1996 and 2004 redesigns;

## COUNT XIII

**131.** Plaintiffs incorporate each allegation of paragraphs 1 through 105 as fully set forth herein.

**132.** Defendants have acted contrary to the legal requirements of the Rehabilitation Act by failing to provide accurate and substantiated estimates to this Court with respect to the cost of the design changes sought by Plaintiff; by failing to estimate the cost of using intaglio printing to create a suitable tactile feature; and by failing to provide this Court with accurate data as to the useful life of banknotes so that the Court can evaluate Defendant's arguments with respect to the impact of adding a tactile feature on banknote durability.

**133.** Plaintiffs will suffer irreparable harm if Defendants are not restrained from breaching their duty under the Rehabilitation Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays that this Court further grant the following relief:

(a) issue a declaratory judgment that the Defendants have an obligation under the Rehabilitation Act to design banknotes in such a manner so that they may be readily identified by individuals with visual disabilities.

(b) issue a permanent injunction prohibiting Defendants from continuing to manufacture banknotes in the present manner, the effect of which is to preclude millions of Americans from participating in the essential functions of everyday life.

(c) issue a permanent injunction requiring that banknotes be designed to incorporate features which will make them accessible to people with blindness and other vision impairments; and in conjunction therewith order that Defendant provide for the approval of the Court a detailed corrective action plan as to the features which it will incorporate into the design of U.S. banknotes to accomplish such purpose. Defendant shall address the following specific elements in the corrective action plan to be provided for the Court's approval:

(1) The specific design features on U.S. banknotes which Defendant will incorporate for the purpose of assisting individuals with visual disabilities other than total blindness. Said plan will further contain a schedule by which any such design features will be added to U.S. banknotes.

(2) The specific design features on U.S. banknotes which Defendant will implement for the purpose of assisting the totally blind. In the alternative, Defendant shall provide the Court with a statement of the actions it intends to take, including additional research and testing, which will lead to the incorporation of features which will be useful to the totally blind. Said plan will further contain projected implementation dates, with appropriate milestones to permit ongoing oversight by the Court.

(3) The corrective action plan shall further provide for consultation with various disabled user groups in connection with the implementation of any features.

(4) Defendant shall provide its corrective action plan for the Court's approval not later than 180 days from the date of the Court's order, and in connection therewith the Court shall maintain continuing jurisdiction to monitor Defendant's ongoing compliance.

(d) issue a permanent injunction mandating that Defendant diligently pursue the development of an inexpensive portable electronic device which is capable of both accurate and rapid denomination of banknotes.

(e) award expenses, costs, and reasonable attorney fees to Plaintiffs

(f) issue such further relief as this Court deems just and appropriate.

Respectfully submitted,

Jeffrey A. Lovitky
Attorney at Law
D.C. Bar Number 404834
1735 New York Avenue, N.W.
Suite 700
Washington D.C. 20006
(202) 429-3393

ATTORNEY FOR PLAINTIFF