# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN COUNCIL OF THE BLIND, *et al.*, <br><br>              Plaintiffs, <br><br>              v. <br><br> STEVEN T. MNUCHIN*, Secretary of the Treasury*, <br>              Defendant. | Civil Action No. 02-864 (BAH) <br><br> Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

The plaintiffs have, for the third time, moved to modify the injunction originally entered in this case in 2008, as relief for violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by the defendant, the Secretary of the Treasury ("Treasury").  *See* Pls.' Renewed Mot. & Mem. to Modify Injunction ("Pls.' Third Mot."), ECF No. 160.  The original injunction ordered Treasury to "take such steps as may be required to provide meaningful access to United States currency for blind and other visually impaired persons, which steps shall be completed, in connection with each denomination of currency, not later than the date when a redesign of that denomination is next approved by the Secretary of the Treasury."  Injunction Order, October 3, 2008 ("Injunction Order") ¶ 2, ECF No. 96.  In 2016, citing Treasury's delays in redesigning currency in order to accommodate "significant developments in counterfeiting technology," *see* Def.'s Supp. Status Rpt. (Feb. 22, 2016) ¶ 5, ECF No. 139; Def.'s Supp. Status Rpt. (May 12, 2016) ¶ 1, ECF No. 141, the plaintiffs moved to modify the injunction to require Treasury to provide meaningful access to the $10 bill by December 31, 2020, and to other denominations that can be legally redesigned by December 31, 2026.  *See* Pls.' Second Mot. & Mem. to Modify

Injunction ("Pls.' Second Mot.") at 4–5 & n.1, ECF No. 142.[1]  This Court denied that motion, *Am. Council of the Blind v. Lew*, No. 02-CV-00864 (BAH), 2017 WL 6271264, at \*2 (D.D.C. Jan. 6, 2017), but the D.C. Circuit reversed and remanded, *Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 371 (D.C. Cir. 2017).[2]  In lieu of pursuing their second motion to modify the injunction on the limited issue requiring inquiry on remand, the plaintiffs filed a renewed motion to modify the injunction, mooting their second motion.  *See* Jt. Status Rpt. & Stipulation dated Mar. 7, 2018 ("Mar. 2018 JSR") ¶ 1, ECF No. 158 ("Upon the filing of plaintiffs' renewed motion to modify, plaintiffs' motion of June 6, 2016 [Pls.' Second Mot.] shall be deemed denied as moot.").[3]  The plaintiffs' third motion seeks identical relief to their second motion: an order requiring meaningful access by the visually impaired to the $10 bill by December 31, 2020 and to other denominations that can be legally redesigned by December 31, 2026.  Pls.' Third Mot. at 4 & n.1.[4]  For the reasons explained below, that motion is denied.

## I.    BACKGROUND

In 2002, the plaintiffs filed a lawsuit claiming that Treasury was violating the

---

[1]    The plaintiffs' motion and memorandum are paginated separately, but were not docketed separately. Accordingly, page numbers correspond to those electronically assigned by the CM-ECF system.

[2]    On remand, the D.C. Circuit directed "the district court to better support its findings supporting its denial of modified injunctive relief," *Am. Council of the Blind v. Mnuchin*, 878 F.3d at 363, after concluding that this denial failed to provide "adequate evidentiary support and reasoning," *id.* at 371.  Given this mandate to "better support [this Court's] findings," *id.* at 363, and in the face of the parties' denial of any need for an evidentiary hearing on remand, *see infra* Section I.K, the Court has supplemented the record by ordering the parties to respond to a series of questions focused on Treasury's progress on compliance with its Rehabilitation Act obligations and the costs, equities and feasibility of adopting the plaintiffs' proposed modifications to the Injunction Order.  *See* Order Directing the Parties to Answer Questions, ECF No. 175.  To ensure the completeness of the evidentiary support for the findings made here, the parties' responses to those questions are reproduced virtually in full in the footnotes when the evidence or conclusions predicated on those responses are referenced in the text.

[3]    The plaintiffs note that the parties' stipulation was never formally adopted in an order.  *See* Pls.' Answers to Court's Questions of Jan. 9, 2019 ("Pls.' Answers") (Question 3), ECF No. 176.  Rather, in response to the stipulation, the Court adopted the parties' proposed schedule, which anticipated that the plaintiffs would file any renewed motion to modify by May 8, 2018, and any motion to conduct discovery by July 24, 2018.  *See* Min. Order (Mar. 7, 2018).  To the extent any further clarification is needed, the plaintiffs' second motion, ECF No. 142, is denied as moot in light of the plaintiffs' third motion, ECF No. 160.

[4]    The plaintiffs' motion and memorandum are paginated separately, but were not docketed separately. Accordingly, page numbers correspond to those electronically assigned by the CM-ECF system.

Rehabilitation Act because U.S. currency was not meaningfully accessible to individuals with visual disabilities. *See* Compl. ¶ 1, ECF No. 1. This Court agreed, and the D.C. Circuit affirmed. *See Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d 51, 62 (D.D.C. 2006), *aff'd*, 525 F.3d 1256 (D.C. Cir. 2008). As noted, the 2008 Injunction Order required Treasury to "provide meaningful access to United States currency for blind and other visually impaired persons" within a time frame of "not later than the date when a redesign of that denomination is next approved by the Secretary of the Treasury after the entry of this order and judgment." Injunction Order ¶ 2. At the time the Injunction Order was entered, the parties anticipated that the next redesign would occur between 2013 and 2018. Treasury now anticipates that a new $10 bill will not begin circulating until 2026, with subsequent denominations following at intervals of eighteen months to two years. Def.'s Answers to Court's Questions of Jan. 9, 2019 ("Def.'s Answers") (Question 13(a)), ECF No. 179.[5] This delay, which was necessitated by "significant developments in counterfeiting technology," Def.'s Supp. Status Rpt. (Feb. 22, 2016) ¶ 5, also reflects the complexity of designing currency with a tactile or other feature that is distinct to each denomination, durable, and accurately distinguishable over time by persons with visual impairments. The following sections detail the history of this case, including the negotiations

---

[5] In response to the Court's Question 13(a) ("In the event that the plaintiffs' proposed order is adopted, list, for each U.S. currency denomination, how the schedule for introducing new bills would be affected."), Treasury responded: "Any effort to pursue affixing a raised tactile feature (RTF) to the legacy $10 bill would divert significant resources from [the Bureau of Engraving and Printing ("BEP")] efforts to produce a more secure note by 2026. To accommodate the necessary testing (explained further below), it would delay the timeline for more secure notes by at least two years and possibly more. The plan for the new family of notes is to introduce the $10 bill first in 2026, with each additional denomination being introduced every 18 months to two years thereafter. Pushing back the introduction of the first note by two years or more would result in all other denominations being delayed by a similar amount of time." Def.'s Answers (Question 13(a)). This current "plan" is consistent with information provided by Treasury to this Court in September 2017, during the pendency of the appeal, about the agency's "working timeline" for currency redesign, which is "driven primarily by security," including incorporation of RTF in bill denominations, Def.'s Eighteenth Status Rpt. (Sept. 18, 2017), Att. 1, Letter from Leonard R. Olijar, Dir. of Bureau of Engraving & Printing, to Sen. Ron Wyden (Aug. 1, 2017) ("Aug. 2017 Ltr. from BEP") at 1–2, ECF No. 156-1, which information was acknowledged by the D.C. Circuit, *see Am. Council of the Blind v. Mnuchin*, 878 F.3d at 366.

leading to the original Injunction Order, status reports memorializing Treasury's progress in complying with the Injunction Order, the arguments associated with and outcomes of the plaintiffs' two prior motions to modify the Injunction Order, and the manner in which the record related to the plaintiffs' third motion to modify the Injunction Order has developed.

### A. Claims Resulting in Declaratory Judgment that Treasury is Violating the Rehabilitation Act

In 2002, the American Council of the Blind and two individual plaintiffs sued Treasury, alleging that the design of United States paper currency violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and seeking declaratory and injunctive relief. *See* Compl. ¶ 1. The plaintiffs alleged that individuals with visual impairments lacked meaningful access to currency because "U.S. banknotes are all identical in size and color, and virtually identical in design," *id.* at 1, and that, "[a]s a result, individuals with visual disabilities suffer needless impediments in purchasing groceries, transportation, and a multitude of other goods and services," *id.* In 2006, the then-presiding Judge entered declaratory judgment for the plaintiffs, holding that Treasury violated Section 504 by "fail[ing] to design and issue paper currency that is readily distinguishable to blind and visually impaired individuals." *Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d at 62.[6]

The Court paused, however, at fashioning the appropriate remedy. The plaintiffs sought three types of injunctive relief in their First Amended Complaint, which relief was discussed by the Court in its Memorandum Opinion, *see id.*: (1) "a permanent injunction prohibiting [Treasury] from continuing to manufacture banknotes in the present manner, the effect of which

---

[6]     Treasury's motion for summary judgment had earlier been denied because the record lacked factual development, and the agency's motion to dismiss had been denied, except with respect to dismissing the Treasurer of the United States, because: (1) Treasury's discretion over the design of currency did not preclude application of the Rehabilitation Act; (2) plaintiffs had stated a claim under the Rehabilitation Act; and (3) exhaustion of administrative remedies would be futile. *See Am. Council of the Blind v. Snow*, 311 F. Supp. 2d 86, 87–90 (D.D.C. 2004).

is to preclude millions of Americans from participating in the essential functions of everyday life;" (2) "a permanent injunction requiring that banknotes be designed to incorporate features which will make them accessible to people with blindness and other vision impairments; and in conjunction therewith order that [Treasury] provide for the approval of the Court a detailed corrective action plan as to the features which it will incorporate into the design of U.S. banknotes to accomplish such purpose," which corrective action plan must include a "schedule" for adding design features to assist individuals with visual disabilities other than total blindness, and "projected implementation dates, with appropriate milestones" for the incorporation of features designed to assist persons who are totally blind; and (3) "a permanent injunction mandating that [Treasury] diligently pursue the development of an inexpensive portable electronic device which is capable of both accurate and rapid denomination of banknotes." First Am. Compl. ("FAC") at 35–36, ECF No. 53. The Court declined to grant any of these requested forms of injunctive relief, stating that "[t]his Court has neither the expertise, nor, I believe, the power, to choose among the feasible alternatives, approve any specific design change, or otherwise to dictate to the Secretary of the Treasury how he can come into compliance with the law." *Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d at 62. Rather, the Court chose to "set a status conference for the purpose of discussing remedy," unless Treasury filed an interlocutory appeal. *Id.* To that end, the Court certified that its order "involves a controlling question of law as to which there is substantial ground for difference of opinion," such that "an immediate appeal . . . may materially advance the ultimate termination of this litigation." *Id.* at 62–63.

### B. D.C. Circuit Affirms that Treasury is Violating the Rehabilitation Act But Declines to Address Appropriate Remedy

Accepting review of Treasury's interlocutory appeal, a divided panel of the D.C. Circuit

affirmed that the failure to design and issue paper currency that is readily distinguishable to the visually impaired violates Section 504 of the Rehabilitation Act but remanded "for the district court to address the [plaintiffs'] request for injunctive relief." *Am. Council of the Blind v. Paulson*, 525 F.3d at 1259, 1265, 1274. Agreeing that Treasury "has discretion to choose from a range of accommodations" to provide meaningful access to paper currency, the Court also declined to direct the implementation of the injunctive relief sought by the plaintiffs. *Id.* at 1271. Instead, the Court concluded that Treasury's "failure to demonstrate that all accommodations found by the district court to be facially reasonable would pose an undue burden presents no occasion for us to address any particular accommodation." *Id.* The dissenting panel member opined that the interlocutory appeal was premature because a material fact remained disputed as to whether an "*effective* accommodation [existed that] the government could implement without imposing an 'undue burden' on itself or the private sector." *Id.* at 1275–76 (Randolph, J., dissenting) (emphasis in original) (footnote omitted) (observing that the majority does "not know what if anything should be implemented as an accommodation and neither does the American Council of the Blind, the Treasury, the district court, or the National Federation of the Blind (who supports Treasury)" (footnote omitted)).

### C. 2008 Injunction Order Couples Security Redesign and Meaningful Access Redesign Without Any Deadlines

On remand to this Court, the parties turned their attention to remedies, and whether Treasury should be held to any particular timeline became a point of contention. On August 29, 2008, Treasury summarized its "process of determining how best to provide . . . meaningful access" and urged that "[i]t is in the interest of all concerned to permit . . . Treasury to gather the necessary data and complete its analysis to ensure that the method employed to provide . . . meaningful access is effective in achieving that objective without undermining the Secretary's

critical efforts to prevent counterfeiting and to ensure that United States currency remains a reliable, durable, and usable medium of exchange for the public." Def.'s Status Conference Stmt. ¶¶ 2, 9, ECF No. 80. Treasury suggested that its process would "allow the Court to have the benefit of the Secretary's factual investigation as well as the Department's experience and expertise in appropriately resolving the competing demands related to currency design." *Id.* ¶ 9.

The plaintiffs disagreed with Treasury's proposed process because Treasury "explicitly refused to provide Plaintiffs with any estimated time frames for completion of" its process and "therefore . . . the issue of time frames is [now] appropriate for discussion." Pls.' Status Conference Stmt. ¶ 1, ECF No. 81. The plaintiffs, alternatively, proposed that the Court and the plaintiffs be deeply engaged in any process undertaken by Treasury in redesigning U.S. currency. Specifically, the plaintiffs requested that the Court "convene a status conference to discuss the timeframes for completion of [the process]," with Treasury "provid[ing] estimated timeframes so as to permit monitoring by the Court," with such monitoring to include ongoing status reports if Treasury anticipated missing any deadline. *See* Pls.' Proposed Remedial Order ¶¶ 3, 5, 9, ECF No. 81-1. The plaintiffs also sought quarterly progress reports, with the Court required to "accept and consider comments from Plaintiffs" following each report, as well as quarterly meetings between the plaintiffs and Treasury to discuss progress and give the plaintiffs further opportunity to share comments. *Id.* ¶¶ 10–12.

At a status conference convened on September 4, 2008, Min. Entry (Sept. 4, 2008), the plaintiffs' request for close judicial monitoring of Treasury was rejected, with the Court explaining it "will not, cannot, [and does not] want to micromanage this process; nor do I think, with all deference to the [plaintiffs], that [they] ha[ve] won a seat at the Treasury table that designs the bills." Transcript of Hearing (Sept. 4, 2008) ("Sept. 2008 H'rg Tr.") at 13:4–7, ECF

No. 113-2.  At the same time, the Court expressed concern that Treasury's preferred proposal appeared "open-ended as to time." *Id.* at 3:11–12.  Treasury responded that in order to comply with its "statutory mandate . . . to produce currency in the best manner to guard against counterfeiting," and "because . . . counterfeiters are progressing so quickly in their technology," "the standard" is to produce new currency designs every seven to ten years, *id.* at 10:5–12, and that Treasury planned to "fold some anti-counterfeiting changes into . . . changes made in relation to . . . this case," *id.* at 10:15–17.  This plan prompted the Court to observe that "a reasonable provision of an order going forward that is not a micromanagement order" would be to couple any ongoing security redesign with an accessibility redesign.  *Id.* at 13:15–22.  *But see id.* at 13:15–17 (Court stating that Treasury "requires new currency to be issued every seven to 10 years," when the statute contains no hard deadlines).[7]  Based on this understanding—with an added caution from Treasury that the agency "has to have the ability to respond to changes, to developments and technology on the side of the counterfeiters," *id.* at 20:11–13—the parties were directed to provide status reports every 180 days and to submit a new proposed order "incorporating what [the Court hopes] can be understood from the conversation [at the Status Conference]."  *See id.* at 16:23–17:2, 22:10–15; Min. Entry (Sept. 4, 2008).

Accordingly, Treasury submitted two versions of a proposed order.  *See* Def.'s Mem. Regarding Final Order & Judgment ("Def.'s Mem. on Final Order") at 2–3, ECF No. 88.  In Treasury's preferred version, the agency proposed that "injunctive relief is neither necessary nor appropriate," and suggested that only a "report on progress in providing meaningful access to [] currency" should be required.  *Id.* at 2.  In the alternative version, Treasury proposed that a

---

[7]     The statutory mandate requires that, "[i]n order to furnish suitable notes for circulation as Federal reserve notes, the Secretary of the Treasury shall cause plates and dies to be engraved in the best manner to guard against counterfeits and fraudulent alterations, and shall have printed therefrom and numbered such quantities of [each denomination]." 12 U.S.C. § 418.

meaningful access redesign be required in connection with the next redesign of each denomination of currency. *Id.* at 7–8. Treasury cautioned that "[t]his does not mean, however, that redesigning the currency will necessarily be chosen as the means to comply with the Court's declaratory judgment. . . . [because Treasury is] considering all potential methods of providing meaningful access to [] currency." *Id.* at 8. Indeed, the plaintiffs' original injunctive relief request sought, *inter alia*, development and deployment by Treasury "of an inexpensive portable electronic device which is capable of both accurate and rapid denomination of banknotes." FAC at 36.

The Injunction Order adopted by the Court largely mirrored Treasury's less preferred, alternative proposal, with only slight revisions. *See* Injunction Order ¶ 2. Treasury's proposed language exempting the $1 bill and the upcoming version of the $100 bill from the accessibility redesign requirement, *see id.* ¶ 3, as well as language requiring Treasury to provide status reports every six months, *id.* ¶ 4, were also adopted.[8] Significantly, no specific deadlines for any redesign were included. Indeed, while the plaintiffs unsuccessfully urged that reference to "scheduled" redesigns, based on Treasury's history of redesigning currency every seven to ten years, be expressly included in the Injunction Order, *see* Pls.' Resp. to Def.'s Mem. on Final Order at 7 n.3, ECF No. 89, they acknowledged the risk that if deadlines were incorporated as they initially requested, Treasury "will use court mandated time frames as a justification for a remedy which is based on external note tellers," whereas "[r]edesigning the currency may

---

[8]     The 2008 Injunction Order did not include the $1 bill because Congress prohibited the Secretary from redesigning the $1 bill. *See* Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, sec. 6, div. D, tit. I, § 113. This prohibition remains in effect. *See* Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, sec. 4, div. D, tit. I, § 116. The $100 bill was not included because a new version was shortly expected to enter circulation. *See* U.S. Dep't of the Treasury, Bureau of Engraving & Printing, U.S. Currency: History of the BEP and U.S. Currency, https://www.moneyfactory.gov/uscurrency/history.html (last visited August 22, 2019). The most recent redesigns for each denomination are as follows: a new $20 bill began circulating on October 9, 2003; a new $50 bill began circulating on September 28, 2004; a new $10 bill began circulating on March 2, 2006; a new $5 bill began circulating on March 13, 2008; and a new $100 bill began circulating on October 8, 2013. *Id.*

require more time than would the furnishing of external note tellers," *id.* at 6. *See also Am. Council of the Blind v. Lew*, 2017 WL 6271264, at *1 (noting that the language coupling the two redesigns was "based on a draft of a remedial order proposed by [Treasury], but the plaintiffs raised no objection to this particular provision, nor did they suggest a specific timeframe be designated").

The Memorandum Opinion accompanying the order did "not question the Treasury Department's commitment to achieving compliance," and also commonsensically noted that "the best-laid plans can be derailed by shifting priorities, limited resources, and the other vagaries of bureaucratic action." *Am. Council of the Blind v. Paulson*, 581 F. Supp. 2d 1, 2 (D.D.C. 2008). Acknowledging that the Court "has neither the expertise, nor . . . the power[] to choose among the feasible alternatives, approve any specific design change, or otherwise . . . dictate to the Secretary of the Treasury how he can come into compliance with the law," the Court maintained "the expertise and the authority to create goals and to hold the government to those goals." *Id.* (internal quotation marks and citation omitted). While Treasury had requested the right to delay the issuance of accessible currency if a redesign was "urgently needed to counter a threat or threats of counterfeiting," Def.'s Mem. on Final Order at 9, this "carte blanche to delay the issuance of accessible currency" was denied in light of the agency's ability to "file a specific request, properly supported" if Treasury "needs relief from the injunction for that reason (or any reason)." *Am. Council of the Blind v. Paulson*, 581 F. Supp. 2d at 2.

This background to the original Injunction Order illustrates that the plaintiffs were aware at the time of adoption that any redesign of currency was not on any precise schedule. *See* Pls.' Resp. to Def.'s Mem. on Final Order at 7 n.3 ("Defendant is correct in stating that major redesigns are not on any '*precise schedule*.'" (emphasis in original)). The plaintiffs

intermittently requested that Treasury be held to more specific deadlines, but also recognized both the difficulty and drawbacks of attempting to set a deadline for the complicated goal of achieving meaningful access to currency. *Id.* at 6. Their request for more specific timeframes was, accordingly, considered but overruled. At its core, the 2008 Injunction Order acknowledged that Treasury was subject to two legal requirements: an obligation to ensure that U.S. currency is meaningfully accessible to the visually impaired, and an over-arching obligation to ensure that U.S. currency is secure. The 2008 Injunction Order instructed Treasury to accomplish both redesigns simultaneously, but recognized that the means of complying with both legal obligations were subject to some degree of uncertainty. This order has remained in place, without modification, for more than a decade—a period marked by constructive attention to the accessibility issue by Treasury as well as adoption of a number of steps to make U.S. currency more accessible to the visually impaired. *See Am. Council of the Blind v. Mnuchin*, 878 F.3d at 364–65 (recognizing that "[s]ince 2011, the Bureau [of Engraving and Printing] has produced tangible results" and noting "all denominations include large numerals and some denominations . . . include high-contrast numerals. . . . [the Bureau] created and produced free currency readers. . . . [and] also developed free currency-reading applications for mobile phones").

### D. Treasury Adopts a Three-Pronged Approach to Providing Meaningful Access to Currency and Submits Regular Status Reports

Over the next three and a half years, between October 3, 2008 and June 4, 2012, Treasury submitted eight status reports. Each report detailed the steps Treasury took to gather data about the demographics of visually impaired persons, conduct focus groups, and perform "usability studies" in which "blind and other visually impaired individuals in all age categories . . . used various technologies, including foreign currency with tactile features, currency with large print

numerals, different-sized currency, currency with varying color and contrast features, currency readers, and cell phone technology." *See* Def.'s First Status Rpt. (Feb. 27, 2009) ¶ 2, ECF No. 102.

Following this course of study, Treasury published, in the Federal Register, a three-pronged approach proposed by the Bureau of Engraving and Printing ("BEP") to provide meaningful access to currency by: (1) adding a raised tactile feature ("RTF") to bills so that visually impaired individuals could differentiate denominations by touch; (2) continuing to add colors and large, high-contrast numerals to bills; and (3) implementing a supplemental currency-reader distribution program. *See* Meaningful Access to United States Currency for Blind and Visually Impaired Persons, 75 Fed. Reg. 28331-02 (proposed May 20, 2010); *see also* Def.'s Fourth Status Rpt. ¶ 1 (Sept. 16, 2010), ECF No. 106.[9]  On May 31, 2011, following public comment, the Secretary of the Treasury approved this three-pronged approach. *See* Def.'s Sixth Status Rpt. (Sept. 16, 2011) ¶ 2, ECF No. 108.  Treasury noted that "[d]evelopment of the most appropriate tactile feature is expected to require a significant amount of time," and it "has not yet established a timetable for the next currency redesign." *Id.* ¶ 3.  Regardless, Treasury indicated that "[d]evelopment of an appropriate tactile feature is a priority project at the BEP, which is currently conducting a number of feasibility studies on multiple technologies."  Def.'s Seventh Status Rpt. (Mar. 16, 2012) ¶ 2, ECF No. 109.

On May 21, 2012, Treasury was "directed to file an additional status report, by June 4, 2012, explaining . . . when [it] anticipates that it will be in full compliance with the terms of the

---

[9]     Currency readers are external devices that scan and announce (through voice, noise, or vibrations) the denomination of currency; Treasury provides currency readers to visually impaired and blind individuals at no cost. *See* Def.'s Fourth Status Rpt. (Sept. 16, 2010) ¶ 1; U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-14-823, U.S. CURRENCY: READER PROGRAM SHOULD BE EVALUATED WHILE OTHER ACCESSIBILITY FEATURES FOR VISUALLY IMPAIRED PERSONS ARE DEVELOPED (2014) ("2014 GAO Rpt.") at 13–14; U.S. DEP'T OF THE TREASURY, BUREAU OF ENGRAVING & PRINTING, MEANINGFUL ACCESS PROGRAM: U.S. CURRENCY READER PROGRAM, https://www.moneyfactory.gov/uscurrencyreaderpgm.html (last visited August 22, 2019).

[Injunction Order], and whether the obligation to file status reports every six months should be modified in any way." Min. Order (May 21, 2012).[10] Treasury reiterated that its "goal is to redesign each denomination of currency every seven to ten years, primarily in furtherance of the statutory mandate to produce currency 'in the best manner to guard against counterfeits and fraudulent alterations.'" Def.'s Supp. Status Rpt. (June 4, 2012) ¶ 2, ECF No. 111 (quoting 12 U.S.C. § 418). Noting that, as of 2012, Treasury had "not yet established a timetable for the next currency redesign," *id.* ¶ 4, the agency further observed that as it "continues to develop the tactile feature to be used, [Treasury] is unlikely to have much information to report toward that end until development of the specific feature is completed," *id.* ¶ 7. Consequently, Treasury recommended that its reporting obligations be reduced to once every twelve months, *id.* ¶ 9, which recommendation was opposed by plaintiffs, *see* Pls.' Resp. to Def.'s Supp. Status Rpt. (June 2012) at 11–12, ECF No. 112, and not adopted by the Court.

E.    **Plaintiffs' First Motion to Modify the Injunction is Denied**

Shortly thereafter, on June 14, 2012, in a motion that was identical to, and filed on the same day as, their response to Treasury's supplemental status report, the plaintiffs filed their first motion to modify the Injunction Order. *See* Pls.' First Motion to Modify the Injunction Order ("Pls.' First Mot."), ECF No. 113.[11] The plaintiffs contended that Treasury's "failure to advise this court of even an anticipated date by which [it] will come into compliance with the law clearly demonstrates the need for more intrusive judicial supervision," *id.* at 6, and that "it is now clear that the assumed contingency [of a seven- to ten-year period for redesigning currency] will not materialize, *id.* at 8. *See also* Pls.' Reply in Supp. of First Mot. at 7, ECF No. 120 ("The

---

[10]    On March 21, 2012, following the retirement of Judge James Robertson, this case was reassigned to the undersigned Judge. *See* Reassignment of Civil Case, ECF No. 110.

[11]    The plaintiffs' motion and memorandum are paginated separately, but were not docketed separately. Accordingly, page numbers correspond to those electronically assigned by the CM-ECF system.

intended result of [the Injunction Order] has been thwarted because the expectation of issuing redesigned currency every [seven to ten] years has not materialized. These changed circumstances warrant modification of the decree.").

As relief, the plaintiffs "request[ed] that this Court mandate that the Secretary, within the next 60 days, furnish a detailed implementation plan setting forth the specific steps which will be required to come into compliance with the law, and the anticipated dates by which each of those steps will be completed" and that Treasury be ordered to "come into compliance with Section 504 by the *earlier* of the (a) dates set forth in [that] detailed implementation schedule . . . or (b) the date when a redesign of that denomination is next approved by the Secretary of the Treasury." Pls.' First Mot. at 11–12 (emphasis in original). In particular, the plaintiffs wanted the 2008 Injunction Order modified to incorporate the three-pronged strategy Treasury adopted in 2011, which specified that Treasury would add an RTF and high-contrast numerals to bills and would distribute currency readers, *id.* at 12–14; *see supra* Section I.D, and a further modification requiring "either the Secretary of the Treasury, the Director of the BEP, or one of their principal deputies, on a non-delegable basis," to report quarterly on the agency's progress, Pls.' First Mot. at 15–16.

Treasury opposed the plaintiffs' proposed modifications because the plaintiffs had failed to show that "extraordinary circumstances" justified modifying the injunction, under Federal Rule of Civil Procedure 60(b)(6). Def.'s Opp'n to Pls.' First Mot. at 6, ECF No. 115.[12] First, Treasury noted that "plaintiffs' motion seeks to relitigate proposed provisions that this Court rejected in entering its [Injunction Order]," *id.* at 7, including by resubmitting evidence

---

[12] The plaintiffs disputed the applicability of Rule 60(b)(6), arguing that their motion must be analyzed under Rule 60(b)(5) or the Court's inherent authority to strengthen an injunction. Pls.' Reply in Supp. of First Mot. to Modify at 4–6.

concerning Canadian currency that the "Court was fully aware of . . . before entering the current judgment," *id.* at 8.  Second, Treasury argued that the "plaintiffs have presented no valid reason to alter the Court's judgment by disconnecting assistance for the blind and visually impaired from the timing of the next redesign for purposes of counterfeit deterrence." *Id.* at 9.

Additionally, Treasury posited that "'a detailed implementation plan with anticipated dates' would be unworkable and would unduly intrude into the Secretary's discretion in designing the currency." *Id.* at 9–10.  Further, Treasury had "encountered significant challenges with the $100 bill. . . . [because] [s]everal new anti-counterfeiting features and other advanced features in the redesigned $100 note subsequently caused significant manufacturing issues that the BEP did not foresee." *Id.* at 10–11 (citation omitted).  In light of these changes, Treasury argued that "the lapse of the [seven- to ten-] year period since the last redesign does not affect the validity of the [Injunction Order]." *Id.* at 11 (footnote omitted).

In rebutting the plaintiffs' call for a detailed implementation plan, Treasury highlighted the fact that

> redesigning the currency, especially to include a tactile feature, is a complex, multi-step process involving many different entities, including the BEP and the Department of the Treasury, the Federal Reserve Board of Governors, the Currency Technology Office of the Federal Reserve System, and the U.S. Secret Service [].  Completing this process successfully also requires balancing many considerations, including the needs of blind and other visually impaired persons; the efficiency and economy of the manufacturing process; the needs of the Federal Reserve System as to durability, usability, and consistency; the needs of currency users and the banknote processing community; and the statutory mandate to produce currency in the best manner to guard against counterfeiting [].

*Id.* at 12–13 (internal citations and quotation marks omitted).  Thus, Treasury posited that "[i]ncorporating a 'detailed . . . plan with anticipated dates' would inevitably lead to judicial micromanagement involving such mundane matters as why a given meeting among the various entities had to be rescheduled." *Id.* at 13 (alterations in original).

Treasury also vigorously opposed the plaintiffs' request to incorporate the agency's 2010 three-pronged plan for coming into compliance with Section 504 into the Injunction Order. Treasury argued that the existence of tactile features on other currencies had been studied but "does not mean that a *satisfactory* tactile feature can easily be included on U.S. currency," *id.* at 12 (emphasis in original), and, further, that "incorporating [the Secretary's] decision [to adopt the three-pronged plan] into a judgment of this Court would necessarily convert it into the *Court's* decision. . . . [so] [t]he Secretary would no longer have discretion regarding the design of currency," *id.* at 15 (emphasis in original).  Moreover, no Court had ever held "that the Rehabilitation Act requires the Secretary to undertake all three of the methods he has chosen to assist the blind and visually impaired," yet incorporating the three-pronged approach "would inaccurately connote that all three of the[] [prongs] are required by the Rehabilitation Act."  *Id.* Finally, Treasury urged rejection of plaintiffs' "overreaching demand for the Secretary of the Treasury or other high official to sign a report every three months," particularly since the agency is "proceeding apace to comply with this Court's judgment."  *Id.* at 16.

The plaintiffs' first motion to modify the Injunction Order was denied without prejudice on the grounds that "the plaintiffs have not shown any extraordinary circumstances justifying a change in the existing semi-annual report obligation, or any other amendment of Judge Robertson's [Injunction Order]."  Order dated Aug. 15, 2012 at 1, ECF No. 121 (internal citations, alterations, and quotation marks omitted).  Treasury was ordered to "continue to file semi-annual reports," "work diligently and expeditiously to fulfill its obligations under the [Injunction Order]," and "promptly inform the Court of any additional major delays in implementing the next major currency redesign—in supplementary updates to the semi-annual reports if necessary—and be as precise as possible in its semi-annual reports about the timeline

for fulfilling its obligations under the [Injunction Order]." *Id.* at 1–2.

**F. Treasury Anticipates that RTF Bills will Begin Circulating in 2020, Although RTF Testing is Slightly Delayed**

Following the denial of the plaintiffs' first motion to modify the Injunction Order,

Treasury continued its efforts to test RTF and to promote currency readers. Over the next three

years, between August 15, 2012 and September 16, 2015, Treasury submitted nine status reports

and one White Paper and began projecting that RTF bills would begin circulating in 2020. In its

ninth status report, Treasury indicated that three different RTF application methods had been

tested and one eliminated, Def.'s Ninth Status Rpt. (Mar. 18, 2013) ¶ 2, ECF No. 123, and that

the agency continued to make progress in implementing its currency reader program and

developing mobile applications for scanning currency, *id.* ¶¶ 7, 8. Treasury also, in 2013,

provided a "White Paper Regarding Meaningful Access to U.S. Currency for Blind and Visually

Impaired Individuals" which BEP submitted to the Senate Committee on Appropriations on June

27, 2013. *See* Def.'s Supp. Status Rpt. (July 3, 2013), ECF No. 124; *id.*, Att. 1, White Paper

Regarding Meaningful Access ("2013 White Paper), ECF No. 124-1. This White Paper was the

first time Treasury projected that "the first redesigned denomination containing a tactile feature,

an improved large, high-contrast numeral, and new security features" would be released for

circulation in 2020, with the $10 bill predicted to be the first new note circulated based on a

security analysis and specific attributes of that bill. 2013 White Paper at 3–4 ("The $10 note was

. . . selected because it is a transactional note used frequently in commerce and it has a low

production volume, which will allow for the smoothest transition of a new complex design to

manufacturing."). Treasury cautioned, however, that this projection "depends on much more

than just the successful design and integration of a tactile feature. The release date is also

dependent on technology/security feature development, production issues, and other

unanticipated developments." *Id.* at 3.

With regards to the RTF method, Treasury discussed efforts to test "for durability and producibility, features using special inks and other materials applied to the surface of the substrate, features embedded into the substrate, features that involve alterations to the substrate, and features using intaglio print techniques," *id.* at 6 (footnote omitted), with intaglio defined as "a printing technique in which an image is incised into a surface and the incised lines hold the ink for transfer to the substrate under pressure," *id.* at 6 n.4. "BEP chose not to directly adopt tactile features used by other countries given the higher durability requirements for the worldwide circulation of Federal Reserve notes and the extended life of those notes in circulation." *Id.* at 6. To assess the needs of visually impaired individuals, Treasury engaged in a number of community outreach and research efforts, including usability and acuity studies, which "involve asking users (blind and other visually impaired persons) to interact with various potential tactile features," Def.'s Tenth Status Rpt. (Sept. 16, 2013) ¶ 2, ECF No. 125, hosting a forum on incorporation of an RTF, *id.* ¶ 3, and meeting with "representatives of eighteen domestic and international cash handling equipment manufacturers," *id.* ¶ 4.

In September 2014, Treasury indicated that "[r]ecent events have affected some of the interim benchmark dates in the development of a tactile feature," because a subcommittee "declined to approve narrowing the field [of RTF technologies] to the single recommended technology." Def.'s Twelfth Status Rpt. (Sept. 16, 2014) ¶ 3, ECF No. 127. Shortly after this report, Treasury submitted a copy of the U.S. Government Accountability Office's report to Congressional Committees on the U.S currency reader program. Def.'s Notice of Filing, Att. 1, 2014 GAO Rpt., ECF No. 129-1. This report found that "BEP's plans to evaluate the effectiveness of [its] new [currency reader] program are incomplete, and without a complete

evaluation, BEP cannot determine the program's effectiveness." 2014 GAO Rpt. at "GAO Highlights". Acknowledging that BEP has "[m]ade limited progress in developing a raised tactile feature," the GAO report noted that development of an RTF was "over a year behind schedule," *id.*, "the Federal Reserve has raised concerns about" "the potential cost impact of a tactile feature and whether the extent of technological changes since the [Injunction Order] could provide alternative options to [the three-pronged approach]." *Id.* at 23. Thus, "there was a discussion of the option to provide access to currency without adding a tactile feature, [although] no decision has been made." *Id.* at 23–24. The GAO noted the importance of the currency reader program in serving as "an effective interim step to provide access to currency for visually impaired persons" as "[e]ven when a tactile feature is introduced, notes with a tactile feature will co-circulate with notes that do not have a tactile feature." *Id.* at 24.

In response to Treasury's September 2014 Status Report, the plaintiffs requested that additional information be ordered produced by Treasury since the Secretary's September 2014 Status Report "fail[ed] to adequately explain the impact of the . . . delay in approving the application method to be used in the manufacture of a tactile feature," and raised concern that Treasury's "representation . . . that the BEP remains on target for circulating accessible currency by 2020 appears to be both inaccurate and misleading." Pls.' Mot. for Order & Mem. in Supp. at 3, ECF No. 128.[13] "Indeed, based upon the prior testimony of BEP's officials, the reengineering process which will be required to provide the Secretary with the capability to manufacture a tactile feature will likely take at least five years from the date of final approval of the application materials and methods to be used." *Id.* at 7–8 (citing declarations to this effect). The plaintiffs pointed to the 2013 White Paper, which specified "nine interim steps, with anticipated dates of

---

[13]     The plaintiffs' motion and memorandum are paginated separately, but were not docketed separately. Accordingly, page numbers correspond to those electronically assigned by the CM-ECF system.

completion for each step," and argued that the agency's incorporation of this White Paper into its July 2013 Status report "necessarily imposes upon the Secretary a concomitant obligation to keep that schedule up to date." Pls.' Reply in Supp. of Mot. for Order at 2, ECF No. 131. The plaintiffs also called attention to Treasury's failure to mention "the highly significant fact that the Federal Reserve has expressed significant reservations pertaining to the inclusion of a tactile feature, or that discussions are ongoing between the Federal Reserve and the BEP which may result in the elimination of that feature." *Id.* at 6.

Treasury, however, reiterated that "[d]espite the concerns expressed by the Federal Reserve, [Treasury] remains committed to the existing three-pronged plan for complying with [the Injunction Order]. Def.'s Surreply in Opp'n to Pls.' Mot. for Order at 1, ECF No. 133. The plaintiffs' motion for an order was denied because "although recent events have affected some of the interim benchmark dates in the development of a tactile feature, [Treasury] does not believe that those events will impact the target date for the ultimate production of redesigned currency with a tactile feature" and although the plaintiffs' "motion requested additional information regarding the reliability of this statement in light of the recent events, . . . [Treasury] provided such information in the [2014] GAO Report." Min. Order (Nov. 3, 2014) (internal quotation marks, alterations, and citations omitted). "Nevertheless, the Court remind[ed] [Treasury] of its obligations to 'be as precise as possible in its semi-annual reports about the timeline for fulfilling its obligations'" including by reporting major delays. *Id.* (quoting Order dated Aug. 15, 2012).

Treasury continued to test various RTF application methods, including by submitting three versions to "high-speed cash machine testing." Def.'s Fourteenth Status Rpt. (Sept. 16, 2015) ¶ 2, ECF No. 138. As a result of this testing, Treasury eliminated one RTF application method, and began to focus on the two remaining ones: intaglio, which uses engraved plates and

a high-pressure printing press to force paper into an engraved plate and create an RTF, and coated-embossed, a process in which a coating is applied to the location of the RTF, then matching dies are pressed together on either side of the note to create the feature. *See id.*; Def.'s Supp. Status Rpt. (Dec. 20, 2018) ¶ 6, ECF No. 169 (explaining these two processes more fully). Treasury planned to print six samples incorporating each of the two RTF application methods for testing in November 2015, including testing by Banknote Equipment Manufacturers, a group that "produce[s] a variety of devices that process U.S. currency." Def.'s Fourteenth Status Rpt. (Sept. 16, 2015) ¶ 3. Further large-group acuity testing was scheduled for April 2016, after which point Treasury anticipated that the final RTF application method would be selected. *Id.* ¶ 4. Based on this schedule, Treasury's "target date for producing currency with a tactile feature remain[ed] the year 2020." *Id.*

G.    **New Counterfeiting Technology Delays Security Redesign As Well As Meaningful Access Redesign**

Five months later, however, in February 2016, Treasury submitted notice "of developments that have recently occurred in the timing of the next redesign of U.S. currency" and "will necessarily affect when BEP begins producing currency with a tactile feature, for reasons unrelated to the development of such feature." Def.'s Supp. Status Rpt. (Feb. 22, 2016) ¶ 2. In particular, Treasury had "recently learned of significant developments in counterfeiting technology that bear upon the long-term effectiveness of the security features which were anticipated for the new $10 note." *Id.* ¶ 5. Thus, "new, additional security features must be created for the next redesign of the currency." *Id.* "The research and development necessary to create these new features *will require a significant amount of time, thus delaying the development and production of the next redesign beyond the year 2020*." *Id.* (emphasis added). Although Treasury predicted that it could provide a new target date "within the next couple of

months," it cautioned that "because this [redesign] effort will require innovation and invention, the target date will reflect significant assumptions." *Id.* ¶ 6. At the same time, Treasury "continues to expect that [RTF] will be ready for incorporation into the next redesign." *Id.* ¶ 7. Further, currency reader programs and mobile applications "will continue to be offered as the BEP develops the new anti-counterfeiting features that have become necessary to keep the nation's currency secure." *Id.* ¶ 8.

In May 2016, Treasury explained that, in light of the redesign delay necessitated by "significant developments in counterfeiting technology," Def.'s Supp. Status Rpt. (May 12, 2016) ¶ 1, BEP was working closely with the Federal Reserve "to accelerate work on the next family of notes with the aim that they circulate as quickly as possible, consistent with security requirements," *id.* ¶ 2. Treasury further advised that BEP "anticipates that the first notes incorporating the new security features will be ready for production no later than 2026," *id.*, although "[t]his timeline is subject to revision based on a variety of factors, most notably security concerns and the pace of technological advancements," *id.*

### H. Plaintiffs' Second Motion to Modify the Injunction is Denied

Treasury's announcement that the security and meaningful access redesigns would be delayed prompted the plaintiffs to file their second motion to modify the injunction. As the plaintiffs noted, had the seven- to ten-year "goal" of security redesigns been met, "the $20 note would have been redesigned between 2010–2013, the $50 note between 2011–2014, the $10 note between 2013–2016, and the $5 note between 2015–2018. The Secretary has now furnished a new estimated date of 2026 to redesign the $10 note, and has not provided any estimated dates for redesign of the remaining denominations." Pls.' Second Mot. at 3. "The magnitude of the delays in this case," according to the plaintiffs, "clearly constitutes a changed circumstance

warranting modification of the [Injunction Order]" because its "intended result . . . has been thwarted." *Id.* at 14. Specifically, the plaintiffs now sought to "set a deadline of December 31, 2020" to provide meaningful access to the $10 bill, and to order Treasury "to make the remaining denominations [not including the $1 bill] of currency accessible to the blind and visually impaired not later than December 31, 2026." *See id.* at 4–5 & n.1. The 2020 deadline for meaningful access to the $10 bill urged by the plaintiffs corresponded to the target date Treasury set in its 2013 White Paper. *See id.* at 7.

As support for modifying the 2008 Injunction Order by altering its core principle of improving access in tandem with redesigns to combat counterfeiting, the plaintiffs highlighted that the redesign date "was postponed until 2026 for reasons that are unrelated to the production of [RTF]" and that Treasury "has not indicated any impediments to adding a tactile feature by 2020." *Id.* at 16–17. Although acknowledging that the BEP Director had stated, in a July 17, 2012 declaration, that "disconnecting the timing of the counterfeiting and accessibility redesigns would add considerable complexity and additional expense," the plaintiffs discounted this concern as "mooted" because "[a]n accessibility redesign in 2020 would be six years apart from a security redesign in 2026." *Id.* at 20–21 (internal quotation marks, citation, and emphasis omitted) (quoting Second Supp. Decl. of Larry R. Felix, Director of BEP ¶ 3, ECF No. 119-1). Moreover, the plaintiffs discounted Treasury's "argument pertaining to the additional cost and complexity of conducting two separate redesigns [as] undocumented," *id.* at 21, and emphasized that, in their view, "[a]n external device cannot serve as a substitute for a system through which a visually impaired person can independently denominate banknotes using his or her own senses," *id.* at 23. Although "[t]he intent underlying th[e] [Injunction Order] was to prod the Secretary into making [U.S.] currency accessible to the blind and visually impaired," *id.* at 37, the

plaintiffs expressed concern that Treasury "is now using the [Injunction Order] as a justification for delaying a meaningful access redesign," *id.* Speculating that Treasury might seek "permission to conduct an urgent counterfeiting redesign even in the absence of an accessibility redesign," *id.*, the plaintiffs posited that "if this Court would amend the order to allow the government to undertake an urgent counterfeiting redesign, it should be no less willing to amend the order to mandate meaningful access by a specific deadline," *id.* at 38.

In opposing the plaintiffs' motion, Treasury argued that "[i]n entering its [Injunction Order], the Court recognized the efficiency of allowing BEP to incorporate any changes to the currency and next round of security features into one redesign. Plaintiffs' modification would eliminate that efficiency." Def.'s Opp'n to Pls.' Second Mot. at 17, ECF No. 148; *id.* at 21 (same). Modification was unnecessary, Treasury reasoned, because the agency "has every incentive to produce a redesign as quickly as possible, because of the ever-growing threat of counterfeiting." *Id.* at 1; *see also id.* at 15 ("This Court chose to link providing meaningful access with changing the currency to guard against counterfeiting not simply as a matter of convenience, but in recognition of the many factors the Secretary must consider in designing currency, including the statutory command to guard against counterfeiting."). As the "Court and the parties understood, at the time of the [Injunction Order]," *id.*, the "timing of . . . redesigns and the intervals between them depend, in large measure, on changes in counterfeiting technology and emerging counterfeiting threats. . . . [which] require BEP to work carefully but quickly in producing redesigns, so that . . . currency is not left vulnerable to counterfeiting," *id.* at 2.

As for RTF methods, Treasury highlighted that "the development of an appropriate tactile feature was always expected to require a significant amount of time," especially where raised

features used by other countries "either are too low to be usable even when new, or wear down so much in circulation as to become unusable fairly quickly." *Id.* at 6–7 (internal quotation marks and citation omitted). Considering Treasury's "strong and ongoing commitment to adding a[n] [RTF] to the nation's currency," "none of the considerations that supported linking the completion of that effort to the redesign of each denomination ha[s] changed." *Id.* at 12.[14]

In arguing that decoupling the two redesigns would not serve the public interest, Treasury explained that currency changes "impose significant costs on private businesses" and "[r]equiring the Secretary to redesign each denomination twice in the near future, . . . once to incorporate a tactile feature . . . and again to update the anti-counterfeiting features[,] would both substantially increase private-sector costs and create a very real risk of confusion for businesses and the broader public." *Id.* at 20. Successful completion of any redesign "process . . . requires balancing many considerations, including the needs of blind and other visually impaired persons; the efficiency and economy of the manufacturing process; the needs of the Federal Reserve System as to durability, usability, and consistency; the needs of currency users and the banknote processing community; and the statutory mandate to produce currency in the 'best manner' to guard against counterfeiting." *Id.* at 24. (citation omitted) (quoting 12 U.S.C. § 418).

The plaintiffs' motion was denied.[15] This Court noted that the original Injunction Order "did not set a specific deadline for compliance with Section 504," but instead "paired the

---

[14]      Treasury also argued that "the measures already implemented . . . now enable the visually impaired to independently identify the denomination of paper currency," *id.* at 12 (internal quotation marks, citation, and alteration omitted), and indicated that, "[a]t an appropriate time," Treasury "may file a motion to vacate the [Injunction Order], although [Treasury] still intends to add a tactile feature to the currency," *id.* at 13 n.3.

[15]      The plaintiffs' motion was analyzed under both Rule 60(b)(5) and Rule 60(b)(6), rather than the Court's inherent equitable authority, because "whichever standard applies, the D.C. Circuit has explained that as a practical matter, it makes little difference whether the district court resolves a motion to modify a consent order under Rule 60 or under its equitable authority as the standard for each is substantially the same. *Am. Council of the Blind v. Lew*, 2017 WL 6271264, at *1 n.1 (internal quotation marks, alterations, and citations omitted) (citing *Pigford v. Johanns*, 416 F.3d 12, 16 (D.C. Cir. 2005); *Cook v. Billington*, No. Civ.A 82-0400(GK), 2003 WL 24868169, at *2–3 (D.D.C. Sept. 8, 2003); *New York v. Microsoft Corp.*, 531 F. Supp. 2d 141, 169 (D.D.C. 2008)).

development of features to improve meaningful access to currency with the ongoing, and statutorily required, redesigns of currency to combat counterfeiting." *Am. Council of the Blind v. Lew*, 2017 WL 6271264, at *2. Despite the delays in implementing "some features that will improve access to currency," the Court declined to "upset the balance struck in the [Injunction Order]." *Id.* The delays neither rendered the Injunction Order "detrimental to the public interest" under Rule 60(b)(5) nor were they "'extraordinary circumstances' that would justify a modification under the higher standard of Rule 60(b)(6)." *Id.* (internal quotation marks and citation omitted). Moreover, since the 2008 Injunction Order "substantial progress has been made in improving access to currency for the blind and visually impaired," *id.*, including progress in designing an RTF, in "adding large, high-contrast numerals and different colors to each denomination," *id.* (internal quotation marks and citation omitted), and in implementing "a currency reader distribution program," *id.*; *see also* Def.'s Opp'n to Pls.' Second Mot. at 19 ("BEP has secured and analyzed a comprehensive contractor study; conducted numerous instances of feasibility testing, usability testing, acuity testing, and manufacturing trials; . . . helped prepare manufacturers of cash handling equipment for the incorporation of a tactile feature; and sought to address concerns expressed by other federal government stakeholders."); *id.* at 6 ("BEP has been working diligently to implement these measures, including the development of a usable and durable tactile feature for the currency. Since 2008, BEP has added high-contrast numerals to the $5, $10, $20, $50, and $100 notes, including different colors [added] to both the $5 and $100 notes. BEP will add colors to all future redesigns. BEP has also made free currency readers available to every individual who requests them. . . . [and] has monitored and deployed technologies that have emerged since the [Injunction Order]."); *id.* at 10 (discussing the full nationwide distribution of the "iBill," a free currency reader, and Treasury's

efforts to publicize it).

While "recogniz[ing] that this progress is not as significant as a released redesigned note," "decoupling improvements for the blind and visually impaired . . . from the continuing efforts by BEP to redesign currency to combat counterfeiting[] could create unnecessarily duplicative work and potentially increase costs for both the government and the private sector." *Am. Council of the Blind v. Lew*, 2017 WL 6271264, at *2 (citing Def.'s Opp'n to Pls.' Second Mot., Att. 1, Decl. of Michael Wash ("2016 Wash Decl.") ¶ 15, ECF No. 148-1 (explaining that redesigning "each denomination twice in the near future . . . once to incorporate [tactile features] and again to incorporate new visual designs and enhanced security features to continue to minimize counterfeiting—would both substantially increase private sector costs and create a very real risk of confusion for both businesses and the broader public")). In other words, "plaintiffs' proposed modification might turn out to be *more* detrimental to the public interest than the current order in effect." *Id.* (emphasis in original).

I. **D.C. Circuit Remands for "[B]etter [S]upport" of Court's "[F]indings [S]upporting [D]enial [O]f [M]odified [I]njunctive [R]elief"**

The plaintiffs appealed the denial of their second motion to modify the injunction. Analyzing the motion under Federal Rule of Civil Procedure 60(b)(5), the D.C. Circuit reversed and remanded to obtain "[a] more concrete estimate of the financial burden of incorporating a raised tactile feature," which the Circuit described as "necessary," even though Treasury had told the Circuit "we don't know exactly what the costs are." *Am. Council of the Blind v. Mnuchin*, 878 F.3d at 369 (internal quotation marks omitted) (quoting Treasury Secretary's counsel at oral argument before D.C. Circuit, Transcript of Oral Argument, *Am. Council of the Blind v. Mnuchin*, D.C. Cir. No. 17-5013 (Oct. 19, 2017) at 20:55–21:05). The D.C. Circuit found that, in denying plaintiffs' proposed modification of "forcing an earlier redesign of currency separate

from the planned anti-counterfeiting redesign," *id*. at 367, this Court "did not abuse its discretion by considering the costs to the government" or "private sector costs," *id*. at 367–68, and further that the "added financial burden of decoupling the timelines may very well render the Secretary's ongoing violation of the Rehabilitation Act—which the parties reasonably expected to be cured in one decade but under the Secretary's current timeline will stretch into a second decade, and most likely a third—equitable," *id.* at 368.

Nevertheless, the D.C. Circuit deemed "without adequate evidentiary support," "insufficient," "hardly precise," not "concrete," "unclear," and "guesstimates" projections that private sector costs to upgrade equipment could be $3 to $4 million, and that the "investment required to prepare" Treasury to produce banknotes with an RTF would be $5 million to $66 million and that "annual maintenance costs" would be up to $12 million, *id.* at 368–70. The Circuit opined that "the investment costs . . . specific to producing a raised tactile feature" will be "incurred whenever it is put to use without regard to coupling/decoupling," *id.* at 369, and "we do not have any data on the difference" to the private sector between two redesigns compared to a "single coupled change," *id.* at 370. The Circuit recognized that "decoupling the timelines and producing banknotes with a raised tactile feature sooner than 2026 (at the earliest) may lead to more annual maintenance costs and therefore more total costs," *id.* at 369, would require Treasury "to change printing plates twice rather than once if a raised tactile feature is introduced before the next planned currency redesign," *id.*, which "may well be more inefficient," *id.*, and that "[t]he costs of two redesigns will presumably [] be higher than the cost of one redesign," *id.* Yet, the Circuit sought more concrete evidence of this "difference in costs between the two timelines," *id.*, stating that this "financial difference is crucial to weighing the equities of the plaintiffs' requested modification," *id.* At the same time as concluding "the district court needs

more concrete estimates of the costs that matter," *id*. at 371, the Circuit was aware not only that Treasury was unable to provide such concrete costs since no RTF technology had been selected, *id*. at 365 n.6, 368–70, but also that "even banking industry representatives say that the industry cannot make reasonable estimates until the [BEP] announces the specific height and application method of the tactile feature," *id*. at 370 (internal quotation marks and citation omitted).

On remand, the parties were directed to propose a schedule for further proceedings and to appear for a status conference on March 14, 2018. *See* Min. Order (Feb. 23, 2018). In response, the parties agreed that the plaintiffs would file a renewed motion to modify, mooting their second motion, *see* Mar. 2018 JSR ¶ 1, and the plaintiffs indicated that they might seek discovery, *id.* ¶ 4, although no such discovery motion ever materialized. The parties disclaimed the necessity of any status conference, *id.* ¶ 6, and thus the scheduled status conference was cancelled, Min. Order (Mar. 7, 2018).

During the pendency of the appeal to the D.C. Circuit, Treasury had continued testing on RTF technologies. Specifically, Treasury "recruit[ed] . . . approximately fifty-five focus group participants" for testing to "rectify the accuracy and durability concerns that have so far been associated with tactile features." Def.'s Seventeenth Status Rpt. (Mar. 16, 2017) ¶ 2, ECF No. 155. This "testing showed significant variation in the accuracy rates among participants." Def.'s Eighteenth Status Rpt. (Sept. 18, 2017) ¶ 3, ECF No. 156. Treasury subsequently provided notice that it had "settled on a four-position rectangle shape for the [RTF], . . . but ha[d] not yet chosen between the two remaining methods of application (Intaglio or Coated-embossed)." Def.'s Nineteenth Status Rpt. (Mar. 16, 2018) ¶ 2, ECF No. 159. To inform this RTF selection, Treasury anticipated holding durability testing on the different RTF methods from February to April 2018, focus groups in March and April 2018, bank equipment testing from March through

May 2018, critical manufacturing testing from April through August 2018, and further large-scale testing with visually impaired individuals in July and August 2018. *Id.* ¶ 3. Treasury also planned to analyze how the RTF would interact with the rest of the note in 2019, enabling it to make a final decision as to which RTF application method to select by late 2019. *Id.* Finally, Treasury updated the sequence of redesigns "[b]ased on an assessment of . . . emerging counterfeiting threats," although the $10 note was still expected to be redesigned first, and to be "ready for production no later than 2026." *Id.* ¶ 4.

### J. Plaintiffs File Third Motion to Modify the Injunction

Two months after the mandate issued, the plaintiffs filed the pending motion to modify the injunction with the identical relief as their second motion. Once again, the plaintiffs request that Treasury be ordered to provide meaningful access to the $10 bill by December 31, 2020, and to the remaining denominations of currency, aside from the $1 bill, by December 31, 2026. Pls.' Third Mot. at 4 & n.1. Treasury objects that, *inter alia*, (1) redesign of the currency for counterfeit deterrence is "not on any precise schedule," Def.'s Opp'n to Pls.' Third Mot. at 16, ECF No. 164 (internal quotation marks and citation omitted); (2) measures implemented already enable identification of currency for the visually impaired, *id.*; and (3) given the costs of testing, implementation, and publicity necessary to implement and educate users on redesigned currency, decoupling the redesign of currency to provide meaningful access from the redesign to improve security would not be in the public interest, *id.* at 16, 21, essentially the same conclusions reached by the Court in 2008 and in denying the plaintiffs' first and second motions to modify the injunction.

Although the arguments regarding this pending motion are similar to those raised in conjunction with the plaintiffs' second motion, the record has changed and expanded

substantially. The plaintiffs' second motion to modify the injunction was supported by a single declaration and six exhibits that generally concentrated on (1) a 2009 report studying methods of providing meaningful access to the visually impaired,[16] (2) Treasury's plans to add Harriet Tubman to the $20 bill,[17] and (3) perceived deficiencies with the iBill currency reader.[18]

By contrast, as support for their third motion, the plaintiffs incorporated the studies and declarations previously submitted, *see, e.g.*, Pls.' Third Mot. at 12, 20 n.9, 21–22, supplemented by: (1) nine new declarations from persons with visual impairment attesting to how the lack of meaningful access to currency prevents them from engaging in everyday retail transactions or employment or volunteer opportunities, and why they find currency readers and mobile applications to be an insufficient solution;[19] (2) a 2016 report from the U.S. Bureau of Labor Statistics indicating that retail salespersons and cashiers were the occupations with the highest employment in May 2015, in order to demonstrate that "the design of currency . . . creates significant obstacles to employment opportunities requiring the handling of cash," leaving persons with visual impairment "largely shut out from the second largest occupation in the United States," *id.* at 12–13;[20] (3) information on federal supplemental security income ("SSI")

---

[16]     *See* Pls.' Second Mot., Ex. 1, ARINC, Final Report: Study to Address Options for Enabling the Blind and Visually Impaired Community to Denominate U.S. Currency (July 2009) ("ARINC 2009 Study"), ECF No. 142-2.

[17]     *See* Pls.' Second Mot., Ex. 2, Nick Timiraos, *Q&A: Jacob Lew Explains His Currency Redesign Plan*, The WALL ST. J. (Apr. 21, 2016, 10:29 AM), ECF No. 142-3 (discussing interview with Jacob Lew regarding "his long-awaited plan for a sweeping currency redesign that will put Harriet Tubman on the $20 bill"); *id.*, Ex. 3, An Open Letter from Secretary Lew (Apr. 20, 2016), ECF No. 142-4 (discussing decision to put Harriet Tubman on the $20 bill).

[18]     *See* Pls.' Second Mot., Ex. 4, Decl. of Eric Bridges ("Bridges Decl.") ¶ 4, ECF No. 142-5 (detailing why the iBill currency reader "is of little use in a public setting"); *id.* Ex. 5, iBill Talking Banknote Identifier, ECF No. 142-6 (on file in Chambers); *id.*, Ex. 6, Orbit Research, *iBill Users Manual* (2014), ECF No. 142-7; *id.*, Ex. 7, BEP Solicitation/Contract/Order for Commercial Items, ECF No. 142-8.

[19]     *See* Pls.' Third Mot., Ex. 1, Decl. of Rev. Helen Jo Taliaferro ("Taliaferro Decl."), ECF No. 160-2; *id.*, Ex. 2, Decl. of Mark Richert ("Richert Decl."), ECF No. 160-3; *id.*, Ex. 3, Decl. of Jeff Thom ("Thom Decl."), ECF No. 160-4 *id.*, Ex. 4, Decl. of Kim Charlson ("Charlson Decl."), ECF No. 160-5; *id.*, Ex. 7, Decl. of Paul Mims ("Mims Decl."), ECF No. 160-8; *id.*, Ex. 8, Decl. of Ernie Udo ("Udo Decl."), ECF No. 160-9; *id.*, Ex. 15, Decl. of Mark Adreon ("Adreon Decl."), ECF No. 160-16; *id.*, Ex. 16, Decl. of Linda Schneider ("Schneider Decl."), ECF No. 160-17; *id.*, Ex. 17, Decl. of Hannah Fairbairn ("Fairbairn Decl."), ECF No. 160-18.

[20]     *See* Pls.' Third Mot., Ex. 5, U.S. Bureau of Labor Rpt. on Retail Salespersons (Mar. 2016), ECF No. 160-6.

payments to support the claim that "SSI payments would be reduced if the blind and visually impaired were able to obtain employment in occupations involving the use of currency," *id.* at 13;[21] (4) five reports or press releases from the Federal Reserve and the U.S. banking industry showing "astronomical" resources, such that the "impact on the government and the private sector of modifying the injunctive decree [would be] relatively mute," *id.* at 13–14;[22] (5) the transcript from the oral argument in this case before the D.C. Circuit in October 2017 as evidence that Treasury "[k]eeps [s]witching [p]ositions" on whether currency readers already provide meaningful access to U.S. currency, *id.* at 16;[23] and (6) the BEP's performance plan for Fiscal Year 2018 which reflects that "demand for these devices has been well below expectations," *id.* at 28, and a report from the Federal Reserve on access to mobile financial services which the plaintiffs cite for the proposition that "smartphone applications are likely to be of little benefit to large numbers of elderly blind and visually impaired persons," *id.* at 31.[24]

Likewise, Treasury submitted substantially more information in opposing the third motion than the second. In connection with the plaintiffs' second motion, Treasury submitted: (1) two declarations from Treasury officials describing the RTF testing process, the currency reader program, and the development of mobile applications;[25] and (2) an excerpt from a 2004 deposition of plaintiff Patrick Sheehan, who has limited vision, regarding how larger, high-

---

[21]     *See* Pls.' Third Mot., Ex. 6, U.S. Social Security Administration, Federal Benefit Rates, ECF No. 160-7.
[22]     *See* Pls.' Third Mot., Ex. 9, Federal Reserve Board, Annual Report 2016, ECF No. 160-10; *id.*, Ex. 10, Federal Reserve Board, 2018 Currency Budget, ECF No. 160-11; *id.*, Ex. 11, Press Release, Federal Reserve Board, Federal Reserve Board announces Reserve Bank income and expense data and transfers to the Treasury for 2017 (Jan. 10, 2018), ECF No. 160-12; *id.*, Ex. 12, Federal Reserve Bank of New York, Quarterly Trends for Consolidated U.S. Banking Organizations: Third Quarter 2017, ECF No. 160-13; *id.*, Ex. 13, Net Income of FDIC-Insured Commercial Banks, ECF No. 160-14.
[23]     *See* Pls.' Third Mot., Ex. 14, Transcript of Oral Argument, *Am. Council of the Blind v. Mnuchin*, D.C. Cir. No. 17-5013 (Oct. 19, 2017), ECF No. 160-15.
[24]     *See* Pls.' Third Mot., Ex. 18, U.S. Dep't of Treasury, Bureau of Engraving & Printing, Congressional Justification for Appropriations FY 2018, ECF No. 160-19; *id.*, Ex. 19, Federal Reserve Board, Consumers and Mobile Financial Services 2016, ECF No. 160-20.
[25]     *See* 2016 Wash Decl.; Def.'s Opp'n to Pls.' Second Mot., Att. 2, Decl. of Teresa Fynes ("First Fynes Decl."), ECF No. 148-2.

contrast numerals change his ability to denominate currency and exploring his use of a closed

circuit television to count money in his role as Treasurer for his chapter of the American Council

of the Blind.[26]  By contrast, in opposing the plaintiffs' third motion, Treasury submitted: (1) four

declarations from Treasury officials, which collectively described the RTF testing process,

currency reader program, and drawbacks of various RTF methods;[27] (2) two declarations, one

from the Federal Reserve and one from the U.S. banking industry, describing the testing

necessary to ensure that RTF is compatible with high-speed currency-processing machines and

---

[26]     *See* Def.'s Opp'n to Pls.' Second Mot., Att. 3, Excerpts from Dep. of Patrick M. Sheehan, ECF No. 148-3.
[27]     *See* Def.'s Opp'n to Pls.' Third Mot., Att. 1, 2016 Wash Decl., ECF No. 164-1; *id.*, Att. 2, Second. Decl. of
Teresa Fynes ("Second Fynes Decl."), ECF No. 164-2; *id.*, Att. 3, Decl. of Leonard R. Olijar ("First Olijar Decl."),
ECF No. 164-3; *id.*, Att. 4, Decl. of Michael Johnston ("First Johnston Decl."), ECF No. 165-1.  The 2016 Wash
Declaration was resubmitted, with no updates, despite the D.C. Circuit's conclusion that this declaration "tell[s] us
nothing about the difference in costs between the two timelines. . . . [which] financial difference is crucial to
weighing the equities of the plaintiffs' requested modification." *Am. Council of the Blind v. Mnuchin*, 878 F.3d at
369.  Consequently, Treasury was directed to explain why this declaration should not be stricken from the record.
Order Directing the Parties to Answer Questions (Question 15).  Treasury explained that "additional declarations
and responses to the Court's questions [could] be read in conjunction with the Wash declaration and complete the
record in this matter."  Def.'s Answers (Question 15).  Indeed, Treasury updated these declarations when responding
to the Court's questions.  *See, e.g.*, Def.'s Answers, Att. 1, Second Decl. of Leonard R. Olijar ("Second Olijar
Decl."), ECF No. 179-1; *id.*, Att. 2, Third Decl. of Teresa Fynes ("Third Fynes Decl."), ECF No. 179-2; *id.*, Att. 3,
Second Decl. of Michael Johnston ("Second Johnston Decl."), ECF No. 179-3; *id.*, Att. 4, Second Decl. of Michael
J. Lambert ("Second Lambert Decl."), ECF No. 179-4.  Treasury also pointed out that the Wash Declaration
"provides several components of an extremely complicated picture, including important background information on
the development of an RTF and the testing process.  For example: [1] Paragraph 3 of the declaration explains the
RTF testing process as conducted through August 2016.  It notes the various types of RTFs that were tested and
describes the accuracy rates and 'ease of use' ratings for the tested RTFs. [2] Paragraph 4 describes requirements for
an RTF and the potential damage a tactile feature could cause to national commerce absent sufficient testing.  [3]
Paragraph 5 describes additional requirements for an RTF and the significant challenge of balancing durability with
manufacturability and usability.  [4] Paragraph 6 provides detailed information about the testing process and the
observations made in the first stages of that process.  In particular, it sheds significant light on the question of
whether any RTF can ever be practical for one-handed use.  [5] Paragraph 7 further describes the testing process and
provides the specific results of a year's worth of testing.  It also identifies the many blind organizations, including
[American Council of the Blind], which participated in the testing.  [6] Paragraph 8 describes the challenges other
countries have encountered when attempting to incorporate an RTF into their currency.  [7] Paragraph 9 describes
some costs that BEP may incur in applying an RTF to United States currency.  The estimates are tentative and
incomplete because those costs are dependent on a number of factors, most notably which RTF and application
method is eventually selected.  [8] Paragraph 10 provides some general information regarding private sector costs
that may be incurred by incorporating an RTF into the currency.  Again, the estimates are tentative and incomplete
because of many unknown factors.  [9] Paragraphs 11 and 12 describe BEP's testing and planning process.  They
also note that more definitive cost estimates will depend on further testing and collaboration with private parties
later in the process.  [10] Paragraph 13 describes the testing requirement and how it would relate to legacy notes.
[11] Paragraphs 14 and 15 describe BEP's planning and the schedule for development of the next family of notes, as
well as certain aspects of cost.  They underscore that security is the driving factor."  Def.'s Answers (Question 15).

ATMs;[28] and (3) two excerpts from depositions from two individuals with visual impairment, one of which was the same Sheehan deposition submitted in conjunction with the second motion, and one of which described how Melanie Brunson, who is legally blind, folds money in a particular way prior to making purchases.[29]

Shortly after briefing on this motion was complete, Treasury filed a Supplemental Status Report, Def.'s Supp. Status Rpt. (Dec. 20, 2018), sharing a recent study of RTF methods conducted by the MITRE Corporation, *see id.*, Att. 1, Raised Tactile Feature Implementation Performance Study: Final Report (2018) ("MITRE 2018 Study"), ECF No. 169-1. Based on the MITRE study, which consisted of a series of tests with 239 blind participants at five locations, Treasury shared "concerns regarding its ability to create a tactile feature for U.S. currency with an accuracy rate that will make it suitable for reliable use in commerce." Def.'s Supp. Status Rpt. (Dec. 20, 2018) ¶¶ 4, 11. Specifically, Treasury anticipated "that a large and growing segment of blind and visually impaired persons . . . will be unable to use a tactile feature," *id.* ¶ 12, for example, because they suffer from "neuropathy or other issues affecting tactile sensitivity," *id.*, or because, unlike many of the MITRE study participants, they are not experienced Braille readers, *id.* ¶ 11. Treasury's own research and the MITRE study now caused Treasury to

> believe[] many of the assumptions [BEP] made in 2010 [when it recommended the three-pronged strategy for providing meaningful access] are no longer valid. Due to its inherent inaccuracy, [BEP] is concerned that a tactile feature is unlikely to allow blind and visually impaired persons to denominate currency effectively. Conversely, since 2010, advances in technology have made electronic currency readers far more effective than previously imagined. Similarly, the introduction of free smartphone applications that denominate currency with essentially perfect accuracy provides blind and visually impaired

---

[28] *See* Def.'s Opp'n to Pls.' Third Mot., Att. 5, Decl. of Michael J. Lambert ("First Lambert Decl."), ECF No. 164-5; *id.*, Att. 6, Decl. of David Tente, ECF No. 164-6.
[29] *See* Def.'s Opp'n to Pls.' Third Mot., Att. 7, Excerpts from Dep. of Patrick Sheehan, ECF No. 164-7; *id.*, Att. 8, Excerpts from Dep. of Melanie Brunson, ECF No. 164-8.

persons with options not contemplated in 2010.

*Id.* ¶ 13 (citation and footnote omitted).

The plaintiffs responded to Treasury's reevaluation of the validity of its 2010 strategy for incorporating RTF, and the effectiveness of RTF generally for accurate usage by visually impaired persons, with criticisms of the study and Treasury's conclusions. *See* Pls.' Resp. to Def.'s 2018 Supp. Status Rpt., ECF No. 173. First, the plaintiffs noted that the RTF tested by MITRE measured 90 microns in height, even though RTF measuring 140 microns in height had been shown, in previous tests, to be more perceptible and durable and is the height of the RTF used on Canadian banknotes. *Id.* at 2. Citing to an exhibit to the plaintiffs' second motion to modify the injunction, *see id.* at 2 (citing ARINC 2009 Study at 30) and to comments submitted in response to Treasury's 2010 Notice of its three-pronged strategy for providing meaningful access, some of which concerned Canadian banknotes and some of which only discussed RTF "in concept," the plaintiffs declared that "[t]here was no basis for the BEP to limit the height of the RTF . . . to 90 microns." Pls.' Resp. to Def.'s 2018 Supp. Status Rpt. at 2, 3. These criticisms, however, failed to address the fact that Treasury had previously studied the RTF on Canadian banknotes and that the same study cited by the plaintiffs concluded that the feature wears out so frequently that "blind persons can accurately identify it on widely circulated notes only 49% of the time," Def.'s Opp'n to Pls.' Third Mot. at 8 (citing ARINC 2009 Study at 70), and that RTFs at that height "failed functionality testing because [they] proved to be unsuitable for use in the high-speed machine processing and handling equipment that is the standard in the industry." Def.'s Answers (Question 19).[30]

---

[30] In response to the Court's Question 19 ("Is the best accuracy rate for an RTF in testing environments 80 percent or 90 percent? *Compare* [First Olijar Decl.] ¶ 10, *with* [2016 Wash Decl.] ¶ 3"), Treasury responded: "The best accuracy rate achieved for any proposed feature that has not been eliminated from consideration for other reasons is approximately 80%. The two declarations cited in this question were referring to different tests, before

The plaintiffs also downplayed the MITRE study's concerns with accuracy, stating that any such concerns "can be resolved by more frequent replacement of currency," while recognizing that "[r]eplacement of banknotes at more frequent intervals would undoubtedly result in higher costs in terms of production equipment, facilities, transportation, and other expenses." Pls.' Resp. to Def.'s 2018 Supp. Status Rpt. at 4. Finally, the plaintiffs suggested that "[t]he reason that Braille users performed better was . . . a function of greater tactile experience," such that "the utility of the RTF is not dependent upon knowledge of Braille, but is rather a function of regular usage of the RTF." *Id.* at 5.

### K. Plaintiffs Decline to Call Witnesses and Urge Resolution of Pending Motion Without a Hearing

To focus the parties on the factors necessary to resolve the pending motion, and address the evidentiary gap that the D.C. Circuit directed should be considered on remand, a motions hearing for January 25, 2019 was scheduled, for which hearing the plaintiffs were instructed to identify witnesses to testify. *See* Min. Order (Jan. 4, 2019). Due to a partial government shutdown, Treasury sought to stay proceedings in light of a lapse of appropriations. *See* Def.'s Mot. to Stay ¶¶ 1–3, ECF No. 170. Opposing a stay, the plaintiffs "rest[ed] their case on the basis of their existing briefs plus the attachments," Pls.' Opp'n to Def.'s Mot. to Stay at 1, ECF

---

different test groups, using different prototype RTFs. In referring to an accuracy rate as high as 90%, Mr. Wash was describing initial test results using small focus groups and a 140-micron Coated-Embossing feature. As stated in the Wash declaration, however, it was 'unclear how those results would translate with larger scale testing.' Moreover, that type of feature later failed functionality testing because it proved to be unsuitable for use in the high-speed machine processing and handling equipment that is the standard in the industry. Therefore, the recent MITRE study tested RTFs of 90 microns in height, which BEP considers more likely to be usable in machine processing and handling equipment. The results of testing at that height are as follows:

- Intaglio (90 microns/max height)—2017 Focus Group—78%
- Coated-embossing (90 microns)—2018 Acuity Study—65%
- Intaglio (90 microns/max height)—2018 Acuity Study—82%

The above refutes plaintiffs' criticism of the MITRE study on the basis that the study failed to use a test feature of 140-160 microns in height. *See* [Pls.' Resp. to Def.'s Supp. Status Rpt.] at 4. Although there had previously been an assumption or belief that a feature of that height might be workable for U.S. currency, functionality testing has shown otherwise." Def.'s Answers (Question 19) (alterations omitted).

No. 172, and disclaimed any need for an evidentiary hearing, *id.* At the same time, ironically, the plaintiffs demanded more clarity as to three key issues: (1) Treasury's position on the feasibility of an RTF, *see* Pls.' Reply in Supp. of Third Mot. ("Pls.' Reply") at 8, ECF No. 168; (2) Treasury's cost estimates, *see* Pls.' Opp'n to Def.'s Mot. to Stay at 1; Pls.' Reply at 1–3; and (3) relatedly, Treasury's timeline for deployment of currency changes, Pls.' Third Mot. at 3.

In lieu of an evidentiary hearing to help resolve the disputed factual issues between the parties—an opportunity that apparently interested only this Court—the evidentiary hearing was vacated and the parties were directed to respond to questions posed by the Court, with twelve questions directed to the plaintiffs and sixteen questions directed to Treasury. *See* Order Directing the Parties to Answer Questions at 1; Pls.' Answers, as amended by Pls.' Unopposed Mot. to Amend, ECF No. 177; Def.'s Answers; Pls.' Resp. to Def.'s Answers, ECF No. 180. The response to these questions laid bare multiple disagreements between the two sides, with the plaintiffs questioning whether Treasury was acting in good faith, Pls.' Answers (Question 12),[31]

---

[31]     In response to the Court's Question 12 ("If the defendant insists, based on internal and independent evaluations of available RTF and other technologies presented to this Court, that meeting the timelines in the plaintiffs' proposed order would be infeasible or impossible, must the plaintiffs' pending motion be denied?"), the plaintiffs responded: "Plaintiffs believe that instead of denying the motion, the Court should tailor its remedial order to impose a feasible schedule for compliance. . . . That being said, the Court should view with considerable skepticism any assertion of infeasibility. Any such assertion would be inconsistent with the Secretary's prior representations to this Court that the delays in the next currency redesign were necessitated not by challenges in making the currency accessible, but rather by the additional time required to combat new counterfeiting technologies. *See* [Def.'s Supp. Status Rpt. ¶ 5 (Feb. 22, 2016)]. . . . Additionally, the Secretary has not acted in good faith and with reasonable diligence in providing meaningful access to currency. This is illustrated by the Secretary's most recent status report, which states that the Secretary may abandon the RTF approach due to lack of efficacy. [Def.'s Supp. Status Rpt. (Dec. 20, 2018) ¶ 13]. This finding was based on a study conducted by [MITRE], which tested a 90 micron RTF feature, instead of a 145-160 micron feature which the [ARINC 2009 Study] found could be easily integrated with existing cash handling equipment. According to the [MITRE] study, the 90-micron feature was used in order to hold '*the height to a lower limit for stack height (which increase due to the addition of the RTF), [Banking Equipment Manufacturing] use, and Intaglio capability*.'). [citing MITRE 2018 Study at 7–8]. The Secretary was well aware of these '*lower limits*' in 2010, when he first proposed using the RTF. 75 Fed. Reg. 28331 (May 20, 2010). Amazingly, the Secretary waited for nearly nine years before conducting a test on the 90-micron feature to determine its effectiveness. The Secretary can point to no reason why he could not have performed the same study in 2010. Essentially, the Secretary wasted the past nine years in pursuing an approach that he knew or should have known would not be effective. This points to the obvious conclusion that the Secretary will spare no effort to delay implementation of meaningful access. This approach will not change unless this Court makes clear that it expects the Secretary to provide meaningful access by a hard deadline, and it is prepared to use

Treasury suggesting that meaningful access to currency, even if RTF is never successfully incorporated, was already being provided to satisfy Rehabilitation Act requirements, *see* Def.'s Answers (Question 16),[32] and the parties unable to agree even on the number of people who would be helped by RTF methods, *cf. id.* (estimating 340,547 blind persons in the United States

---

its enforcement powers to compel compliance with its order. The effective use of currency is critical to full participation in modern society. As noted by the Court of Appeals, the accessibility of currency is endowed with '*special importance*' given its centrality as a mechanism of commerce. *Am. Council of the Blind v. Paulson*, [525 F.3d at 1269]. Plaintiffs respectfully request that the Court modify the injunctive order so that millions of blind and visually impaired individuals can enjoy meaningful access to currency without being required to wait for several more decades." Pls.' Answers (Question 12) (emphases in original) (citations and two footnotes omitted).

[32]        In response to the Court's Question 16 ("The defendant suggests that external currency readers and mobile apps available to the blind or visually impaired already provide meaningful access to currency. . . . Given that the usage rate of currency readers and mobile apps has not changed significantly in the past year, why is the defendant's argument that meaningful access is already being provided not foreclosed by the D.C. Circuit's opinion in *American Council of the Blind v. Mnuchin*, 878 F.3d 360, which included several statements indicating that the D.C. Circuit did not believe that currency readers and mobile apps fulfill the defendant's obligation to provide meaningful access? [citations omitted]), Treasury responded: "Defendant submits that the D.C. Circuit opinion, *American Council of the Blind v. Mnuchin*, 878 F.3d 360 (D.C. Cir. 2017), does not foreclose the argument that blind and visually impaired persons already have meaningful access to the currency through external currency readers and mobile device applications. First, plaintiffs' filing of a renewed motion to modify mooted the Court of Appeals' decision, which thus no longer governs these proceedings as a matter of law (although it provides some insight into questions the court may have if this matter appears before it again). Second, the question of whether currency readers and mobile applications already provide meaningful access was not before the court, such that the statements referred to above should be seen as merely assumptions or shorthand references to the fact that this is a Rehabilitation Act case. Third and relatedly, the record before the Court of Appeals was far from complete regarding the efficacy of currency readers and mobile applications or the question [of] whether blind and visually impaired persons now have meaningful access to U.S. currency. . . . Defendant's efforts to provide meaningful access to the currency for blind and visually impaired persons should be assessed in terms of the reasonable accommodations *offered*, not those *accepted*. Defendant has offered meaningful access to 100% of the blind community. . . . Similarly, one factor that may impact the number of mobile applications downloaded is the availability of competing applications. For example, Microsoft produces Seeing AI, an award-winning, free application, that can denominate both United States and foreign currency, as well as perform numerous other tasks. *See* Seeing AI, https://microsoft.com/en-us/seeing-ai (last visited Feb. 7, 2019). Indeed in July 2018, the American Council of the Blind gave Microsoft and Seeing AI its 'James R. Olsen Distinguished Service Award' for 'important contributions which have advanced opportunities for the blind community.' *See* Microsoft Receives ACB's James. R. Olsen Distinguished Service Award, https://www.acb.org/james-olsen-award-microsoft (last visited Feb. 7, 2019). In making the award, [American Council of the Blind or 'ACB'] stated that the Seeing AI application had 'significantly enhanced the independence and quality of life for Americans who are blind or visually impaired.' *Id.* ACB further noted, 'Due to its no-cost and multi-use capabilities, the application has been downloaded over 150,000 times and completed over 5 million tasks for users.' *Id.* Presumably, many blind individuals who are accessing currency using Microsoft's application have decided not to seek the government-provided applications or readers. . . . Despite the above factors that would tend to reduce the number of blind individuals who choose to access currency through government-provided readers or applications, defendant will continue to make good-faith efforts to publicize and distribute those options. To date, BEP's Office of External Relations ('OEX') has attended more than 90 conferences as part of its meaningful access initiative, and dozens of organizations and government entities continue to actively support the currency reader distribution efforts. . . ." Def.'s Answers (Question 16); *see also id.* n.2 ("Defendant recognizes that these [folding] methods of accessing currency, while fully effective for some of the blind population, do not provide meaningful access for all, since they depend on a trusted friend or relative to denominate currency initially. That is why BEP offers free currency readers and mobile device applications.").

in 2020); Pls.' Resp. to Def.'s Answers at 15 (estimating that in 2008, 1.5 million blind persons were in the United States and that "[t]hat number has certainly increased substantially in recent years due to the aging of the American population").

Indeed, the only point on which the parties agree is that Treasury has failed to provide concrete estimates of the cost of decoupling the timeline for incorporating RTF from the timeline for redesigning currency to meet security threats. *See, e.g.*, Def.'s Opp'n to Pls.' Third Mot. at 2; Pls.' Reply at 1–3. On the one hand, Treasury says that such costs cannot be provided until an RTF method is chosen, essentially rendering the D.C. Circuit's remand to gather and evaluate cost estimates an impossible task that simply cannot be fulfilled given the current state of the agency's evaluation of RTF technology. *See* Def.'s Opp'n to Pls.' Third Mot. at 2 (stating "the exact costs cannot be known until the Secretary identifies the best technological method for adding a tactile feature to the currency"); *id.* at 15 (private sector testing associated with redesigned currency "cannot begin, and its cost cannot be determined, until BEP chooses the precise tactile feature for the currency"); Def.'s Answers (Question 23).[33]

---

[33]     In response to the Court's Question 23 ("The D.C. Circuit repeatedly emphasized that, to determine whether to modify the injunction, this Court needs 'concrete estimates of the costs that matter,' *Am. Council of the Blind v. Mnuchin*, 878 F.3d at 371, that is, the difference between a timeline coupled to other security measures and one that is decoupled from any other redesign. Yet the defendant continues to state that the costs of 'decoupling the provision of meaningful access . . . cannot be known until the Secretary identifies the best technological method for adding a tactile feature to the currency.' [Def.'s Opp'n to Pls.' Third Mot. at 2]. Has the defendant (a) determined the best technological method for adding a tactile feature to currency?; (b) calculated more concrete estimates comparing the cost of adding an RTF, decoupled from any other redesign requirement, to the costs of combining RTF with the security redesign?; and (c) if the response to both (a) and (b) is no, estimated when answers may be provided to these questions?"), Treasury responded: "(a) BEP has not determined the best application method for any potential RTF, nor has any RTF passed all of the vigorous and extensive manufacturability and circulation testing required before it could be recommended for use on currency. Two methods are still under consideration: Intaglio and Coated-Embossing. (b) Since BEP has not yet determined the best method for adding an RTF, the agency cannot provide concrete cost estimates for any effort to add an RTF to the legacy $10. As noted previously, it is impossible to predict how well any feature would do in testing. This adds a great deal of additional uncertainty to any cost estimates. Further cost considerations, as far as they are currently known, are described in response to Question 13 []. (c) BEP anticipates completing manufacturing testing for the RTF by September 2019 and selecting the RTF application method by December 2019. Once the application method is selected, BEP would be able to provide more concrete estimates comparing the cost of adding an RTF, decoupled from any other redesign requirement, to the costs of combining the RTF with the overall security redesign." Def.'s Answers (Question 23).

On the other side, the plaintiffs, without disputing Treasury's position, apparently read the D.C. Circuit's decision remanding this case as compelling the granting of their motion if Treasury is unable to provide "concrete estimates of the costs that matter." *Am. Council of the Blind v. Mnuchin*, 878 F.3d at 371. Indeed, the plaintiffs declare that "the Secretary has failed to meet his burden of providing 'concrete estimates' of the costs of decoupling the accessibility from the security redesign," Pls.' Reply at 8 (quoting *Am. Council of the Blind v. Mnuchin*, 878 F.3d at 369) (emphasis omitted)), and also assert that "[a]ny costs other than the additional costs of decoupling the two redesigns are irrelevant for purposes of this motion," *id.* at 2. Even if the plaintiffs' reading of the D.C. Circuit's decision were reasonable, given the current state of Treasury's efforts to implement RTF and the testing needed before bills incorporating RTF could be placed into circulation, Treasury unequivocally states that "[i]t would not be feasible or possible to produce a $10 note with an RTF by December 31, 2020, or to produce all denominations with an RTF by December 31, 2026," and thus that it would be infeasible and impossible to comply with the timelines demanded in the plaintiffs' third motion. *See* Def.'s Answers (Question 27).[34]

---

[34]      In response to the Court's Question 27 ("Does the defendant contend that introduction of a $10 bill with RTF by December 31, 2020, or of other denominations of bills (aside from the $1 bill) with RTF by December 31, 2026 would be infeasible or impossible? If so, please detail the specific reasons supporting this contention, with citation to any up-to-date declarations or other evidence provided by the defendant to support each reason."), Treasury responded: "It would not be feasible or possible to produce a $10 note with an RTF by December 31, 2020, or to produce all denominations with an RTF by December 31, 2026. At this point, BEP has not determined the application method for any potential RTF, nor has any RTF passed all of the extensive manufacturability and circulation testing required before BEP could recommend it for use on currency. *See* [Second Olijar Decl.] ¶ 5. Both government agencies and private industry need to conduct extensive testing on each denomination when it is redesigned for security purposes. Similarly, once an RTF is incorporated into each new denomination design, both public and private bodies would have to conduct similar extensive testing on each denomination. There is no way to predict the results of this testing, and if notes containing any feature fail the testing, there is no way to predict how much additional development and testing would be required. *See* [Second Johnston Decl. ¶¶ 4, 5; Second Lambert Decl. ¶¶ 19, 21; Second Olijar Decl. ¶ 9]. If BEP were ordered to affix an RTF on the legacy $10 note, regardless of potential effectiveness, it would still need to go through extensive testing to ensure that it is manufacturable at high volumes; will be fully functional in banking equipment, high-speed counting machines, ATMs, and other machines; and will not interfere with either the overt or covert security features on the existing $10 note. This testing would likely take a minimum of three years. However, the process could be longer, particularly if the RTF adversely impacts currency's use in commerce or the high-speed processing (inspection and authentication) machines at the

## L.     Matter is Stayed While Parties Negotiate

Amidst these multiple areas of disagreement was a faint glimmer of hope that the parties might be able to reach a solution on their own.  Treasury indicated, in its answers to the Court's questions, that the plaintiffs had been invited to meet in September 2018 for a "frank discussion about the progress the agency had made and the limitations of any RTF," which invitation the plaintiffs then declined.  *Id.* at 2.[35]  The plaintiffs indicated, however, that they "would likely have" accepted the invitation, "had the Secretary's counsel provided some indication that new proposals would be forthcoming . . . that could resolve this matter."  *See* Pls.' Resp. to Def.'s Answers at 17.  Accordingly, the Court ordered the parties to meet and discuss proposals from both sides that could resolve the plaintiffs' pending motion "in light of the defendant's representations supplementing the record as to why the provision of more concrete cost estimates, as required by the D.C. Circuit's opinion . . . are impossible to provide and why it would not be feasible to meet the deadlines proposed by the plaintiffs."  Min. Order (Feb. 25, 2019).  The parties met on March 11, 2019 and requested a stay of proceedings to give the

---

Federal Reserve Banks.  Any problem would then need to be diagnosed and an appropriate remedy identified and implemented.  A new round of testing would be required to ensure that the implemented remedy was effective.  *See* [Second Olijar Decl. ¶¶ 5, 6; Second Lambert Decl. ¶¶ 17–21].  Banknote equipment manufacturers ["BEMs"] have asked to receive the final RTF design (on test coupons) for testing of their transport systems at least two years before the issuance of currency bearing the RTF.  Every BEM, from a company that makes bill acceptors to a company that makes ATMs and even those that make high-speed casino and central bank machines, will need to complete extensive testing.  *See* [Second Lambert Decl. ¶ 21; Second Johnston Decl. ¶ 6].  Production of secure currency notes in the volume required that function seamlessly in commerce is an extremely complicated, multi-step industrial process, and unexpected problems can arise at any point.  For this reason, it would be extremely risky to truncate or suspend this extensive testing.  *See* [Second Olijar Decl. ¶ 7]."  Def.'s Answers (Question 27).

[35]      Treasury provided details of this invitation in the introduction to its answers to the Court's questions, stating, "[i]n light of the results of the MITRE study, the defendant, through his counsel, proposed to meet with the American Council of the Blind [] and its counsel in September 2018, to discuss the efforts of the [BEP] to meet the needs of the blind and visually impaired and to develop an acceptable tactile feature.  BEP offered to provide appropriate tactile feature samples for examination during that meeting.  At such a meeting, defendant's representatives would have answered questions from the plaintiffs, provided accurate information, and dispelled any misconceptions the plaintiffs may have had.  Defendant believed that a frank discussion about the progress the agency had made and the limitations of any RTF may have resolved plaintiffs' renewed motion to modify.  The plaintiffs, however, declined defendant's invitation to hold a meeting."  Def.'s Answers at 2 (citation to copies of email correspondence omitted).

parties more time to negotiate potential solutions.  *See* Jt. Status Rpt. (Mar. 14, 2019) ¶¶ 1, 2,

ECF No. 182; Min. Order (Mar. 14, 2019) (staying case until Apr. 15, 2019); Unopposed Mot. to

Stay, ECF No. 185; Min. Order (Apr. 9, 2019) (continuing the stay until June 10, 2019).

> **M.    When Stay Is Lifted, Parties Agree that Plaintiffs' Pending Third Motion
> Should be Decided Based on the Existing Record, as Expanded by Answers
> to the Court's Questions**

When the stay was lifted on June 10, 2019, Treasury urged that the plaintiffs' pending

motion be decided "based on the extensive record before" the Court.  Jt. Status Rpt. (June 10,

2019) at 1, 3, ECF No. 187.  The plaintiffs, despite having never moved for discovery and having

declined the Court's prior invitation for an evidentiary hearing in January 2019, "disagree[d]

with the Secretary that the pending motion . . . should be decided on the basis of the existing

record."  *Id.* at 3.  The plaintiffs now recommended that an evidentiary hearing or supplemental

briefing "may be required" to determine the feasibility of redesigning any denominations by

December 31, 2026, especially when, as Treasury conceded, its claim of infeasibility was only

directly raised in supplemental briefing responding to the Court's questions.  *Id.* at 2–4.  The

plaintiffs also requested "an opportunity to obtain discovery as to the factual basis for the

Secretary's claim of infeasibility[] prior to the filing of further briefs on [this] issue."  *Id.* at 4.

Once again, the Court sought clarification regarding the status of this matter, ordering the

plaintiffs to show cause why their pending motion for modification of the Injunction Order, on

which briefing was complete, should not be denied without prejudice in light of the plaintiffs'

assertion that this motion should not be decided on the current record.  *See* Min. Order (June 14,

2019).  The plaintiffs clarified that they only wanted discovery if their motion was going to be

denied, suggesting that the "Court may have misunderstood the thrust of [their] position," which

was intended to "state that the Court should not decide the pending motion . . . on the basis of the

existing record[] *if the Court's decision was to be based on a finding that the relief sought by*

*[plaintiffs] was infeasible.*"  Pls.' Resp. to Show Cause Order at 1, ECF No. 188 (emphasis added).  The plaintiffs' newly clarified position was "that they should first be given an opportunity to conduct discovery on the feasibility issue, as well as additional briefing after such discovery is concluded, if the Court were inclined to deny the pending motion on the basis of [Treasury's infeasibility defense]," *id.*, with the proposed discovery intended to clarify the "scope" of such defense, and whether infeasibility "applies to only one denomination, all denominations, or something in between."  *Id.* at 2.  At the same time, "if the Court does address the feasibility issue without discovery and/or additional briefing," their motion should be granted, as "the declarations filed by [Treasury] present no factual basis for the infeasibility defense."  *Id.* at 1.  Further, because "several design features other than an RTF could be employed to achieve accessible currency," the plaintiffs argue their motion should be granted "even if the RTF is infeasible."  *Id.* at 2 (citing Pls.' Resp. to Def.'s Answers at 9–11).  Thus, the plaintiffs "assert[ed] that the Court should without further delay decide the pending motion on the basis of the issue" at hand, which they suggest is solely "whether the Secretary has provided concrete estimates of the additional costs of decoupling the accessibility redesign from the security redesign."  *Id.* at 2.

With both parties in agreement that the pending motion should be decided on the basis of the current record, that motion is denied.

## II.    LEGAL STANDARD

Rule 60(b)(5) of the Federal Rules of Civil Procedure circumscribes a court's ability to modify a final judgment unless "applying [the order] prospectively is no longer equitable."  FED. R. CIV. P. 60(b)(5).  The party seeking modification "bears the burden of establishing that a significant change in circumstances warrants [its] revision," *Rufo v. Inmates of Suffolk Cty. Jail,*

502 U.S. 367, 383 (1992), and this initial burden may be met by showing "a significant change either in factual conditions or in law," that renders continued enforcement "detrimental to the public interest," *see id.* at 384; *accord Horne v. Flores*, 557 U.S. 433, 447 (2009). A party's request to modify an injunction must be viewed through a "broad and flexible" analysis as to whether the "changed circumstances warrant[] relief," *Horne*, 557 U.S. at 456, and "the public interest is a particularly significant reason for applying a flexible modification standard" because the injunction "reach[es] beyond the parties involved directly in the suit," *Rufo*, 502 U.S. at 381 (internal quotation marks and citation omitted).

Here, the party benefitting from the Injunction Order moves for modification, whereas "the overwhelming majority of motions to modify the terms of a[n] [injunction] are filed by the *enjoined* party seeking 'relief from' the court's judgment." *Salazar ex rel. Salazar v. District of Columbia*, 896 F.3d 489, 498 (D.C. Cir. 2018) (emphasis in original). Regardless, a motion to modify can also "be filed by the plaintiff seeking to enforce the terms of the injunction." *Id.* "[A] court's 'broad and flexible' equitable powers, which Rule 60(b) codifies, may allow a district court to 'tighten a decree' as well.'" *Id.* (alterations omitted) (quoting *United States v. W. Elec. Co., Inc.*, 46 F.3d 1198, 1202 (D.C. Cir. 1995)).

"Although . . . a district court should exercise flexibility in considering requests for modification . . . , it does not follow that a modification will be warranted in all circumstances." *Rufo*, 502 U.S. at 383. Rather, modification must be in the public interest and be suitably tailored to the changed circumstances. *See Gov't of Province of Manitoba v. Zinke*, 849 F.3d 1111, 1122 (D.C. Cir. 2017) (identifying these two prongs of the Rule 60(b)(5) inquiry). At the same time, once a party establishes that a significant change in circumstances warrants revision, the court should, "[a]t the very least . . . consider whether the proposed modification is suitably

tailored to the changed circumstance." *Id.* at 1117 (internal quotation marks omitted) (quoting *Rufo*, 502 U.S. at 383).

In analyzing the public interest, "courts sitting in equity are obliged to consider the interests of *all* those affected by a decree." *Twelve John Does v. District of Columbia*, 861 F.2d 295, 298 (D.C. Cir. 1998) (emphasis added). The D.C. Circuit previously concluded that, in this case, the public interest includes the interests of "private third parties," such as banking machine manufacturers, who "will unquestionably be affected by the currency redesign." *Am. Council of the Blind v. Mnuchin*, 878 F.3d at 368.

As for the suitably tailored prong, three factors inform this consideration. First, "a modification must not create or perpetuate a constitutional violation." *Rufo*, 502 U.S. at 391. Second, a "proposed modification should not strive to rewrite [the order]. . . . the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances." *Id.*; *see also Salazar*, 896 F.3d at 498 ("Any adjustment of the order . . . 'should do no more' than is necessary to 'resolve the problems created by the change in circumstances.'" (quoting *Rufo*, 502 U.S. at 391)). Third, the court must "defer to . . . government administrators, who have the 'primary responsibility for elucidating, assessing, and solving' the . . . intricacies of implementing a decree modification." *Rufo*, 502 U.S. at 392 (quoting *Brown v. Bd. of Educ.*, 349 U.S. 294, 299 (1955)); *id.* at 392 n.14 ("[S]imple common sense require[s] the court to give significant weight to the views of the [] government officials who must implement any modification."). While *Rufo* concerned institutional reform directed at state and local governments that were seeking relief from an injunction, similar deference is owed to assessments by a federal agency with particular expertise and knowledge in understanding relevant resource constraints in the context of the agency's overall mission in

service of the public interest.

This analysis under Rule 60(b)(5), particularly when the beneficiary of an injunction seeks a modification that would hold an agency to strict deadlines, is not far afield from the D.C. Circuit's guidance on the equitable factors to consider when an "agency's delay is so egregious as to warrant mandamus." *See Am. Hosp. Ass'n v. Burwell* ("*AHA I*"), 812 F.3d 183, 189 (D.C. Cir. 2016) (internal quotation marks and citation omitted). In such a case, the D.C. Circuit first held that "in order for law—man-made or otherwise—to command the performance of an act, that act must be possible to perform." *Am. Hosp. Ass'n v. Price* ("*AHA II*"), 867 F.3d 160, 161 (D.C. Cir. 2017). Thus, the district court must "seriously grapple" with an agency's "assertion that lawful compliance" with proposed timelines "would be *impossible*." *Id.* at 162 (emphasis in original). When fashioning a mandamus order, a number of factors may be relevant and depend on the case, including the real impact on human health and welfare, *id.* at 164, the defendant's discretion over the program at issue, *id.*, the "risk of infringing on the authority and discretion of the executive branch," *id.* (alteration, internal quotation marks, and citation omitted), the "legislative branch's awareness of the problem and its capacity to furnish a comprehensive solution," *id.*, the defendant's "incipient but good-faith efforts" to resolve the issue, *id.*, and the "availability of some, albeit incomplete," alternative form of relief, *id.* Each of these factors tempers a district court's equitable discretion when fashioning a mandamus order, and each of these factors is relevant to considering the proposed modification here.

## III. DISCUSSION

At the outset, any argument that Treasury is already complying with its obligation to provide meaningful access to currency is squarely foreclosed by the D.C. Circuit's most recent opinion in this case. Treasury's assurance that its currency readers and mobile applications

"provide essentially universal meaningful access to the entire blind community," Def.'s Opp'n to Pls.' Third Mot. at 31, was rejected by the D.C. Circuit on a record, which although now expanded on some issues, was virtually indistinguishable from the current record on the availability of such devices. The D.C. Circuit observed that "[u]nder the injunction's current terms, millions of visually impaired Americans who could have expected meaningful access to currency by 2018 must now wait until 2026 and beyond. In the meantime, only a fraction of them are helped by the other measures put in place by the Secretary." *Am. Council of the Blind v. Mnuchin*, 878 F.3d at 367. Thus, in no uncertain terms, the D.C. Circuit concluded that Treasury's new timeline for redesigns meant that it "will be in violation of federal law for eight to twenty more years than it would have been had it met its expected timeline for currency redesigns when the injunction issued." *Id.* at 366; *see also id.* at 368 (referring to Treasury's "ongoing violation of the Rehabilitation Act"). Indeed, notwithstanding Treasury's fleeting arguments about already complying with the Rehabilitation Act, the agency never moved to terminate the injunction, or sought reconsideration of the D.C. Circuit's conclusions on this issue, and even concedes here that a "fuller record" would be needed prior to consideration of any such motion. *See* Def.'s Answers (Question 16), *supra* n.32.

Accordingly, the question of whether Treasury is already in compliance with the Rehabilitation Act has already been answered with a blunt, and binding, "no." The question now pending is the efficacy and equities of the decade-old Injunction Order. Despite disagreement on a number of grounds in this case, neither party denies that the Injunction Order is dated, and that the assumptions upon which that relief was based—namely, that a security redesign of U.S. currency would likely occur between 2013 and 2018, and that, in light of the experience of other countries, feasible and durable features could be incorporated into U.S. currency within that

timeframe—have not come to pass.  Notwithstanding the plaintiffs' insinuations to the contrary, Treasury has been working in good faith to meet its obligations under the Rehabilitation Act while concurrently meeting its obligations to design currency to guard against counterfeiting under 12 U.S.C. § 418, *see supra* Sections I.D, I.F, I.G.  Yet, due to the complexities of designing and incorporating RTF that meets the standards for U.S. currency and to the need to address new and evolving counterfeiting security threats, the Injunction Order has been insufficient to bring Treasury into full compliance with its obligations under the Rehabilitation Act.  In short, circumstances have changed.

Notably, however, the passage of time has also demonstrated the prudence of coupling the accessibility redesign to the ongoing security redesign, as the 2008 Injunction Order provided.  Directing Treasury to work on both redesigns simultaneously reflects the reality that these redesigns cannot be independent of each other: any accessibility feature, whether that be RTF or any other method, must work in tandem with the security features of the banknote.  *See, e.g.*, Def.'s Answers (Question 13(c)) ("These undetermined security features will need to work with an RTF application method that has not yet been approved."); *id.* (Question 14) ("Testing would have to be done to ensure . . . that the new feature did not interfere with existing security features or impede the function of machinery."); *id.* (Question 27) (same); Second Olijar Decl. ¶ 6 (explaining that any RTF "would still need to go through extensive testing to ensure that it . . . will not interfere with either the overt or covert security features" of a bill); Second Johnston Decl. ¶ 6 ("If BEP . . . affix[ed] a rudimentary or minimal RTF to [a bill], the normal process for this type of change would still include. . . . approximately a year of technical integration testing . . . to ensure that the feature could be effectively integrated into a note without interfering with security features . . ."); *see also* 2016 Wash Decl. ¶ 14 ("The primary reason for redesign of

banknotes is to enhance the security of U.S. Federal Reserve Notes. Accordingly, [Treasury's] development is based on closely monitoring counterfeit rates and other threat assessment data on U.S. notes in use around the world."); First Lambert Decl. ¶ 4 ("Incorporating a[n] [RTF] into any denomination of Federal Reserve notes would require ensuring that it does not interfere with or degrade the ability of the [Federal Reserve's] high-speed currency-processing machines to detect the overt and covert [security] features of the notes.").

Attempting to design or implement an RTF without accounting for how the bill's security features would be affected would amount to a derogation of duty by increasing potential risks to the security of the currency. Even if RTF in some yet undetermined form were added to the current version of the $10 bill, with no security updates, extensive testing would be required to ensure that anti-counterfeiting measures would not be compromised. *See* Def.'s Answers (Question 27) ("If BEP were ordered to affix an RTF on the legacy $10 note, regardless of potential effectiveness, it would still need to go through extensive testing to ensure that it . . . will not interfere with either the overt or covert security features on the existing $10 note."). Moreover, RTF and security features vary by denomination, so such testing is needed for each redesigned bill, not merely for the first bill to incorporate a new security feature or RTF. As Treasury has explained, "[s]ecurity features and their placement, as well as the overall design of the bill, differ from one denomination to another." Def.'s Answers (Question 22). Consequently, "[t]he incorporation of an RTF would necessarily affect the overall design of the bills, and thus would affect the design of each denomination, including potentially the effectiveness of security features." *Id.* These fundamental realities of the redesign process for U.S. currency were the basis for the core principle underlying the original Injunction Order's coupling of the timeline for accessibility redesigns with security redesigns, as well as for the

denials of the plaintiffs' first and second motions for modification of that Order. As Treasury has explained at length in response to the Court's Questions, the reasons for continuing to couple the two redesigns remain sound.

Thus, for the reasons explained below, circumstances have not changed to the point where "continued enforcement [is] detrimental to the public interest." *Horne*, 557 U.S. at 447 (internal quotation marks and citation omitted). To the contrary, the relief the plaintiffs seek, in the form of decoupling the meaningful access redesign from the security redesign and holding Treasury to hard and relatively short deadlines for providing meaningful access to currency, is neither in the public interest nor suitably tailored to the changed circumstances in this case. Given the complexities of designing a workable RTF, and the reality that RTF is the only possible large-scale modification that has been studied and tested in depth, the timelines proposed by the plaintiffs are infeasible. Further, requiring Treasury to prioritize the meaningful access redesign over the security redesign in order to meet the plaintiffs' proposed deadlines would introduce unjustifiable risk to the security of U.S. currency. For each of these reasons, which are discussed in more detail below, the plaintiffs' motion must be denied.

### A. Circumstances Have Changed

The plaintiffs have established that circumstances have changed, but not that continued enforcement of the Injunction Order is detrimental to the public interest, certainly when adoption of the plaintiffs' suggested modifications would in fact result in such detriment. First, Treasury cannot and does not dispute that the redesign of U.S currency has been delayed well beyond what was anticipated when the Injunction Order was entered. Treasury simply offers excuses and explanations for why the delay is necessary in light of new counterfeiting technologies and why RTF is "far from the panacea touted by the plaintiffs," along with vigorous argument as to why any meaningful access redesign must remain coupled with the ongoing security redesign.

*See* Def.'s Opp'n to Pls.' Third Mot. at 15–19.  Yet any discussion of whether changed circumstances warrant modification, or warrant modification in the manner the plaintiffs request, must be separated from an analysis of whether changed circumstances exist.

At the time the Injunction Order was entered, the parties anticipated that the next redesign would occur between 2013 and 2018.  Treasury now anticipates that a new $10 bill will not begin circulating until 2026, with subsequent denominations following at intervals of eighteen months to two years.  Def.'s Answers (Question 13(a)), *supra* n.5.  Further, these estimates assume that Treasury selects an RTF application method by December 2019, even though this benchmark date has been pushed back repeatedly, stymieing not only further testing but also Treasury's ability to provide concrete cost estimates of decoupling the security redesign from the meaningful access redesign.  *See* Def.'s Answers (Questions 13(b)(iv), 15, and 23), *supra* n.27.[36]  This "much greater than planned delay in providing meaningful access to visually impaired individuals is unquestionably a change in factual conditions."  *Am. Council of the Blind*

---

[36]    In response to the Court's Question 13(b)(iv) ("In the event that the plaintiffs' proposed order is adopted, list . . . (b) the specific and potential estimated costs associated with: . . . (iv) testing costs."), Treasury responded: "Extensive testing would be required to determine whether the presence of an RTF in Federal Reserve notes would cause the notes to get caught in or cause damage to the Federal Reserve's high-speed currency-processing machines or slow down their normal operation.  Depending on the characteristics of the RTF, there is an unquantified risk that raised features could result in accelerated wear on the sensors used in those machines.  Testing to determine this risk would also be time-consuming and expensive.  These costs would be incurred and then incurred again a short time later if an RTF were incorporated into the legacy $10 note, and then shortly thereafter the new $10 note design is launched.  Furthermore, if the testing revealed that the presence of the RTF disrupted or slowed the operation of the Federal Reserve's 128 specialized high-speed currency-processing machines, additional costs would be incurred to determine what aspect of the RTF is involved and what part or parts of the machines were affected.  Then, further costs would be incurred to determine whether changes to the machines or to the RTF itself, or both, would be necessary.  Assuming machine reconfiguration were required, reconfiguring each of the 128 machines to enable processing notes with an RTF without jamming or other disruptions or at slower processing speeds would require extensive design work and testing, which would add unpredictable amounts of both expense and time to the process.  This testing and reconfiguration may have to be repeated if initial solutions prove ineffective.  Even if reconfiguration of its machines were unnecessary, the Federal Reserve would incur one-time costs associated with implementation of the RTF and possible ongoing operational costs associated with slower processing speeds caused by the RTF.  Such ongoing costs could include the need to add machine shifts, which would result in increased labor and maintenance costs.  In light of these factors, it is impossible to estimate the precise costs that would be associated with changes to the hardware and software of the Federal Reserve's machines due to the addition of an RTF to currency notes."  Def.'s Answers (Question 13(b)(iv)).

*v. Mnuchin*, 878 F.3d at 366–67.

Second, selecting an RTF application method that is effective, manufacturable in sufficient quantity, durable, and capable of functioning in commercial and governmental machines has proven far more elusive than originally anticipated. *See* Def.'s Answers (Question 24).[37] Although "a number of other nations have placed an RTF on their currency," those RTFs "are generally not durable." First Olijar Decl. ¶ 7. Moreover, most foreign currencies are not comparable to U.S. currency because they are "printed on a different type of paper or plastic, . . . are not made in anywhere near the volume of [U.S.] currency, and . . . have a much shorter circulation life." *Id.* ¶ 8. "Banknotes are typically crumpled, exposed to harsh conditions, and sometimes completely immersed in water or even laundered through a machine," making it difficult to design an "RTF that is robust enough to withstand normal handling." 2016 Wash

---

[37]        In response to the Court's Question 24 ("Provide an estimate, with a detailed description of the assumptions about accuracy and durability, of how long it would take to introduce, with associated costs, a $10 bill with RTF for circulation, if no other security redesigns were included, even if that RTF were not as durable or effective as a later version might be."), Treasury responded: "A usable tactile feature must meet four criteria: (1) it must be effective—that is, it must allow blind persons to denominate currency accurately; (2) it must be manufacturable in sufficient quantity on BEP's machinery; (3) it must be sufficiently durable for U.S. currency; and (4) it must function in commercial and governmental counting machines and inspection machines and in ATMs and vending machines. If an RTF were added to the legacy $10 note, a great deal of additional testing would still be required. Approximately a year of testing would be required to ensure that the feature could be effectively integrated into a note without interfering with security features or other design elements. Approximately another year would be required to ensure that BEP was able to produce the RTF in the volumes needed and without disrupting the production process. BEP would allow private industry approximately two years to test and verify that the potential RTF could work effectively in banknote counting machines, ATMs, and other machines. Some of this testing could proceed simultaneously, but the entire process will likely take at least three years and potentially more, depending on the results of the testing. Costs would also vary, depending on results of the testing. The above estimates assume (1) that the RTF provides an accuracy rate that the Secretary of the Treasury determines to be acceptable, and (2) that the resulting currency, with the RTF, passes the usual BEP durability testing. As noted in prior filings, the Secretary is ultimately responsible for the design of U.S. currency. *See* 12 U.S.C. § 418. As part of longstanding practice by BEP, all U.S. currency must survive a series of durability tests designed to simulate the actual use and circulation of currency. These include a Crumble test which crushes currency a number of times, a Laundering test which simulates accidental washing of currency, and a Chemical Resistance test which saturates the notes with chemical substances, all to verify that the RTF will remain virtually intact and adhere to the note. All features of a note, such as security features and an RTF, must be able to survive these tests. Additionally, the RTF will be subject to a few new tests to assess its functionality, namely a Scrape test simulating abrasion with a coin or fingernail, and a Humidity test with long exposure to hot and humid conditions, both to ensure that the RTF remains intact. *See* [First Johnston Decl. ¶ 8]. As described above, since BEP has not yet determined the technological method for adding a tactile feature to the currency, it is impossible to provide concrete cost estimates of any effort to add an RTF to the legacy $10 note." Def.'s Answers (Question 24).

Decl. ¶ 5. Before selecting RTF, Treasury reviewed and discarded other options of creating a

tactile feature or way to distinguish currency, including notches in the paper, perforations in the

paper, and bills of different sizes. Def.'s Answers (Question 18).[38] "Perforations and notches

dramatically reduced the durability of currency notes by creating tear points during the stress of

normal day-to-day handling," a problem "exacerbated in a modern economy like that of the

United States, in which currency must flow smoothly through high-speed processing

(authentication and fitness sorting) equipment." *Id.* As for bills of differing size, "[s]tudies

showed that blind and visually impaired individuals could not manually distinguish bills of

differing sizes unless the size differential was so large as to make the bills unusable in

---

[38]     In response to the Court's Question 18 ("The defendant has described numerous concerns about RTF, explaining that 'many of the assumptions the [BEP] made in 2010 are no longer valid.' Def.'s Supp. Status Rpt. (Dec. 20, 2018) ¶ 13. Has the experience of developing and testing RTF led the defendant to conclude that other, previously discarded options for providing meaningful access to currency, such as producing notes in different sizes, should be re-evaluated for adoption?"), Treasury responded: "No. Despite the drawbacks and deficiencies of the RTF, previously considered options have significant drawbacks that cannot be overcome. Early in the process, BEP reviewed denomination schemes from over 60 countries and found most of them to be clearly ineffective or impractical for United States currency. A few did appear to have some promise and were incorporated into design and testing approaches but were later discarded, specifically: 1. Notches in the paper, 2. Perforations in the paper, 3. Bills of different sizes. Perforations and notches dramatically reduced the durability of currency notes by creating tear points during the stress of normal day-to-day handling. This problem would be exacerbated in a modern economy like that of the United States, in which currency must flow smoothly through high-speed processing (authentication and fitness sorting) equipment, without resulting in jams or damage. Bills of differing sizes were also long ago discarded as not feasible. Studies showed that blind and visually impaired individuals could not manually distinguish bills of differing sizes unless the size differential was so large as to make the bills unusable in commerce. Although blind and visually impaired persons can distinguish bills that differ less in size by using an external measuring device, that would largely replicate the potential situation with currency readers. Furthermore, changing the size of the bills would be far more costly to the economy than an RTF. All of the testing required for an RTF would be required for bills of differing size. In addition, that approach would render obsolete every cash register, bill counting machine, ATM cash cassette, and cash acceptance slot in vending machines, transit systems, and supermarkets. Most of BEP's printing presses would have to be modified, and even most existing personal wallets would become [un]usable. The impracticality of these three potential approaches is underscored by plaintiffs' exhibits, which strongly counsel against the use of 'mechanical' (non-RTF) methods of achieving meaningful access. As exhibits to a recent filing, plaintiffs included comments provided by the American Bankers Association, JPMorgan Chase & Co., and the Branch Banking and Trust Company (BB&T), in response to defendant's notice of proposed agency action in 2010. Those comments all raised the issue of the costs to the industry due to the changes that will be required for cash processing and dispensing equipment, ATMs, retailers, and vending machines. Additionally, they stated that the costs and burdens to the industry in implementing these changes would depend on the final design, placement, and extent of the modifications. [Pls.' Resp. to Def.'s 2018 Supp. Status Rpt., Ex. 1, Comments Submitted to Treasury Regarding Meaningful Access to U.S. Currency, at 1–7, 12–17, ECF No. 173-1]. Finally, any exploration of the previously discarded options would essentially turn the clock back to 2011, requiring BEP to undertake the long and complicated experimental process, while likely confirming that those options are not feasible." Def.'s Answers (Question 18).

commerce." *Id.* In addition, "changing the size of the bills would be far more costly to the economy" as it "would render obsolete every cash register, bill counting machine, ATM cash cassette, and cash acceptance slot in vending machines, transit systems, and supermarkets." *Id.* Thus, "[d]espite the drawbacks and deficiencies of the RTF, previously considered options have significant drawbacks that cannot be overcome." *Id.*

In its quest for an effective RTF, Treasury has "reviewed over 60 potential denomination schemes of the RTF, prototyped and tested 11 variations, and eliminated all but one because they did not best meet the necessary criteria." First Johnston Decl. ¶ 3. Two possibilities for RTF application methods are now being considered: Intaglio and Coated-Embossed. *See* Def.'s Supp. Status Rpt. (Dec. 20, 2018) ¶ 2. Treasury continues to anticipate that one of these two RTF application methods will be selected as most suited for currency by December 2019. *See* Jt. Status Rpt. (June 10, 2019) at 3. Even after an RTF application method has been selected, "the design will be subjected to additional testing. Def.'s Twentieth Status Rpt. (Sept. 17, 2018) ¶ 4, ECF No. 166. "As part of longstanding practice, all U.S. currency must survive a series of durability tests designed to simulate the actual use and circulation of currency. These include a Crumble test that crushes the currency a number of times, a Laundering test that simulates accidental washing of currency, and a Chemical Resistance test that saturates the bills with chemical substances." *Id.* "All features of a bill, including security features and a tactile feature, must be able to survive these tests." *Id.* "Additionally, the RTF [itself] will be subject to a few new tests to assess its functionality, namely a Scrape test simulating abrasion with a coin or fingernail, and a Humidity test with long exposure to hot and humid conditions, both to ensure that the RTF remains intact." Def.'s Answers (Question 24), *see supra* n.37

After undergoing extensive testing and research, no RTF currently meets the

requirements for U.S. currency. First Olijar Decl. ¶ 9. "Thicker tactile features are more durable and effective over time, but they will not function in the banknote processing and acceptance equipment and/or are not manufacturable due to the increased thickness of the notes." *Id.* Even aside from these concerns, based on "observations of individual test groups," Treasury believes that the accuracy rate of its sample RTF is "approximately 80% in one small focus group," although it "range[s] from 52% to 90% across a range of feature forms and application technologies." First Olijar Decl. ¶ 10; 2016 Wash Decl. ¶ 3; Def.'s Answers (Question 19), *see supra* n.30. While noting that "[a]t this point it is unclear what an acceptable error rate will be for real world use, . . . a 20% error rate appears quite high." First Olijar Decl. ¶ 10. "Almost as important," according to Treasury, is that focus group users express "an average confidence level of 3.5," on a scale of 1 to 5, "that they have accurately denominated a bill." *Id.* ¶ 11. The plaintiffs downplay these accuracy concerns, suggesting that, "[a]s a general matter, a blind user can request a new banknote from a cashier in place of a worn note," Pls.' Answers (Question 8), but this workaround also "[f]orc[es] the blind to rely upon strangers," when making purchases, Pls.' Third. Mot. at 12, the precise circumstance that an effective RTF is meant to avoid.[39]

---

[39]     In response to the Court's Question 8 ("What is the plaintiffs' position as to an acceptable accuracy rate for RTF?"), the plaintiffs responded: "There is no single accuracy rate that could be defined as acceptable for any given feature. An acceptable accuracy rate would depend upon a variety of factors, including the amount of time a banknote has been in circulation. As a general matter, a blind user can request a new banknote from a cashier in place of a worn note. Therefore, a lower accuracy rate on a worn banknote would be acceptable if the accuracy rate on a new banknote were higher. Acceptable accuracy rates may also vary on the basis of the nature of an individual's disabilities. For example, lower accuracy rates can be expected with respect to individuals who have lost tactile sensitivity. Acceptable accuracy rates also depend upon the amount of experience an individual has with a particular feature. Thus, a lower accuracy rate is acceptable for individuals who have not had experience using a particular feature. On the other hand, a higher accuracy rate should  be expected with respect to persons who have had a reasonable amount of experience in using the feature. Plaintiffs would also expect that accuracy rates in using a particular feature would increase as the BEP itself develops experience in the manufacture of that feature, and obtains user feedback concerning that feature. As such, the accuracy rates for a completely new feature may well be lower than would be the accuracy rates after that feature has been in production over a period of time. Plaintiffs further assert that the Secretary should pursue a multi-pronged approach to making currency accessible. A multi-layered approach is preferable, because any single method of accessibility may not be suitable for the disparate population that comprises the universe of blind and visually impaired individuals." Pls.' Answers (Question 8).

## B.    The Significant Delay in Providing Meaningful Access Harms Plaintiffs

Due to Treasury "devot[ing] extensive resources, time, and effort" to improve the access to currency for those who are visually impaired, U.S. currency is undeniably more accessible now than in 2008, when the Injunction Order was entered.  *See* Def.'s Opp'n to Pls.' Third Mot. at 19.  First, Treasury has added "large, high-contrast numerals" that allow individuals with visual impairments to more easily identify currency.  *Id.* at 19, 32.  In response to the plaintiffs' criticisms that more could be done to improve those high-contrast features, *see* Pls.' Third Mot. at 31–33, Treasury explained that future releases of $10, $20, and $50 bills will include the large, high-contrast, varying colors that now appear on the $5 and $100 bills.  Def.'s Answers (Question 20).[40]

Treasury has also implemented, with the National Library Service, a free currency reader program.  Def.'s Opp'n to Pls.' Third Mot. at 7, 19; Def.'s Answers (Question 16), *see supra* n.32.  This technology has changed and improved over time.  Treasury currently provides qualified citizens, at no cost, with an iBill currency reader, which "is of a compact key-fob style with a key ring . . . about the size of a typical vehicle remote" and "announces the denomination of a bill in a natural voice, a pattern of tones, or a pattern of vibrations, usually within one or two seconds after insertion of a bill."  Def.'s Opp'n to Pls.' Third Mot. at 32–33 (citing Second Fynes Decl. ¶ 2).  The iBill is a "small, lightweight device" that "quickly identifies a note with

---

[40]    In response to the Court's Question 20 ("The plaintiffs are critical of the defendant's efforts to add larger, high-contrast numerals to bills as failing to provide meaningful access to currency for some vision-impaired persons and urge that more be done to make bills meaningfully accessible to vision-impaired persons.  *See* Pls.' Third Mot. at 31–33.  Does the defendant intend to address those concerns by making further changes to the numerals or to the coloring of bills as part of any upcoming redesign?"), Treasury responded:  "Yes.  When the current family of notes was produced beginning in the 1990's, larger bold and higher contrast numerals were added to the $5, $10, $20, $50 and $100 notes.  The $10, $20 and $50 notes were the first three to be issued.  BEP received feedback from the visually impaired community indicating that the numeral should be larger and that the agency should further increase the contrast with varying color.  BEP accepted and concurred with that feedback.  As [a] result, the next two denominations to be issued, the $5 and $100 notes, included larger numbers and higher contrast.  The Secretary plans to incorporate these larger high-contrast numbers with varying color into the next family of notes."  Def.'s Answers (Question 20).

essentially 100 percent accuracy, even for worn, older design notes.  Unlike the tactile feature, a

currency reader is usable by blind individuals who also have tactile sensitivity issues, such as

diabetic neuropathy."  Aug. 2017 Ltr. from BEP at 2.  As of February 4, 2019, 68,078 currency

readers have been distributed, Third Fynes Decl. ¶ 3, and Treasury claims "never [to have]

received a report of an incorrect reading" from the iBill, Def.'s Opp'n to Pls.' Third Mot. at 33.

A figure from the 2014 GAO Report displays both the large, high-contrast "5" on the $5 bill and

an illustration of the iBill.



Sources:  U.S. Bureau of Engraving and Printing and GAO.  |  GAO-14-823

2014 GAO Rpt. at "GAO Highlights."

Taking advantage of technology that barely existed in 2008, Treasury has also "fostered

the development of popular currency-reader applications for both Apple and Android mobile

devices."  Def.'s Opp'n to Pls.' Third Mot. at 19, 34–35.  These mobile applications, which work

without an Internet connection, "scan continuously looking for currency notes in front of the

camera," and "[o]nly a portion of the bill needs to be in front of the camera" to be read.  *Id.* at 34.

Upon identification of a bill, the application "announces the denomination of the bill after two-

to-four seconds, in either an audible voice or a series of vibrations."  *Id.*  Scanning can be

accomplished either with one hand holding the mobile device while the bill rests on a surface, or

with one hand holding the device and the other hand holding the bill.  *Id.*  These applications

have been downloaded 84,992 times as of February 4, 2019.  Third Fynes Decl. ¶ 2.  To promote

each of these technological advances and to learn about the needs of customers and businesses, representatives from Treasury have attended conferences and have "given more than a dozen interviews on media outlets, reading services, and [radio] programs." *Id.* ¶¶ 4–6, 17, 20–26.

These advancements are laudable, but the D.C. Circuit has already concluded that these steps have not yet brought Treasury into compliance with the Rehabilitation Act. *See Am. Council of the Blind v. Mnuchin*, 878 F.3d at 366 ("With the newest timeline, the Secretary will be in violation of federal law for eight to twenty more years than it would have been had it met its expected timeline for currency redesigns when the injunction issued."); *id.* at 368 ("[U]nder the Secretary's current timeline," the "Secretary's ongoing violation of the Rehabilitation Act— which the parties reasonably expected to be cured in one decade . . . will stretch into a second decade, and most likely a third . . .").

The declarations submitted in support of the plaintiffs' motion highlight how the current design of U.S. currency leaves a person with visual disabilities vulnerable to being taken advantage of by strangers and limits that person's ability to engage in common retail transactions or to participate in numerous employment and volunteer opportunities. *See* Pls.' Third Mot. at 10–13, 19–27 (summarizing these declarations). For example, the Reverend Helen Jo Taliaferro, who has been blind since birth, attested that "[h]aving inaccessible currency has created significant stress" and that she has "been taken advantage of in the past, typically [by] someone giving [her] incorrect change." Taliaferro Decl. ¶¶ 2, 4. In addition, "lack of accessible currency has limited [her] opportunities for more equal social inclusion," such as being denied an opportunity to volunteer in a role that manages ticket sales as she is "unable to handle the cash box." *Id.* ¶ 5. Similarly, Jeff Thom, who is totally blind, explained that although he is "extremely active in [his] community," "there is a level of unsureness when [he] pay[s] with

paper money," as he "routinely question[s] whether [he] accurately folded different bills" to allow him to differentiate them and he "fear[s] that cashiers can be dishonest about the money they return."  Thom Decl. ¶¶ 2, 3, 5.  Paul Mims, who lost his sight after an accident while stationed with the Navy in Vietnam, recounts his "road to independence after going blind," and urges Treasury to provide meaningful access, particularly "[w]hen so many other countries have found ways" to do so.  Mims Decl. ¶¶ 3, 4, 5.

The plaintiffs point to a number of disadvantages in the use of currency readers.  They chiefly call attention to the fact that bills must be inserted one at a time into the iBill, which lacks the ability to add up the total of multiple bills, meaning that relying on currency readers to denominate bills in common transactions is slow, impractical for fast-moving retail exchanges, and "creates significant obstacles to employment opportunities requiring the handling of cash."  Pls.' Third Mot. at 12.  In order to keep track of bills that must be inserted one at a time, individuals using the currency reader are exposed to "substantial security risks . . . in a public environment" particularly when two hands are sometimes needed to handle both the currency reader and currency, *id.* at 21, which can make it virtually impossible to accept change and promptly determine that the amount is correct, *id.* at 23.  Especially when combined with other necessary tasks, such as "maintain[ing] firm physical control over [a] [guide] dog," *id.* at 21, or "maintain[ing] physical contact with [a child]," *id* at 21–22, the impracticalities of using currency readers for making simple, every day purchases become clear.  In addition, the plaintiffs note that currency readers are easily lost, broken, or lose power, and that for these reasons many individuals continue to denominate their currency at home, folding the bills into particular patterns, in order to prepare for cash-based transactions.  *Id.* at 19–27.

Smartphone applications are similarly deficient, as they generally require two hands for

use and thus "create the same security concerns that exist when using the iBill," *id*. at 29, with the additional obstacle that a smartphone "may not be affordable, especially for older Americans living on a fixed income," *id*. at 30 (footnote omitted); *see also* Pls.' Reply at 16–17 & n.10 (disputing Treasury's contention that programs are available to help individuals with disabilities purchase smartphones). Seven plaintiffs submitted declarations explaining why they found currency readers or mobile applications to be unsatisfactory:

- Eric Bridges, who is completely blind and who is the Executive Director of the American Council of the Blind, attested that the iBill "is of little use in a public setting," because using it "is a time-consuming process requiring a substantial number of hand movements." Bridges Decl. ¶¶ 1, 2, 4, 5. "By tying up both hands with the use of the currency reader [he] is unable to maintain adequate physical contact with either [his] guide dog or [his young] son while denominating currency. It is therefore not possible for [him] to safely use the currency reader when in a public place." *Id.* ¶ 7. Mr. Bridges explained that it is not possible to use the iBill to verify change without leaving bills exposed on the counter, posing a risk they will be stolen, and that "[i]t is embarrassing to make . . . customers behind [him] wait for several minutes" while he uses the iBill. *Id.* ¶¶ 14–16.

- Mark Richert, who has been blind since birth, is "continually reminded [of] the vulnerability of individuals who are blind each time [he] take[s] a taxi cab or visit[s] a store that relies on cash only transactions," and believes that "electronic currency readers and mobile phone applications only create cumbersome work-arounds that are not always reliable" and "perpetuate separate but equal policies of exclusion." Richert Decl. at 2–3;

- Kim Charlson, who is completely blind, stated that "external currency readers . . . are of little utility, especially when making purchases in a public environment," as she "often receive[s] an error message," "especially when the bill is worn," and the "reader is generally cumbersome to use." Charlson Decl. ¶¶ 1, 2. Charlson claims that the "process of properly inserting the banknote into the currency reader is time consuming" and "requires the use of both hands." *Id.* ¶ 2. As for mobile applications, "flat touch screens on most smartphones" are "inaccessible to the blind" and "aligning the camera . . . so as to capture the banknote image is often a difficult and time-consuming process" which also "requires use of both hands." *Id.* ¶ 3. As a result of these concerns, Charlson "avoid[s] making spontaneous purchases in a retail environment." *Id.* ¶ 4;

- Ernie Udo, who is a blinded veteran, avers that he "should not have to rely on the goodwill and trust of strangers or third-party technologies that are cumbersome and not always reliable in order to have access to the most basic things like food and clothing." Udo Decl. ¶¶ 1, 4;

- Mark Adreon is blind and considers the currency readers and mobile applications "cumbersome" and "not a reasonable solution to accessing money denominations in real time." Adreon Decl. ¶¶ 1, 2. For example, he cannot confirm the accuracy of change while in line without holding up other customers, and must step away, risking that he will not be believed if he returns to challenge the amount. *Id.* ¶ 3. "The challenge of trying to manage purchased goods, a guide dog, packages or backpacks or other items . . . is not only stressful but unreasonable when you consider other patrons are moving through this process [three] times as quickly." *Id.* Given that Adreon has "traveled to a lot of other countries" where bills are different sizes or have RTF, he knows that "the

experience of using [this foreign] currency is not only efficient but empowering."  *Id.*  In short, "it is amazing to be treated like a person who is not only competent but like everyone else and not requiring 'special' treatment."  *Id.*;

- Linda Schneider, who has been blind her whole life, believes that currency readers "work well enough, but in a crowded place such as a store, it is hard to get it out and use it to identify an unknown bill."  Schneider Decl. ¶¶ 1, 4.  As a result, she continues to "fold[] [her] own money different ways to tell it apart, but that assumes that [she] ha[s] been given correct information about the bill in the first place and that [she] [does not] make a mistake in folding it."  *Id.* ¶ 3; and

- Hannah Fairbairn, who is blind, explains that even when she folds her money a certain way, she has "learned how easy it is to get confused," especially while "managing bags, a white cane, and [] money," since it is "easy to forget last-minute changes, or to hold your wallet or purse oriented in a different way . . . so that bills are not where you think they are."  Fairbairn Decl. ¶¶ 1–4.  Fairbairn finds the currency readers inadequate, as they require "a flat surface and good dexterity," and "not much background noise because the voice or beep is soft."  *Id.* ¶ 5.

While no declaration specifies the precise currency reader or mobile application causing dissatisfaction, Treasury suggests that the plaintiffs' declarations refer to an "older, slower currency reader available commercially during [a] contractor study" rather than the iBill, "which did not exist at that time," and thus the plaintiffs' estimates of the time it take to use a currency reader for regular purchases "are inflated in several respects."  Def.'s Opp'n to Pls.' Third. Mot. at 33.  As for mobile applications, Treasury notes that smartphones are far more common now than in 2008, and that smartphones with flat screens are regularly made accessible to the blind by

use of "screen-reader applications, such as the pre-installed VoiceOver for Apple devices and Talkback for Android devices." *Id.* at 35 & n.12. Nevertheless, Treasury does not dispute that currency readers and mobile applications pose problems in fast-moving retail transactions, particularly when counting change received, and that they are an impractical means of enabling a blind person to work as a cashier.

In light of the significant delay in providing full meaningful access to currency, where external devices, mobile applications, and large, high-contrast numerals offer only incomplete relief, the conclusion is obvious that circumstances have changed since the Injunction Order in this case was originally entered. Yet, as discussed in the next sections, these changed circumstances do not necessarily warrant modification, particularly the modification requested by the plaintiffs.

## C. Modification of the Injunction Would Not Be in the Public Interest

Despite Treasury's urgent need to respond to security threats and the harder-than-anticipated process of designing a workable RTF, Treasury has never moved to modify or terminate the Injunction Order in this case. Rather, Treasury continues to work in good faith to comply, and the plaintiffs, not the enjoined party, now seek relief. As this Court has previously noted, *see supra* n.15, this unusual circumstance has no effect on the standard for considering whether modification of an injunction is warranted. Indeed, in its most recent decision in this case, the D.C. Circuit agreed that the plaintiffs' motion was properly analyzed under Rule 60(b)(5). *See Am. Council of the Blind v. Mnuchin*, 878 F.3d at 366–67; *see also see* Pls.' Third Mot. at 10–11 (analyzing the motion under Rule 60(b)(5)); Def.'s Opp'n to Pls.' Third Mot. at 15–17 (same).

Now that the plaintiffs have carried their burden of establishing that changed

circumstances exist, the question is whether the relief requested is warranted because continued enforcement of the Injunction Order in its current form would be detrimental to the public interest. *See Horne*, 557 U.S. at 447. It is not. Decoupling the two redesigns in order to add an RTF feature to different denominations of bills would divert Treasury resources and attention from pressing anti-counterfeiting measures, as well as require retrofitting of current private sector and Federal Reserve Bank cash-processing machines, posing risks to the global security of U.S. currency with concomitant serious ramifications for consumers, businesses, and the health of the global economy. Given these other interests, and especially where a feasible RTF remains elusive, the public interest would decidedly not be served by modifying the Injunction Order as the plaintiffs request. *See Am. Council of the Blind v. Mnuchin*, 878 F.3d at 368 (concluding that because "institutional reform cases such as this one 'reach beyond the parties involved directly in the suit,'" and "private third parties will unquestionably be affected by the currency redesign," it is appropriate to consider third-party costs as part of the overall "public interest" (internal citations and quotation marks omitted) (quoting *Rufo*, 502 U.S. at 381; *Twelve John Does*, 861 F.2d at 298)).

The plaintiffs argue otherwise, urging consideration of the "continuing detrimental impacts upon the blind and visually impaired as a result of being deprived of meaningful access to currency," Pls.' Third Mot. at 11, which consideration "far outweighs any additional costs to the government and the private sector," *id*. at 15. Moreover, the plaintiffs state that "requiring [Treasury] to adopt an accommodation prior to 2026 would not be disproportionate to the benefit," *id.* at 11, when blind and visually impaired individuals "likely los[e] many millions of dollars each year . . . whether due to inadvertence or bad faith," *id.* at 12.

Although the delay in providing meaningful access to currency imposes real harms on

individuals who are blind or visually impaired, *see supra* Section III.B, those harms, when

partially mitigated by the steps already taken, do not justify delaying an already postponed

security redesign even further in order to prioritize the meaningful access redesign. The risks

that such a course of action would introduce to the global economy and to the security of U.S.

currency are simply too great, particularly when significant testing and development is required

prior to introducing RTF on each bill denomination.[41] If Treasury were required to implement

RTF on the $10 bill by 2020, it would need to "divert extensive resources from its. . . . ongoing

research and development efforts for security features being contemplated for the new family of

notes," Def.'s Answers (Question 14), and would delay the timeline for more secure notes by "at

least two years or possibly more," Def.'s Answers (Question 13(a)), *supra* n.5; *see also* Second

Johnston Decl. ¶ 6.[42] This delay would "leave the nation's currency more vulnerable," Def.'s

---

[41]     In response to the Court's Question 21 ("Clarify whether public and private bodies conduct extensive
testing on each denomination when it is redesigned for security reasons, or whether only the first denomination with
newly designed security features requires extensive testing, whereas testing for later denominations is generally
simpler and less costly."), Treasury responded: "Both government agencies and private industry need to conduct
extensive testing on each denomination when it is redesigned for security purposes." Def.'s Answers (Question 21).
         In response to the Court's Question 22: ("Clarify whether public and private bodies would need to conduct
extensive testing on each denomination that incorporates RTF, or whether only the first denomination with RTF
would require extensive testing, whereas testing for later denominations would be generally simpler and less
costly."), Treasury responded: "Both government agencies and private industry need to conduct extensive testing on
each denomination when it is redesigned for security purposes. Security features and their placement, as well as the
overall design of the bill, differ from one denomination to another. Similarly, once an RTF is incorporated into each
new denomination design, both public and private bodies would have to conduct similar extensive testing on each
denomination. The incorporation of an RTF would necessarily affect the overall design of the bills, and thus would
affect the design of each denomination, including potentially the effectiveness of security features. There is no way
to predict the results of this testing, and, if notes containing any feature failed the testing, there is no way to predict
how much additional development and testing would be required. *See* [First Johnston Decl.] ¶ 3; [First Lambert
Decl.] ¶¶ 5–6. Although testing on the first denomination containing an RTF may inform the testing on subsequent
denominations, the testing on each denomination would still have to be extensive. Any potential interference with a
security feature would always be a key concern. Since security features vary from denomination to denomination,
testing must be done for each denomination. At this point, it is unknown what the results of that testing would be
and how those results may vary from denomination to denomination. An RTF that interferes with one security
feature may pose no issues with another security feature." Def.'s Answers (Question 22).
[42]     In response to the Court's Question 14 ("In the event that the plaintiffs' proposed order is adopted, would
the defendant be forced to prioritize a redesign incorporating RTF over the ongoing security redesign, and, if so,
would this reprioritization jeopardize the security of U.S. currency in any way? Provide any details available
regarding the costs to public and private entities of counterfeit bills."), Treasury responded: "If BEP were required
to add a tactile feature to the existing legacy $10 note by the end of 2020, the agency would have to divert extensive
resources from its efforts to produce a new family of notes by 2026. Adding an RTF to existing notes would require

Answers (Question 14), *supra* n.42, which would "domestically result[] in losses to individuals and businesses[,] . . . increase[] law enforcement workload," and "affect the confidence in and acceptance of U.S. currency internationally." *Id.* This country is at a high risk of counterfeit notes, with "2.9 million counterfeit notes . . . with a face value of $140.7 million" circulating in 2017 alone. *Id.* Due to this risk, Treasury has both the incentive and the statutory duty, *see* 12 U.S.C. § 418, to complete the redesign of the currency as quickly as possible. Indeed, Treasury is "working to accelerate the introduction of redesigned notes to address the increase [in counterfeiting]." Def.'s Answers (Question 14), *supra* n.42; Def.'s Opp'n to Pls.' Third Mot. at 20 ("[E]ach day that passes since the last redesign raises the risk of new security concerns. In redesigning the currency, BEP has every incentive to produce a new and secure bill as quickly as possible."); *see also* Def.'s Opp'n to Pls.' Third Mot. at 3 (explaining that the "Federal Reserve Act requires . . . Treasury to design and produce [U.S.] currency 'in form and tenor as directed by the Secretary' and 'in the best manner to guard against counterfeits and fraudulent alterations'" (quoting 12 U.S.C. § 418)).

The risk to the security of U.S. currency if the security redesign is pushed back for the

---

extensive testing, not only at BEP, but also at the Federal Reserve (cash processing equipment) and by manufacturers of ATMs, vending machines, etc. Testing would have to be done to ensure, among other things, that the new feature did not interfere with existing security features or impede the function of machinery. This testing would pull resources from ongoing research and development efforts for security features being contemplated for the new family of notes. BEP's staff estimates that being required to add a tactile feature to the existing $10 note by the end of 2020 would likely push back the production date of 2026 by at least two years, and an additional two years for each of the other legacy notes. Currency is redesigned primarily to deter counterfeiting. Pushing back the production date for redesigned notes by two or more years would leave the nation's currency more vulnerable. The threat from counterfeiters is constantly evolving, and a new generation of technologically sophisticated security features is needed to meet that threat. To illustrate the magnitude of that threat, in 2017, the last full year for which data are available, 2.9 million counterfeit notes were passed domestically with a face value of $140.7 million. Moreover, counterfeiting is increasing, and the Advanced Counterfeit Deterrence Steering Committee (BEP, Treasury, Secret Service, and the Federal Reserve) is working to accelerate the introduction of redesigned notes to address the increase. The increased value and volume of counterfeit notes passed (that is, used in a commercial transaction) domestically results in losses to individuals and businesses. It also results in an increased law enforcement workload. Furthermore, increased counterfeiting abroad can affect the confidence in and acceptance of U.S. currency internationally. The exact economic impact of counterfeiting is unknown." Def.'s Answers (Question 14).

sake of complying with the plaintiffs' timelines is more than sufficient reason to conclude that modification of the injunction is not in the public interest. The plaintiffs, however, interpret the D.C. Circuit's opinion to hold that in the event Treasury cannot provide more specific concrete estimates of the cost of decoupling, the plaintiffs win, and their timelines are mandated to be adopted. *See* Pls.' Reply at 2 ("Any costs other than the additional costs of decoupling the two redesigns are irrelevant for purposes of this motion."); Pls.' Resp. to Show Cause Order at 3 ("[T]he primary reason for granting Plaintiffs' motion is the failure of [Treasury] to provide concrete estimates of the additional costs of decoupling the accessibility redesign from the security redesign. This fact alone justifies granting Plaintiffs' motion on the existing record."); Pls.' Answers (Question 5).[43] This presumption may be one reason the plaintiffs originally declined the invitation to call government, or any, witnesses to an evidentiary hearing, preferring to "rest their case on the basis of their existing briefs plus the attachments." Pls.' Opp'n to Def.'s Mot. to Stay at 1. The plaintiffs presume too much. While the D.C. Circuit held that it was an abuse of discretion to deny the plaintiffs' second motion for modification of the

---

[43] In response to the Court's Question 5 ("How do the plaintiffs propose for the Court to consider '[a] more concrete estimate of the financial burden of incorporating a raised tactile feature,' as directed by the D.C. Circuit, *Am. Council of the Blind v. Mnuchin*, 878 F.3d at 369, including the difference in costs between a timeline based solely on incorporating RTF and a timeline coupling the incorporation of RTF with other necessary redesigns, *id.*, when the defendant continues to state that the 'exact costs [of decoupling the RTF provision from the next redesign] cannot be known until the Secretary identifies the best technological method for adding a tactile feature to the currency'?"), the plaintiffs responded: "The Court of Appeals recognized that the cost of incorporating the RTF depends upon the application method selected. *Am. Council of the Blind v. Mnuchin*, 878 F.3d at 370. The Court also recognized that the Secretary has not yet selected an application method. *Id.* at 365 n.6. Therefore, the Secretary must comply with the Court's mandate, even if the Secretary has not yet selected the application method. Plaintiffs' understanding of the Court's decision makes perfect[] sense, because it is by no means certain or even likely that the application method selected will have any impact whatsoever on the additional costs of decoupling the security from the accessibility redesigns. Plaintiffs believe that the vast majority of the additional costs to be incurred as a consequence of incorporating the RTF will be incurred even if the security and accessibility redesigns are undertaken in conjunction with each other. *See Am. Council of the Blind v. Mnuchin*, 878 F.3d at 370 ('[W]hether machines such as ATMs must be changed in a redesign separate from the anti-counterfeiting redesign or as part of the same redesign, the private sector will have to incur these costs.'). In any event, the Secretary has narrowed the options for the RTF to two different application methods. *Am. Council of the Blind v. Mnuchin*, 878 F.3d at 365 n.6. The Secretary could have submitted two sets of decoupling cost estimates, one for each application method. Therefore, the fact that the application method has not been finalized is not a defense to the Secretary's failure to comply with the Court's mandate." Pls.' Answers (Question 5) (emphasis omitted).

Injunction Order because of "potential increased costs" posed by the modification, where concrete cost estimates were not available, *see Am. Council of the Blind v. Mnuchin*, 878 F.3d at 367–71, nothing about that holding prevents fresh consideration of the record as it exists *now*, with updated and supplemental declarations and more detailed responses from both sides to the Court's questions.

In light of Treasury's explanation of the security risks that would result if it were required to prioritize the meaningful access redesign over the security redesign in order to meet the plaintiffs' timelines, and especially where no workable RTF yet exists, the plaintiffs' proposed modification of the injunction would not be in the public interest.

### D. The Proposed Modifications are Not Suitably Tailored to Resolve the Changed Circumstances

For many of the same reasons that the plaintiffs' modification of the injunction would not be in the public interest, their modification is not suitably tailored to resolve the specific problems created by the change in circumstances they identify: the prolonged delay in redesigning currency. The Supreme Court has explained that the "focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances" and that deference to "government administrators, who have the primary responsibility for elucidating, assessing, and solving the problems" is appropriate. *Rufo*, 502 U.S. at 391, 392 (internal quotation marks and citation omitted). Although the plaintiffs have successfully identified the lengthy delay in redesigning currency as a change in circumstances, they have offered no reason to believe that modifying the injunction to require Treasury to decouple the meaningful access redesign from the security redesign would "resolve the problems created by th[at] change in circumstances," *id.* at 391, and achieve what they seek, which is currency that is meaningfully accessible by specified timelines. Treasury has explained there is

not time to provide meaningful access to the blind with any new design feature *other* than RTF, Def.'s Answers (Question 18), *supra* n.38, and that circulation of currency with an RTF that meets the standards required of U.S. currency within the timelines proposed would be impossible and infeasible, Def.'s Answers (Question 27), *supra* n.34.

### 1. *The Plaintiffs' Proposed Modification Would Require RTF, Yet No RTF is Ready for Circulation*

The plaintiffs demand that Treasury "should continually explore all options for the purposes of providing meaningful access to currency," but that "this is not a reason to delay implementation of the most effective accommodations that are currently available." Pls.' Answers (Question 7).[44] The plaintiffs are coy in identifying the "most effective accommodations" referenced, but presumably they mean RTF. This stance is reckless and at odds with their position, elsewhere, decrying iBills as "cumbersome and not always reliable," *see supra* Section III.B. Whereas an iBill has an accuracy rate of close to 100 percent, the plaintiffs evidently believe that the version of RTF now available, which has an accuracy rate varying from 52 to 90 percent in small groups of individuals who are not necessarily representative of the entire population, should be applied to currency immediately. *See* 2016 Wash Decl. ¶ 3; First Olijar Decl. ¶ 10; Def.'s Answers (Question 19), *supra* n.30. Treasury has explained that attempting to circulate currency with RTF in its current state would give a false sense of security to individuals who rely on it instead of other methods of differentiating currency, and that

---

[44]     In response to the Court's Question 7 ("The defendant has described numerous concerns about RTF, explaining that 'many of the assumptions the [BEP] made in 2010 are no longer valid.' Def.'s Supp. Status Rpt. (Dec. 20, 2018) ¶ 13. Do the plaintiffs believe that the defendant should explore other, previously discarded options for providing meaningful access to currency, such as producing notes in different sizes? Would the plaintiffs support such a reevaluation even if this further delayed the development of accessible currency?"), the plaintiffs responded: "The Secretary should continually explore all options for the purposes of providing meaningful access to currency. However, this is not a reason to delay implementation of the most effective accommodations that are currently available. Therefore, Plaintiffs would not consent to further delay in the development of accessible currency." Pls.' Answers (Question 7).

introducing new versions of currency necessarily requires testing, educational campaigns, and a

significant investment of resources, from both the public and the private sector—resources that

would be poorly spent if devoted to an imperfect version of RTF and then an entirely new RTF

or new version of the bill were introduced shortly thereafter. *See* Def.'s Opp'n to Pls.' Third

Mot. at 20–22, 29; Def.'s Answers (Question 13, 21, 22, 25), *see supra* nn. 5, 41.[45]  Demanding

---

[45]     In response to the Court's Question 13(b) ("In the event that the plaintiffs' proposed order is adopted, list . . . (b) the specific and potential estimated costs associated with: (i) redesigning, manufacturing and distributing the $10 bill with any new feature(s), including RTF, to provide meaningful access to currency for the blind and visually impaired, (ii) education, (iii) upgrading banking equipment hardware or software, (iv) testing costs, (v) costs to replace bills that wear down, and (vi) any other costs the defendant believes to be relevant."), Treasury responded: "(b)(i) Since BEP has not yet determined the technological method (application method) for adding a tactile feature to currency, it is impossible to provide concrete cost estimates for any effort to add an RTF to the legacy $10 note at this time.  Furthermore, extensive testing in both the private and public sectors would be required.  As noted in prior filings, it is impossible to predict how well any proposed feature will do in testing. *See* [First Johnston Decl.] ¶ 8. Moreover, should the feature fail any tests, costs would rise significantly, but not predictably.  Should failure occur, BEP would undertake a root-cause analysis to determine why.  This process could be relatively short or lengthy, depending on the causes and their nature.  Once a cause is discovered, attempts to remedy the problem would begin. The remediation process is also of unpredictable length.  It may involve multiple rounds of additional testing, as the technology and engineering offices attempt to find a solution.  This adds a great deal of uncertainty to cost estimates. (b)(ii) Educating the public about an RTF added to the legacy $10 note would be dramatically different from and far more complex than any previous educational effort.  The RTF is quite different from any existing currency feature and would likely require different educational approaches.  Effective public education regarding a tactile feature would require designing and implementing an entirely new component of currency education to explain the visual and tactile features of authentic notes both to the public at large, as well as to the blind and low-vision community. Defendant cannot estimate the potential costs of developing, testing, and deploying a currency education program that incorporates tactile educational materials and methods because no such program regarding U.S. currency has been conducted in the past.  Additionally, if an RTF were incorporated into the legacy $10 note and a new $10 note were launched in a relatively short period thereafter, it would be necessary to develop two comprehensive but different educational programs, with the second also launched in a relatively short period after the first.  (b)(iii) As stated in [First Lambert Decl.], upgrades to banking equipment hardware and software include hardware and software for currency processing equipment at the Federal Reserve Banks, as well as for other banknote equipment such as automated teller machines ("ATMs") and machines used in gaming, retail, amusement, and food/beverage businesses.  The Federal Reserve Banks use 128 specialized high-speed currency-processing machines located at the 28 Reserve Bank offices across the country to separate notes of sufficient fitness from damaged or suspected counterfeit notes.  Incorporating an RTF into any denomination of Federal Reserve notes would require ensuring that it does not interfere with or degrade the ability of the high-speed currency-processing machines to detect the overt and covert security features of the notes.  Determining whether an RTF would impair the ability of those machines to make all of the necessary detections and to determine the fitness of a note would require extensive testing, and, potentially, adjustments to both software and hardware for subsequent retesting.  The Federal Reserve upgraded its optical sensors in 2014 at a cost of $21 million over a five-month implementation period.  It is believed that such testing for an RTF would be time-consuming and expensive and could conceivably exceed the time and expense of the upgrade in 2014.  The Federal Reserve would expect industry participants in the banknote supply chain, such as banknote equipment manufacturers ("BEMs"), to incur far greater costs due to implementation of an RTF.  Every BEM, from a company that makes bill acceptors to a company that makes ATMs and even those that make high-speed casino and central bank machines, would need to complete extensive testing.  Every such device has picking and feeding mechanisms and a transport system that could be affected by an RTF.  These costs would be duplicated in relatively short succession if an RTF were added to the legacy $10 note and then a new design of the $10 note were launched in a relatively short period of time thereafter.  The following cost estimate is based on

public testimony and the Federal Reserve's relationship with the BEMs through the United States Cash Machine Group, which was established to improve communication between the Federal Reserve and BEMs. The number of machines that could be affected by an RTF, such as ATMs, gaming, retail, amusement, and food/beverage, is estimated at more than 9 million. Previous congressional testimony has estimated that the addition of an RTF to the currency could require hardware changes costing, on average, $350 for each such machine. Adding an RTF could require a one-time upgrade of the picking and feeding mechanism in each machine. Therefore, assuming all machines required hardware changes, those changes could cost up to approximately $3 billion. Software changes may also be needed, which would entail additional costs. . . . (b)(v) Since U.S. currency is not recalled or demonetized, legacy $10 notes issued with an RTF would co-circulate with non-RTF $10 notes for many years. The denominations of Federal Reserve notes that are circulated more widely become worn more rapidly, and require replacement more frequently, than notes in less widely circulated denominations. The cost of replacing a currency note depends primarily on the cost of manufacturing the note, which differs based on the presence or absence of security features on a given denomination. The cost of adding an RTF to a Federal Reserve note is not yet known, but would likely increase the cost of replacing notes with an RTF compared to the cost of replacing a note of the same denomination without an RTF. The Federal Reserve Board expects that users may handle notes with an RTF more than notes without an RTF, as users gain familiarity with the characteristics of the RTF and as they attempt to use the RTF to denominate the note. This is true not only of blind or low-vision users, but also of the public at large. Therefore, a note with an RTF could wear down more rapidly than a note of the same denomination without an RTF because it is handled more than non-RTF notes. *See* [Second Lambert Decl.] ¶ 25. Finally, the circulation and use of notes with an RTF will cause wear on the RTF itself. Because Federal Reserve notes do not currently contain RTFs, it is not possible to know the extent to which normal circulation and handling of, for example, a $10 note would wear down an RTF on such note. Also, as stated above, the RTF itself is likely to be handled more as users seek to become familiar with it and attempt to use it for denomination. The extent to which such handling would wear down the RTF feature itself is not known. Taking all of these factors into consideration, it is unknown at this point how adding an RTF to a note will affect its circulation life, but it is reasonable to assume that it will increase the general rate of wear. (b)(vi) BEP's experience in producing the current family of notes highlights the importance of extensive preproduction and full production testing to reduce potential risks. The last note to be redesigned was the current $100 note. For the first time, BEP was producing a note that included a 3-D security ribbon. Unfortunately, once large-scale production began, BEP discovered that creases were being produced in a large number of notes, rendering them unsuitable for circulation. It took extensive effort and time to perform a root-cause analysis and determine appropriate remedies. These unexpected problems delayed the release of that $100 note by approximately three years. Later reviews determined that insufficient preproduction testing contributed to the problem in the production phase. Unexpected problems, such as creasing, can occur at any point in the development process. The remedy may be simple and inexpensive, or complex and very costly." Def.'s Answers (Question 13(b)) (footnote omitted).

In response to the Court's Question 25 ("What specifically is the harm, including any economic costs, of introducing an initial version of RTF on the $10 bill that may need adjustment to improve accuracy, durability, or other features before incorporation in the other denominations?"), Treasury responded: "Having such a single-feature design change relatively soon before a bigger design change could increase public confusion about the features of authentic Federal Reserve notes, especially since both designs would co-circulate for a number of years. The fact that the United States does not recall or demonetize older note designs adds to the stability and attractiveness of United States currency as a world reserve currency. Because U.S. currency is not recalled or demonetized, however, legacy $10 notes issued with an RTF would co-circulate with older, non-RTF $10 notes for many years—and, later, with the new family of notes potentially incorporating a (possibly improved) RTF. The Currency Education Program currently estimates that the lifespan of a $10 note is approximately 4.5 years. *See* Lifespan Data, https://www.uscurrency.gov/life-cycle/data/life-span (last visited Feb. 7, 2019). The chance that a given user would receive a $10 note with an RTF, therefore, would be very limited in the first few years following issuance of $10 notes with an RTF. The primary focus of public currency education when a new note design is introduced is twofold. First, the public must be educated about what the new note looks like, in order to avoid the possibility that the new note might mistakenly be considered to be counterfeit based solely on the design change. Any design change which materially alters the appearance of a note, even if only targeted at a specific audience, requires educating the general public about the design change. This ensures that they understand what a genuine banknote looks like. For these reasons, currency education programs are targeted to the entire public and must educate the entire public about all features, even features of a new note that might be targeted to a specific part of

that an RTF method be incorporated into U.S. currency immediately—regardless of whether it is accurate, confusing, capable of being processed in the machinery that runs our economy, or leaves currency vulnerable to security threats—is frankly irresponsible, not to mention irreconcilable with the plaintiffs' argument, elsewhere, that an accurate, reliable means of identifying currency is necessary to integrate the blind into the economy.

The plaintiffs emphasize that they are not demanding RTF—or any other specific improvement—as a means of providing meaningful access to currency. *See* Pls.' Answers (Question 6).[46] Yet this concession does little to alleviate the problems posed if Treasury were

---

the public such as a low-vision feature like the large numeral '100' on the back of the redesigned $100 note. Second, the education program must ensure that the public understands the security features on the new note, and how to use them. This ensures that the public is better-equipped to know that a new design note is authentic compared to a counterfeit note that attempts to exploit unfamiliarity with new designs as a means of passing counterfeit notes. The currency education program must be international in scope. Federal Reserve notes are used around the world as a store of value and medium of exchange. Any changes to the appearance of the notes can cause confusion. If people are not informed about the appearance and security features of a genuine Federal Reserve note, they are at greater risk of becoming victims of counterfeiters passing fake notes. The potential for confusion— and the exploitation of that confusion by counterfeiters—is greater in cases where there are multiple circulating designs of authentic notes, which appear to be similar but have slight differences in design or security features. In addition to educating individual currency users, the currency education program addresses institutional users such as banks, currency exchange, and retail businesses that play an important role in facilitating currency circulation. The confusion that can arise from having multiple circulating designs of authentic notes could cause these entities not to accept legitimate notes, which itself could adversely affect confidence in United States money. Accordingly, effective currency education programs must be broad in scale and address the general public both domestically and internationally. As part of the currency education program, the Federal Reserve Board produces printed, online, and video and audio materials for use by merchants, educators, law enforcement, and financial institutions to assist them in identifying authentic Federal Reserve notes. Any single change to a note design, such as a change that only adds an RTF to a single denomination, would require updating all of those materials to reflect the new design. All of the foregoing requirements for currency education programs apply with equal strength to each denomination of currency. Aside from the potential for confusion, incorporating an RTF into the legacy $10 note and again in connection with the redesign of currency for counterfeit deterrence would require undertaking these educational efforts multiple times. Assuming an RTF could meet all established durability, manufacturability, and functionality criteria, the question of effectiveness must also be considered. In particular, the studies and research conducted to date indicate that RTF users have a relatively low level of confidence in the accuracy of their denomination determination. In addition, the lack of durability of the RTF may provide the segment of the population that attempts to use it with a false sense of confidence. In this scenario, it would leave them vulnerable to making mistakes and being taken advantage of, resulting in users being in a worse situation than they had been in previously. As a result, supplemental methods that are nearly 100% accurate, such as readers and/or currency denominating applications, have recently been introduced in many countries." Def.'s Answers (Question 25).

[46]     In response to the Court's Question 6 ("Explain how the plaintiffs have met their burden of establishing that changed circumstances are significant enough to warrant relief, *Am. Council of the Blind v. Mnuchin*, 878 F.3d at 366–67, when one circumstance is that the defendant's development of RTF is not yet sufficiently advanced to meet the plaintiffs' proposed timelines, or even to provide concrete cost estimates of the cost of modifying the injunction?" (citation omitted)), the plaintiffs responded: "The Court of Appeals recognized the challenges in

required to meet the plaintiffs' timelines, as Treasury has offered persuasive evidence that,

although other methods of providing meaningful access to currency have been studied, RTF

remains the most feasible method.  *See* Def.'s Answers (Question 18), *supra* n.38 (noting that if

these non-RTF options were reconsidered it "would essentially turn the clock back to 2011,

requiring BEP to undertake the long and complicated experimental process, while likely

confirming that those options are not feasible").  Moreover, in light of the extensive testing and

study required for currency redesigns, Treasury has explained the impossibility of developing,

testing, and producing currency with a feature other than RTF by the plaintiffs' timelines.  *See*

*id.*  Even if Treasury attempted to apply the currently available RTF, which does not meet the

specifications required for U.S. currency, to the "legacy" $10 note with no new security features,

"the entire process [of bringing that note into circulation] will likely take at least three years and

potentially more, depending on the results of the testing," including a year of testing "to ensure

that the feature could be effectively integrated . . . with [current] security features" and another

year "to ensure that BEP [is] able to produce the RTF in the volumes needed," plus two years for

---

developing a tactile feature, and also recognized that the Secretary had not yet selected an application method for that feature.  *Am. Council of the Blind v. Mnuchin*, 878 F.3d at 365 & n.6.  However, the Court nonetheless required the Secretary to provide concrete estimates as to the cost of decoupling the security from the accessibility redesign. The Secretary must therefore comply with the Court's mandate, even assuming the existence of the circumstances stated in the Court's question.  In any event, the Secretary has not asserted that he is unable to meet the deadlines contained in Plaintiffs' proposed order.  Nor has he asserted that he is unable to provide the concrete cost estimates required by the Court of Appeals.  Plaintiffs also do not believe that the extent to which RTF has been developed is a "*changed circumstance*" that should be taken into account in determining whether continued enforcement of the injunctive order is detrimental to the public interest.  *Rufo*, 502 U.S. at 384.  The extent of RTF development was not considered by the district court in issuing its injunctive order, and should not be considered in this Court in deciding whether relief is warranted.  Plaintiffs observe in this regard that the injunctive order dated October 3, 2008 did not require incorporation of a RTF.  Nor do Plaintiffs seek incorporation of a RTF in their motion to modify the injunctive order [].  The proposed order merely requires accessibility by specific dates, as opposed to mandating specific methods of providing accessibility [].  Therefore, any delays in developing the RTF do[] not qualify as a changed circumstance for purposes of the pending motion.  Finally, a party seeking modification of the decree must demonstrate changed circumstances.  However, the existence of changed circumstances is not a defense to a party resisting modification of the decree, especially when it is due to the Secretary's willful failure to implement an effective method of providing accessibility.  *See NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 36 (D.C. Cir. 2000) (noting that "*[s]elf-imposed hurdles and hurdles*" do not qualify as changed circumstances).  As noted [elsewhere], the Secretary's failure to develop an effective feature is due to his own lack of reasonable diligence."  Pls.' Answers (Question 6) (some internal citations omitted) (emphases in original).

private industry "to test and verify that the potential RTF could work effectively in banknote counting machines, ATMs, and other machines." Def.'s Answers (Question 24), *supra* n.37; Second Olijar Decl. ¶¶ 6–10; *see also* First Lambert Decl. ¶ 9 ("Adding an RTF to the existing $10 Federal Reserve note rather than awaiting the next redesign would require the foregoing testing procedures to be undertaken once, and then undertaken a second time in connection with the scheduled redesign.").

The delay in choosing and implementing in U.S. currency a workable RTF is frustrating, but Treasury has provided sufficient explanation of the testing and process required for the redesign of each bill denomination to rebut the plaintiffs' allegations that the delay is contrived or an issue of bad faith. The solution to this delay is *not* simply to ignore Treasury's considered judgment, based on its extensive experience in the process and testing necessary for redesigning and circulating new versions of currency, and to require circulation of U.S. currency that Treasury has sworn would be inadequate. The solution, rather, is to rely on the partial steps Treasury has already offered (currency readers, high-contrast numerals, etc.), while improvements continue to be made to develop other methods of providing meaningful access to currency.

### 2. *Treasury Attests That it is Impossible and Infeasible to Meet the Plaintiffs' Deadlines*

By purporting to leave the means of compliance entirely to Treasury's discretion, but also demanding compliance with strict deadlines despite record evidence that those deadlines cannot be met by any feature except RTF, even though no RTF meets Treasury's specifications, the plaintiffs demand the impossible. This Court will not. *See AHA II*, 867 F.3d at 167 ("[J]ust as a court may not require an agency to break the law, a court may not require an agency to render performance that is impossible.").

The plaintiffs protest that Treasury "present[ed] no factual basis for the infeasibility defense" and "should . . . be required to define the scope of" the "infeasibility defense" "prior to . . . an evidentiary hearing on this issue," Pls.' Resp. to Show Cause Order at 1–2, but they overlook both the extensive record that has been generated in this case and the necessity of granting appropriate deference to the government agency responsible for implementing the injunction. *See Rufo*, 502 U.S. at 392. While the plaintiffs are correct that Treasury only directly cited "infeasibility" in response to the Court's supplemental questioning, that questioning was in turn prompted by Treasury's original opposition to the plaintiffs' motion, which consistently explained that "the exact costs" of decoupling the RTF provision from the next redesign "cannot be known until [Treasury] identifies the best technological method for adding a tactile feature to the currency." *See* Def.'s Opp'n to Pls.' Third Mot. at 2, 14–15, 21–22; First Olijar Decl. ¶ 12

Treasury has explained that neither the circulation of RTF currency nor the provision of concrete cost estimates and timelines can be achieved or accelerated until after an RTF application method is selected, under the current plan, in December 2019, and has provided extensive detail on the testing and other preparations required by private parties and the government prior to the introduction of new currency. Thus, the record adequately supports the conclusion that it would not be feasible for Treasury to meet the plaintiffs' timeline for providing meaningful access to currency, and that the plaintiffs' proposed modification is neither in the public interest nor suitably tailored to the changed circumstances. As an alternative, the plaintiffs proposed that Treasury be ordered to redesign, by December 31, 2026, whatever denominations were feasible to redesign by that date. *See* Jt. Status Rpt. (June 10, 2019) at 2. For the reasons discussed at length, the public interest militates strongly against setting a specific deadline for providing meaningful access to currency that is decoupled from the security

redesign, especially where Treasury already plans to begin circulating the redesigned $10 in 2026.

### 3. *Despite Changed Circumstances, the Core of the Injunction Order Remains Valid*

Although, with the benefit of the expanded record, the plaintiffs' motion must be denied, the lengthy delay in the redesign has undeniably resulted in real harm for individuals with visual impairments and for the security of U.S. currency. Until Treasury completes its process of providing meaningful access to currency, individuals who are visually impaired or blind are denied full access to the benefits of that currency, including economic and volunteer opportunities, and the currency that does exist is vulnerable to security threats that Treasury has yet to adequately counter. The core of the 2008 Injunction Order was to require Treasury to concurrently meet its twin obligations to provide meaningful access to currency and to guard the security of that currency. The record in this case amplifies why that core still holds. Both redesigns have been delayed for unanticipated, independent reasons, yet RTF, especially in its nascent form, is not fully independent from any new security features. Any RTF must work in concert with any new security feature, and a change to either feature requires updates and testing for the private and public sector.

Meanwhile, Treasury has implemented and publicized a free currency reader program, fostered the development of mobile applications that denominate currency, added colors and large, high-contrast numerals to bills, and done exhaustive research and testing to develop an RTF that is durable, effective, accurately distinguishable, and compatible with public and private cash-processing machinery. With these advances, the plaintiffs have come a long way toward securing each of the forms of relief they originally requested in their FAC, and Treasury has demonstrated its commitment to complying with the Injunctive Order. It is not possible, at this

time, to offer the plaintiffs anything more than what their injunction has already achieved.

With the two redesigns remaining coupled, Treasury has every incentive to redesign currency as quickly as possible, and has been working in good faith to do so. No modification, least of all the modification the plaintiffs propose, is needed to enforce those incentives. Moreover, demanding strict adherence to deadlines for providing meaningful access would do nothing to address the root causes of the delay: required security updates and ongoing difficulties developing a durable, workable, and accurate RTF. When production of a bill with RTF that meets Treasury's reasonable specifications by the plaintiffs' deadlines is impossible and infeasible, and when doing so would cause Treasury to "divert extensive resources from its efforts to produce a new family of notes by 2026," "leav[ing] the nation's currency more vulnerable" to a "constantly evolving" threat of counterfeiters," Def.'s Answers (Question 14), *supra* n.42, the conclusion, once again, is that the injunction should not be modified because the "burden of decoupling the timelines . . . render[s] the Secretary's ongoing violation of the Rehabilitation Act . . . equitable." *See Am. Council of the Blind v. Mnuchin*, 878 F.3d at 368.

## IV.    CONCLUSION

For the foregoing reasons, the plaintiffs' Renewed Motion to Modify the Court's Injunction Order Dated October 3, 2008 is DENIED.

An appropriate order accompanies this Memorandum Opinion.


Date: August 22, 2019


_____
BERYL A. HOWELL
Chief Judge